# Exhibit 8

HEIDI    SEEKAMP

et    al

vs.

IT'S   HUGE,   INC.

FUCCILLO   AUTOMOTIVE   GROUP

et   al

In  The  United  States  District  Court  For  The  Northern  District  Of  New  York

civil  case  no.  1 : 09 - CV - 00018  (LEK -- DRH)

# EXPERT    REPORT

# ON

# AUTOMOBILE    TRANSACTIONS

by   David   A.   Stivers

# S C O P E   O F   R E P O R T

# I N T R O D U C T I O N

I have been engaged by Lemberg & Associates, LLC, counsel for the Plaintiffs, in the case of  Heidi Seekamp, et al   vs.   It's Huge, Inc. & Fuccillo Automotive Group, Inc., et al  pending in the United States District Court for the Northern District of New York, identified with the civil class action case number of 1:09-CV-00018 (LEK-DRH).   I have been asked to examine court filings, relevant documents, deposition transcripts, and any other information I deem appropriate with respect to this case, in order to determine whether, based on my background, experience, and knowledge in the field of vehicle transactions, I can offer independent opinions on certain issues in the case.

A list of the documents, testimony, and/or materials I have considered in formulating the opinions published herein may be viewed before the epilogue. A copy of my resume is attached to the conclusion of this report, in addition to a copy of my engagement letter in this case which sets forth my compensation for my study and testimony in this matter. A listing of all other cases in which I have testified at trial, deposition, arbitration, and/or court-ordered mediation, including but not limited to those in the preceding four years, is also attached. My $250 hourly rate for work as a consultant and expert witness is the identical rate for all of my time devoted to this case.

Based on my review of the evidence and on my knowledge and experience, I have reached several expert opinions that are described in detail. This report deals with the "etch" policy in the certificate of Universal / Fuccillo rather than with the "etch" itself (an "etch" impression on the automobile glass). My opinions are summarized following the Table of Contents:

# T A B L E    O F    C O N T E N T S

***page  number(s)***            ***chapter title***


1                        TITLE  PAGE


2                        INTRODUCTION


3                        TABLE  OF  CONTENTS


4                        OPINIONS


5 - 23                    BASIS  FOR  OPINIONS


24 - 27                  DOCUMENTS  REVIEWED


28                       EPILOGUE

# O P I N I O N S

These are my expert opinions, based upon a reasonable degree of certainty and expertise in the study of automobile marketing and transactions:

**1.** It's Huge, Inc. and Fuccillo Automotive Group, Inc. et al (hereinafter "Fuccillo", the "dealer", or the "dealership") and also Universal Automotive Services, Inc. (hereinafter "Universal") implied that the coverage was provided by a real insurance company or warranty company that stood behind the certificate, when in fact there were no assets, intention, or valid mechanism to provide anything to the "etch"-buying customer except the Universal / Fuccillo certificate. This scheme violated industry standards.

**2.** If the "etch" certificate is insurance, the issuer must disclose that the benefit to the consumer in the event of a total loss cannot exceed the deductible under the consumer's primary insurance policy or other auto theft-related expenses. This disclosure was not included in the Auto Theft Security Discount form issued by Universal / Fuccillo that was presented to Ms. Heidi Seekamp and to others similarly situated.  This omission violates auto industry standards.

**3.**  Universal / Fuccillo's Auto Theft Security Discount "etch" certificate was represented to be a product bought for value when in fact it had little or no value to the consumer(s).  This scheme violates industry standards.

**4.** Ms. Seekamp and those similarly situated lost the difference between the cost to them of the "etch" and the cost of its installation.  This scheme violates industry standards.

# B A S I S    O F    O P I N I O N S

**1.** It's Huge, Inc. and Fuccillo Automotive Group, Inc. et al (hereinafter "Fuccillo", the "dealer", or the "dealership") and also Universal Automotive Services, Inc. (hereinafter "Universal") implied that the coverage was provided by a real insurance company or warranty company that stood behind the certificate, when in fact there were no assets, intention, or valid mechanism to provide anything to the "etch"-buying customer except the Universal / Fuccillo certificate. This scheme violated industry standards.

**Discussion:**

In its opinion dated filed March 13, 2010, the Court summarized the case as follows:

"On or about June 12, 2007, Plaintiff entered into a purchase and sales agreement with Defendant, Fuccillo Lincoln Mercury, Inc. ("Fuccillo Hyundai") for the purchase of a 2007 Hyundai Elantra. Compl. (Dkt. No. 1, Attach. 2, Ex. A); Defs.' Mot. at 2. As part of the transaction, Plaintiff enrolled in an Auto Theft Security Discount Guarantee program ("ATSD"). Compl. ¶ 16. The ATSD cost the Plaintiff $295. Compl. (Dkt. No. 1, Attach. 3, Ex. B). The ATSD involved a form of "window etching" in which the vehicle's identification number ("VIN") was permanently engraved into its window. Compl. ¶ 2. Advertised as a theft deterrent, a VIN is traceable to a specific vehicle, making it more difficult to sell car parts etched with the number.

Compl. ¶ 2. Defendant Fuccillo Automotive is purported to have sold ATSD policies to consumers through Fuccillo Hyundai and its subsidiaries. Compl. ¶ 14. The ATSD policies were issued by Defendant Universal Automotive Services, Inc. ("Universal"). Defs.' Mot. at 2. Under the policy, Defendant Universal would indemnify Defendant Fuccillo Hyundai if the dealer had to issue a credit towards a new vehicle purchase due to theft. Defs.' Mot. at 2. Under the terms of the ATSD, if the Plaintiff's car was declared a total loss, due to unrecovered theft, or if it was recovered but still considered a total loss by Plaintiff's insurance company, the authorized dealer (Fuccillo Hyundai) would provide Plaintiff with a 10% discount towards the purchase of a replacement vehicle, in an amount up to $2000. Compl. (Dkt. No. 1, Attach. 3, Ex. B). [footnotes omitted.]"

## History And Background Of Etch Sales

In the 1980's and early 1990's there was an increase in vehicle thefts. Auto dealers and police departments started promoting the etching of either a special code or the vehicle identification number (VIN) on the windows of a car. Sometimes a decal was used instead of etching onto the automobile's glass. By 2000, ignition locks had improved dramatically and most of the major auto manufacturers were embedding the VIN in at least seven locations on vehicles. That made the "etch" simply one more place the VIN appeared on a vehicle. It was commonly presented to consumers who might buy an "etch" product that a prospective thief would see the etch and back off, and steal a different car. However, thieves in the stolen car business would simply scrape off the decal, obliterate the etch (by using the same kind of acid used to install it) or replace (or discard) the etched windows with similar windows that were not etched. Most police departments have stopped promoting this program.

Sale of "etch" or decals continues among car dealers that elect to do so. The actual cost of "etch" installation varies but typically ranges from $6 to $25. However, dealers sell them for inflated prices, sometimes as much as $600. Obviously the sale of this "etch" product is highly profitable to the auto dealers.

## How An Etch Sales Program Works

The traditional etch program works as follows: "Etch" is either installed by the car dealer by the use of kit provided by the "etch" vendor, or the dealer engages an independent auto glass service company to do "etch" installation. A "vendor" company is selected and engaged to issue a certificate for "etch". The sale of the "etch" may simply be a warranty or a policy of insurance, depending upon the law of the state in which the vehicle with the "etch" is sold. In either case, the program sponsored by the "etch" certificate company is essentially the same, and the certificate typically states that the VIN or another number has been placed on the windows of the car as an "etch" or as a decal. The certificate either states or strongly implies that the certificate issuer maintains a registry of the "etch" policies it sells, identifying the car purchaser. It is also implied that participating car dealers would also keep a record of the "etch" sale so that in the future it could determine who were proper claimants. If "etch" is sold to people in a state where the law provides that it is insurance, it is my understanding that, as is usual with insurance, the issuer of the policy is required to keep certain records and maintain certain legal financial reserves to cover claims.

"Etch" numbers may also be registered with one's local or state police. This would now be superfluous because the state departments of motor vehicle place the VIN on car registrations and the VIN can be searched in the Department of Motor Vehicles (DMV) computer to identify the owner of the car. An "etch" number is not typically used by law enforcement for auto identification. If one is stopped by a police officer, he may use his patrol car computer to verify the license plate, identity of the registered owner, and any report of theft or other criminal conduct on the part of the owner or driver.

"Etch" certificate may provide money to the owner of the vehicle if the vehicle is stolen and not recovered intact, or as in the case of the Universal certificate sold by Fuccillo, provide a discount to the purchaser to replace the automobile at the original dealership at a sale price set by the dealership. Generically the former promise to pay money is a form of casualty insurance. The latter promise of a discount often is not a genuine savings to a consumer, who may end up paying a price other automobile shoppers could negotiate.

Universal / Fuccillo "etch" certificate contains the following provisions: First it is titled: "Auto Theft Security Discount", and after boxes for information regarding the "Applicant" name, the document is then called a "GUARANTEE". The body of document's first page states: "(The Auto Theft Security Discount) guarantees to the above named Purchaser / Lessee of the described vehicle that the system installed will be an effective deterrent against Vehicle Theft." The reverse side of the certificate states:

II.  Auto Theft Security Discount

If your Vehicle as described on the reverse side of this page is declared a Total Loss due to unrecovered theft or recovered and is declared a Total Loss which occurred as a direct result of the original theft  by Your primary insurance company within (3) years of the date of purchase, finance or lease, then, subject to the conditions and limitations set forth below, the Authorized Dealer will discount the following: if the original motor Vehicle was a NEW motor Vehicle as of the date of purchase, finance or lease, the Authorized Dealer will provide You with 10 % discount towards the purchase of a Replacement vehicle in the amount of up to $2,000.  Replacement Vehicle shall be amount equal to or greater than the value of the original Vehicle.

If your Vehicle as described on the reverse side of this page is declared a Total Loss due to unrecovered theft or recovered and is declared a Total Loss which occurred as a direct result of the original theft  by Your primary insurance company within (3) years of the date of purchase, finance or lease, then, subject to the conditions and limitations set forth below, the Authorized Dealer will discount the following: if the original motor Vehicle was a USED motor Vehicle as of the date of purchase, finance or lease, the Authorized Dealer will provide You with 10 % discount towards the purchase of a Replacement vehicle in the amount of up to $2,000, but not to exceed 50% of the original N.A.D.A. value as of the date of purchase, finance or lease.

Section VI is titled a "Guarantee Period".

In the Documents Reviewed section at the conclusion of my report are these items, that illustrate industry standards, some of which are applicable to "etch" certificates and issuer standards:

40.  code of ethics published by the National Automobile Dealers' Association

41.  ethics guide published by the National Automobile Dealers' Association

**Issuer Standards:**

A company in the retail automobile industry, whether an auto dealer or "etch" administrator, making those kinds of representations is expected to be a reliable organization capable of carrying out the responsibilities it undertakes. This means that it has some financial capacity to stand behind claims in the event that its guarantee is not being met by another "etch"-participating entity. It also means that it has reliably kept sufficient records so that it would be able to research and verify to which customers "etch" certificates have been issued, when they were issued, and any claims made against those "etch" certificates. The front of the Universal / Fuccillo certificate lists the customer as "Applicant". To describe the purchaser as an "Applicant" suggests that somebody reviews the issuance of each and every Universal / Fuccillo certificate and approves it. At the bottom of the front of a certificate, the buyer signs a statement saying "I do choose to register my Vehicle", when in fact no useful registration occurs. In a state such as New York, where "etch" policies can be sold under limited circumstances without being insurance, if it is insurance, such issuers are expected to adhere to the extensive rules and standards established for that regulated industry and among those regulations are those requiring that adequate financial reserves be maintained and that pertinent records be kept. Additionally, personnel in certain aspects of the sales process must have a license (including background checks) by the state to carry out those functions. "Applicant" means that somebody reviews the issuance of the certificate and approves it.

It is an industry standard that one permitting an automobile dealer to issue its "etch" certificates has a contract with such selling automobile dealers. Otherwise, neither party has a full understanding of what the counterparty is obligated to do.

Materials I have reviewed show Universal met none of these standards. Evidence of this failure include:

    a.  Universal had no office except a clerk.

    b.  There was no regular staff.

    c.  The sole officer, Mr. Nick Souris, was rarely on the premises.

    d.  The telephone number on the policy was not answered in the ordinary course of business.

    e.  There was no review of the "Applicant".

    f.  Universal did not maintain any financial reserves, to pay claims.

    g.  From Mr. Nick Souris' testimony it appears that no compliance wa made by Universal with any discernible regulations which might apply, financial, record keeping, or otherwise.

    h.  No officer or any member of its "staff" was licensed to deal with an insurance product.

    i.  Mr. Nick Souris testified that no claims were ever made, despite the thousand of Universal "etch" policies sold by Fuccillo.

    j.  There was no written agreement between Universal and Fuccillo.

    k.  All money collected on each sale, $295 per certificate, either remained with the dealer or was remitted to William Fuccillo, Jr., except for $4 per certificate which was retained by Universal.

As my opinion states, whether or not the product was insurance, there were no assets, intention, or valid mechanism of Universal / Fuccillo to provide anything to it's "Applicant" except the certificate.

Normally a large number of auto dealerships controlled by one person will be subject to central control, such as the Fuccillo collection of dealerships. Each dealership may be franchised to sell a certain make of car, but it is more economical for a central organization to allocate the financial resources of the extended enterprise to maximize the use of capital and/or reassign personnel. Here, the Universal / Fuccillo "etch" certificate was sold by a large number of affiliated franchised auto dealerships bearing the Fuccillo name.

Etch policy was sold at various prices, and fixed predetermined amounts were paid to Universal on sale of each certificate and to Mr. William Fuccillo, Jr.. It is a fair inference that the introduction of the product, the directive to sell the "etch" product, the pricing of the product, and the directives as to the distribution of the proceeds of the sale came from the controlling person(s) within Fuccillo. Those persons would have intended the product to operate as it did with full knowledge of its true worth.

**2.** If the "etch" certificate is insurance, the issuer must disclose that the benefit to the consumer in the event of a total loss cannot exceed the deductible under the consumer's primary insurance policy or other auto theft-related expenses. This disclosure was not included in the Auto Theft Security Discount form issued by Universal / Fuccillo that was presented to Ms. Heidi Seekamp and to others similarly situated.  This omission violates auto industry standards.

Within the Documents Reviewed section at the conclusion of my report, the following items are listed:

38.  Fidelity Warranty Services, Inc. "secure etch" certificate of warranty

39.  Official Used Car Guide  published by National Auto Dealer's Association

40.  code of ethics published by the National Automobile Dealers' Association

41.  ethics guide published by the National Automobile Dealers' Association

42.  U.S. Treasury Regulation  1.170-1(c).

Fidelity Warranty Services, Inc. "secure etch" certificate of warranty is an item that points to an industry standard that is certainly applicable in this case. Wording in this item includes the disclosure that the consumer may only be eligible to collect the auto insurance deductible or other theft-related expenses. Such limitation of the amount that a consumer may receive from a claim on an "etch" policy is consistent with the theory that an insured is not allowed to become financially enriched as a result of a claim payment for a casualty loss. It is to prevent tempting an insured to orchestrate the theft of one's own vehicle. Disclosure of this limitation complies with industry standards.

In the transaction of Ms. Heidi Seekamp, she is charged $295 for "etch". The Official Used Car Guide  published by National Auto Dealer's Association doesn't add value for "etch" when utilizing this guide to appraise used vehicles. Reasons that this guide does not add value for "etch" may be observed in some of the paragraphs later in the basis for this opinion.

National Automobile Dealers' Association's (located in McLean, Virginia) Code of Ethics and Ethics Guide requires dealer members to be open and honest when dealing with consumers, and that dealer members must:

*   Offer optional insurance or other optional products in a clear and informative manner.  Any purchase of such a product must reflect a voluntary choice by the consumer.

**Coordination Of Benefits**

Industry standards provide that a coordination of benefits should occur, in the event of a stolen vehicle, for those who purchased the "etch" certificate:

Section IV of the Universal / Fuccillo policy requires:

1.  You must purchase and maintain ... automobile physical damage insurance on the Vehicle for limits at least equal to the cash value of the recovered Vehicle.  Failure to do so will VOID this Auto Theft Security Discount.

The requirement in the quoted section seems to require that the discount be no greater than the consumer's primary auto insurance policy deductible.

Auto insurance policies typically require this, preventing an enrichment, by coordinating benefits, thereby putting the "etch" first in line for claim payment. Therefore, no chance of a gain should exist, even if promised by the "etch" plan, and an insured should not be able to profit from the theft of his / her vehicle.

Auto Theft Security Discount "etch" policies sold by Fuccillo promise a maximum $2,000 benefit if the stolen auto is not recovered within a time frame. Typically, consumer auto insurance (theft) deductibles are less than the benefit amount promised above.

Had disclosure of the auto insurance deductible-only claim payment limitations been communicated, most people would not have bought "etch", assuming that they were given a free-will choice on buying it in the first place. Asking their auto carrier to lower their deductibles would typically cost less considering that their deductible would apply to more perils than just "theft". This is based upon my experience in the automobile retail / lease business. For those who might consider buying "etch" policies, (assuming no sales pressure), disclosure of the claim limitations of "etch" policies would appear to be a duplication (of insurance coverage people already have) thereby reducing the volume of "etch" policy sales.

In the US auto sales and finance industry, a "material fact" is defined as something people would want to know when making their car buying decision. Knowing about the coordination of benefits is a material fact.

The auto sales industry and our government share a common definition of "fair market value", when viewing the negotiation and outcome of a car sale. According to the Internal Revenue Service (paraphrasing), the fair market value is the price at which the property would change hands between a willing buyer and a willing seller, when neither has the compulsion to buy or sell, and when both have reasonable knowledge of relevant facts, as it is described in U.S. Treasury Regulation 1.170-1(c).

**3.**   Universal / Fuccillo's Auto Theft Security Discount "etch" certificate was represented to be a product bought for value when in fact it had little or no value to the consumer(s).  This scheme violates industry standards.

Putting aside questions of insurance or warranty, participating dealers could have offered this kind of deal themselves as part of their sales pitches. Instead some car dealers, as did Fuccillo, offer the assurance of a third party. In such a situation people are lead to believe that a reputable independent stands behind these programs to enforce the promised grant of a discount. For instance, here the Universal policy issued to the customer states on its face:

> It guarantees to the above named purchaser/lessee of the described Vehicle that the system installed will be effective deterrent against Vehicle theft.

It also gave the dealer another opportunity to increase its profit by selling a presumably reputable independent product.

Unfortunately, in the case of Ms. Heidi Seekamp and similar consumers, the Universal certificate and Universal / Fuccillo program have no substance. The promised discount is illusory because the Universal / Fuccillo certificate does not state the base price that the $2,000 discount is to be deducted from. According to the Universal / Fuccillo certificate, the victim of theft is required to report the theft to Universal within 30 days of the theft (a.k.a. the "occurrence"). Note that reporting a theft to police is not enough to satisfy Universal / Fuccillo. The dealer would take the position that of course he would give the customer the discount, but the discount is off the sticker price or higher, set by the dealer. The dealer may also take the position that a customer can only get one discount and cannot add discounts together, as may be allowed to others. The problem with the discount promised by the certificate is that the industry expects that sticker prices are simply the beginning of transaction negotiation. Customer filing a claim would probably get that discount by simply negotiating. Therefore in my opinion, the promise of a discount is illusory.

"Etch" policies are sold on the basis of fear, fear the customer's newly acquired car will be stolen and "etch" will prevent theft or help recover the car. Such sales tactics are unethical.

Nothing stood behind Universal / Fuccillo to guarantee a claim payment. Universal's Mr. Nick Souris testified that Universal retained only $4 of the sum that Fuccillo charged to each customer for Auto Theft Security Discount "etch". Mr. Souris also testified that Universal had no records and kept no reserves. Consequently nothing stood behind Universal's assurance that Fuccillo would honor a claim based upon one's purchase of a Universal / Fuccillo certificate. Secondly, the issuance of the Universal certificate by the dealers was effectively a statement that they were selling an assurance when in fact there was nothing to support that representation.

Mr. Nick Souris' description (in his deposition taken November 16, 2010) of his business shows that it had neither a structure or assets one associates with an insurance company or a warranty issuer to stand behind its product. Any statement stating Universal actually stood behind the assurance it gave, or that the Universal / Fuccillo policy had value, was a misleading statement of material fact.

Customers who purchased ATSD had a natural expectation that a company giving an assurance that the selling automobile dealer will provide a discount would keep records of policies issued, customers to whom issued, and the names and financial information about dealers who issue the policies. As noted, these are the basic tools to determine whether the dealers are carrying out the promise for which the issuer of the policy has given assurance. For Fuccillo to sell the "etch" certificates with those assurances is misleading. First, to claim that in the many years this policy was sold not a single person collected shows that the policy really had no value, and that this lack of value was known to and continuously verified by management of Universal / Fuccillo. Secondly, for Mr. Nick Souris to say that no Fuccillo customer had ever made a claim boggles the mind, considering the probability of theft of some vehicles. Assuming the truth of that statement, it means that Fuccillo management has never recognized a claim.

Most cars are used within the state in which they are sold, particularly in New York where Fuccillo's car lots were located around the center of the state. Various state, federal, and insurance organizations keep track of the number of automobiles (and the proportion of brands of automobiles) that are stolen. Since Fuccillo is one of the largest automobile dealers in New York, it stands to reason that at least some of those cars that were stolen were sold by Fuccillo. In addition, given that thousands of etches were sold during the noted period, certainly some of the owners of the stolen cars had been sold "etch" and some of the Auto Theft Security Discount certificate buyers would have made claims. The claimed failure of Universal and Fuccillo to keep records appears to be a deliberate attempt to conceal the number of actual theft claims made and any corresponding payouts (e.g. discounts on sale prices for replacement vehicles) obtained from the "etch" program.

The product is really worthless to consumers and very dealer-profitable. Fuccillo management knew its profit potential and directed "etch" policy sales. Mr. Nick Souris also testified that Universal initially received only $25 for each Universal certificate sold by Fuccillo, and dealerships kept $270 from the sale. The cost of installing the etch ranged from $6 to $25 and therefore the gross profit on the sale of the etch policy to a car dealer ranged from $245 up to $264, assuming that the "etch" policy price that was charged was $295 per vehicle. Mr. Nick Souris also testified that of the $25 he received he returned $21 to Mr. William Fuccillo, Jr. (see Documents Reviewed numbers 20 through 37). Therefore Mr. William Fuccillo, Jr. obtained direct benefit from every "etch" sale. It's Huge, Inc. the company he owned, operated, and controlled, surely had knowledge of the scheme of a large profit generated by "etch" and it true worth. Sale of "etch" as described in the documents I have reviewed fails to comply with the ethical standards described above.

Alternatively, Mr. Souris theorized that money paid to Mr. William Fuccillo, Jr. was used to cover Fuccillo's losses, in the event of payment of a claim. Mr. Souris described the $21 payments as: "money that you're getting in case somebody does have a loss due to theft. And if they have to give away $2,000, I am sure that would help carry that $2,000."

**4.** Ms. Seekamp and those similarly situated lost the difference between the cost to them of the "etch" and the cost of its installation.  This scheme violates industry standards.

A cost to install "etch" ranges from $6 to $25 in the auto sales industry, and Ms. Seekamp was charged $295 for Universal / Fuccillo's "etch" certificate. In this case, in the auto sales industry, there is no value to her "etch" certificate. The gross profit on its installation to Universal / Fuccillo was $270 on Ms. Seekamp's purchase of "etch", and the same profit formula should be applied as was overpaid by those similarly situated.

# C O D E      O F      E T H I C S

The following Code of Ethics and Ethics Guide illustrate this industry standard and is also applicable as a basis for my expert opinions in this case.

National Automobile Dealers' Association has composed a guide called Code Of Ethics, to which all auto dealer members have pledged to abide by. Provisions and promises made by this code are published by the N.A.D.A. in various forms, including its internet web site at:

http://www.nada.org

The following is a quotation of this Code of Ethics and Ethics Guide as published on this web site:

# Code
## of  Ethics

As a member of the National Automobile Dealers' Association, this dealership subscribes to the following principals and standards.
Implicit in this Code is the requirement that NADA members comply fully with all federal, state and local laws governing their businesses.

We pledge to:

* Operate this business in accord with the highest standards of ethical conduct.

* Treat each customer in a fair, open, and honest manner, and fully comply with all laws that prohibit discrimination.

* Meet the transportation needs of our customers in a knowledgeable and professional manner.

* Represent our products clearly and factually, standing fully behind our warranties, direct and implied, and in all other ways justifying the customer's respect and confidence.

* Advertise our products in a positive, factual, and informative manner.

* Detail charges to assist our customers in understanding repair work and provide written estimates of any service work to be performed, upon request, or as required by law.

* Resolve customer concerns promptly and courteously.

* Put our promises in writing and stand behind them.

## Ethics Guide

In addition to the Code of Ethics poster, NADA has published an Ethics Guide that focuses on areas of dealership operations: sales, service, financial services and advertising:

## 1. ADVERTISING

This dealership is committed to advertising its products and services in a clear, conspicuous and accurate manner that fully complies with applicable legal requirements.  This includes disclosing credit terms in accordance with the federal Truth In Lending Act and consistent with state and local law.

## 2. FINANCIAL  SERVICES

Implicit in these standards is the requirement that NADA members comply fully with all federal, state and local laws governing their businesses.

At this dealership, the finance and insurance professionals will at all times ...

* Disclose fully to customers the costs, terms, and contractual obligations of credit and lease transactions.  Documents will be written in a simple, plain, and unambiguous manner to the extent permitted by federal and state law.

* Offer optional insurance or other optional products in a clear and informative manner.  Any purchase of such a product must reflect a voluntary choice by the consumer.

* Advertise financial services products in a clear and non-deceptive manner.

3. SALES

Implicit in these standards is the requirement that NADA members comply fully with all federal, state and local laws governing their businesses.

At this dealership, the sales professionals will at all times ...

* Embrace the spirit and the letter of the law governing the retail sales of new and used vehicles.

* Be honest and truthful when dealing with customers.

* Have a thorough knowledge of the product and be able to apply that knowledge to help satisfy the transportation needs of the customers.

* Provide each customer with a thorough and clear explanation of the steps involved in the purchase or lease of a vehicle and follow those steps diligently.

* Always treat each customer in a professional manner.

* Be responsible for the prompt performance of post-sale administrative and delivery procedures.

* Represent the dealership and the automobile industry in a professional manner.

4.  SERVICE

Implicit in these standards is the requirement that NADA members comply fully with all federal, state and local laws governing their businesses.

At this dealership, the service professionals will at all times ...

* Perform high quality repair service at a fair and competitive price.

* Employ trained and skilled technicians.

* Furnish an itemized invoice for parts and services that clearly identifies any used or remanufactured parts.  Replaced parts may be inspected upon request.

* Have a sense of personal obligation to each customer.

* When appropriate, recommend corrective and maintenance services, explaining to the customer which of these are required to correct existing problems and which are for preventative maintenance.

* Provide each customer a price estimate for work to be performed, upon request, or as required by law.

* Make available copies of any warranties covering parts or services.

* Obtain prior authorization for all work done.

* Notify the customer if appointments or completion promises cannot be kept.

* Maintain customer service records as required by law.

* Exercise reasonable care for the customer's property while in the dealership's possession.

* Uphold the highest standards of service in our profession.

_____

As additional pertinent evidence, testimonial or documentary, becomes available, it is possible that I may formulate and develop new opinions or revise the opinions contained in this Report.

# D O C U M E N T S     R E V I E W E D

1.  First Amended Class Action Complaint

2.  Memorandum -- Decision And Order, dated 3-15-10

3.  dealer agreement with Fuccillo Chevrolet, Oldsmobile, Pontiac, Buick, Geo Inc. dated 5-14-98, with a handwritten list of other Fuccillo dealerships

4.  fax cover page with the above, dated 9-26-05, from Almarinda Manzaro to John Testone

5.  fax cover page with #3 above, dated 9-12-05, from John Testone to Nick Souris

6.  State of New Jersey, Department of the Treasury, short form standing, Universal Automotive Services, Inc. was registered on March 31, 1994 continues as an active business in good standing as of August 29, 2002

7.  letter dated 9-27-00 from Neil D. Levin, Superintendent of Insurance of the State of New York Insurance Department, addressed to Mr. Thad Hall, Regulatory Affairs Manager at First American Insurance Company (Stamford)

8.  subpoena in a civil case in US District Court for the deposition of Nick Sours

9.  deposition of Nick Souris taken on November 16, 2010     142 pages

10. Seekamp 001 - 002
 typed vehicle cash purchase agreement, dated 6-12-07
 listing a charge for "etch" of $295.00

11. Seekamp 003 - 005
 Chrysler Financial retail installment contract, simple interest dated 6-12-07

12. Seekamp 006
 Auto Theft Security Discount   $2,000   3 years

13. Auto Theft Security Discount form, in blank, #NY2D 21901

14. fax cover page, dated 6-21-99, from Nick Souris to Paul Zuckerman
 with the following three documents:

15. Seekamp 134
 Auto Theft Security Discount form

16. Seekamp 135
 reverse side of the above

17. Seekamp 136
 dealer agreement


invoices of financial disbursements from Universal Automotive Services, Inc. to William Fuccillo, Jr. with check stub data, and for some periods a check copy, listed under "Sales by Rep Detail" and listing amounts according to a file date and date of period, as follows:


|  | file date: | dates of period: | |
|---|---|---|---|
| 18. | 1-20-06 | 12-21-05 | 1-15-06 |
| 19. | 2-20-06 | 1-21-06 | 2-15-06 |

|  | file date: | dates of period: | | |
|---|---|---|---|---|
| 20. | 3-17-06 | 2-21-06 | 3-15-06 | |
| 21. | 4-19-06 | 3-21-06 | 4-15-06 | |
| 22. | 5-19-06 | 4-21-06 | 5-15-06 | |
| 23. | 6-15-06 | 5-21-06 | 6-15-06 | |
| 24. | 7-19-06 | 6-20-06 | 7-15-06 | |
| 25. | 8-17-06 | 7-16-06 | 8-15-06 | |
| 26. | 9-19-06 | 8-16-06 | 9-15-06 | |
| 27. | 10-16-06 | 9-16-06 | 10-15-06 | |
| 28. | 12-19-06 | 11-16-06 | 12-15-06 | |
| 29. | 3-14-07 | 1-16-07 | 2-15-07 | |
| 30. | 3-14-07 | 1-1-06 | 3-14-07 | collection of disbursements |
| 31. | 3-20-07 | 2-16-07 | 3-15-07 | |
| 32. | 4-20-07 | 3-16-07 | 4-15-07 | |
| 33. | 6-20-07 | 5-16-07 | 6-15-07 | |
| 34. | 7-23-07 | 6-16-07 | 7-15-07 | |
| 35. | 8-17-07 | 7-16-07 | 8-15-07 | |
| 36. | 1-2-08 | 10-16-07 | 11-15-07 | |
| 37. | 1-2-08 | 11-16-07 | 12-15-07 | |

38. Fidelity Warranty Services, Inc. "secure etch" certificate of warranty

39. Official Used Car Guide  published by National Auto Dealer's Association

40. code of ethics published by the National Automobile Dealers' Association

41. ethics guide published by the National Automobile Dealers' Association

42. U.S. Treasury Regulation  1.170-1(c)

43. Florida Life, Health And Variable Annuity Study Manual    Nineteenth Edition

# E P I L O G U E

In the class action case of <u>Heidi Seekamp, et al vs.   It's Huge, Inc. & Fuccillo Automotive Group, Inc.   &   Fuccillo Lincoln Mercury Hyundai, Inc.   & Universal Automotive Services, Inc.</u>, this report was prepared after my review of a listed selection of documents pertaining to transactions or topic of "etch". When additional pertinent documents or information become available, I may formulate and develop new opinions.


I, David A. Stivers, completed my preparation of this evaluation report on January 31, 2011, at the request of Mr. Sergei Lemberg, Counsel for Plaintiffs, Ms. Heidi Seekamp, on behalf of herself and all others similarly situated.



_____   David A. Stivers


Any questions regarding this case or the specific subject matter of this evaluation report should be directed to:

Mr. Sergei Lemberg,   Attorney At Law
Lemberg & Associates, LLC
1100  Summer Street    3rd floor
Stamford,  Connecticut    06905
telephone  (203) 653 - 2250
facsimile    (203) 653 - 3424