UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
:
:
:
HEIDI SEEKAMP, On Behalf of Herself and all Others
Similarly Situated,                                           :        **Civil Action No. 1:09-CV-00018**
                                                              :        **(LEK/DRH)**
                                        *Plaintiff*,          :
                                                              :
        - against -                                           :
                                                              :
IT'S HUGE, INC., FUCCILLO LINCOLN MERCURY              :
HYUNDAI, INC., d/b/a FUCCILLO HYUNDAI, FUCCILLO        :
CHRYSLER JEEP DODGE OF AMSTERDAM, INC.,                :
FUCCILLO FORD, INC., FUCCILLO DODGE CHRYSLER
JEEP, INC., FUCCILLO IMPORTS, INC., FUCCILLO AUTO      :
WORLD, INC. FUCCILLO BUICK PONTIAC GMC, INC.,          :
FUCCILLO CHEVROLET OF NELLISTON, INC.,                 :
FUCCILLO HYUNDAI OF SYRACUSE, INC., FUCCILLO           :
HYUNDAI OF GREECE, INC., FUCCILLO FORD OF              :
SENECA FALLS, INC., FUCCILLO CHEVROLET OLDS            :
PONTIAC BUICK, INC., FUCCILLO CHEVROLET, INC.,         :
FUCCILLO CHRYSLER OF NELLISTON, INC., FUCCILLO
ENTERPRISES OF EAST GREENBUSH, INC., FUCCILLO          :
ENTERPRISES, INC., FUCCILLO FORD OF EAST               :
GREENBUSH, INC., FUCCILLO FORD OF NELLISTON,           :
INC., FUCCILLO PONTIAC BUICK, INC., and                :
UNIVERSAL AUTOMOTIVE SERVICES, INC.,                   :
                                                              :
                                        *Defendants*.         :
                                                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X


# MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF
# HEIDI R. SEEKAMP'S MOTION FOR CLASS CERTIFICATION, AND IN
# SUPPORT OF THE FUCCILLO DEFENDANTS' CROSS-MOTION FOR
# SUMMARY JUDGMENT

GREENBERG TRAURIG, LLP
54 State Street, 6th Floor
Albany, New York 12207
Tel:  (518) 689-1400
Fax:  (518) 689-1499
Email:  hurstw@gtlaw.com

ROEMER WALLENS GOLD
   & MINEAUX, LLP
13 Columbia Circle
Albany, New York 12203
Tel:  (518) 464-1300
Fax:  (518) 464-1010
jkelly@rgwmlaw.com
awtwinam@rgwmlaw.com

*Attorneys for Fuccillo Defendants*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...........................................................................................................iii

PRELIMINARY STATEMENT ...................................................................................................1

STATEMENT OF THE CASE

    A.  FLM's Agreement With Co-Defendant Universal Automotive Services
         Concerning the ATSD Program......................................................................................2

    B.  Plaintiff's New Vehicle Purchase ..................................................................................4

    C.  Neither Plaintiff, Nor Any Putative Class Member, Has Ever Asserted,
         or Attempted to Assert, Any Claim Under the ATSD ....................................................6

    D.  Plaintiff Has Misrepresented the Deposition Testimony of Nicholas
         Souris .............................................................................................................................7

ARGUMENT

    I.  PLAINTIFFS MOTION FOR CLASS CERTIFICATION SHOULD BE
       DENIED.........................................................................................................................8

        A.  Rule 23 Requires a "Rigorous Analysis" to Determine Whether
            Class Adjudication is Proper...................................................................................8

        B.  The FAC Does Not Satisfy the Requirements of Rule 23(b)(2)............................11

        C.  Plaintiff's Claims Fail Under the Commonality, Typicality and
            Predominance Tests ...............................................................................................12

            1.  The Alleged Representations Made to Plaintiff
                Materially Differ From Those Allegedly Made to the
                Class.........................................................................................................12

            2.  Plaintiff Has Admitted That She Did Not Rely on
                FLM's Characterization of the ATSD as the Reason for
                Her Enrollment.........................................................................................14

        D.  The FAC Does Not Satisfy the Requirements of Rule 23(b)(3)
            Because Individualized Issues of Reliance and Causation
            Predominate ..........................................................................................................14

          1.  Class Treatment is Not Warranted Further for the
Reason That the Fundamental Question of Whether the
ATSD Qualifies as Insurance Requires an
Individualized Inquiry ............................................................................18

II.  FLM HAS DEMONSTRATED THAT THERE ARE NO GENUINE
ISSUES OF MATERIAL FACT AND THAT SUMMARY
JUDGMENT DISMISSING ALL OF PLAINTIFF'S CLAIMS IS
THUS BOTH NECESSARY AND APPROPRIATE ........................................................19

    A.  Summary Judgment Should be Granted on Plaintiff's GBL § 349
(Count I) and Consumer Fraud Claims (Count II)...................................19

          1.  Plaintiff Cannot Prove Damages Under GBL § 349 By
Seeking Recoupment of the ATSD Enrollment Fee ...................20

          2.  Plaintiff Has Suffered No Actual Damages .................................22

    B.  Summary Judgment is Appropriate Dismissing Plaintiff's Breach
of Contract (Count IV) and Unjust Enrichment (Count V) Claims ........................22

    C.  Plaintiff's "Illegal Contracts" Claim Should be Dismissed ...................24

CONCLUSION ..................................................................................................................................25

Page(s)

**Federal Cases:**

*Amchem Products Inc. v. Windsor,*
521 U.S. 591 (1997)..................................................................................10, 15

*Andrews v. AT&T Co.,*
95 F.3d 1014 (11th Cir. 1996) ...........................................................................14

*Bildstein v. MasterCard International Inc.,*
329 F. Supp. 2d 410 (S.D.N.Y. 2004).......................................................21 n.24

*Caridad v. Metro-North Commuter RailRoad,*
191 F.3d 283 (2d Cir. 1999)...............................................................................9

*Dungan v. The Academy at Ivy Ridge,*
249 F.R.D. 13 (N.D.N.Y.) (McAvoy, D.J.) ...............................................16, 17

*Dunnigan v. Metro Life Insurance Co.,*
214 F.R.D. 125 (S.D.N.Y. 2003) ........................................................................9

*General Telephone Co. v. Falcon,*
457 U.S. 147  (1982).........................................................................................8

*Harsco Corp. v. Segui,*
91 F.3d 337 (2d Cir. 1996)........................................................................22, 23

*In re Hydrogen Peroxide Antitrust Litigation,*
552 F.3d 305 (3d Cir. 2008)..........................................................................10 n.10

*In re Initial Public Offerring Security Litigation,*
471 F.3d 24 (2d Cir. 2006)........................................................................8, 9 n.9

*In re Methyl Tertiary Ether Products Liability Litigation,*
209 F.R.D. 323 (S.D.N.Y. 2002) .................................................................11, 14

*J.H. Cohn & Co., v. American Appraisal Association, Inc.,*
628 F.2d 994 (7th Cir. 1980) ....................................................................13 n.21

*Kline v. Wolf,*
702 F.2d 400 (2d Cir. 1983).....................................................................13 n.21

*Lujan v. Defenders of Wildlife,*
504 U.S. 555 (1992)..................................................................................22 n.27

*Marisol v. Giuliani,*
　　126 F.3d 372 (2d Cir. 1997).........................................................12

*McLaughlin v. American Tobacco Co.,*
　　522 F.3d 215 (2d Cir. 2008)...................................................15, 16

*McManus v. Fleetwood Enterprises, Inc.,*
　　320 F.3d 545 (5th Cir. 2003) .....................................................11

*Moore v. PaineWebber, Inc.,*
　　306 F.3d 1247 (2d Cir. 2002)..................................................14, 16

*Pelman v. McDonald's Corp.,*
　　No. 02-Civ-07821 (DCP), 2010 WL 4261390 (S.D.N.Y. Oct. 27, 2010) ..................19, 20

*Poulous v. Ceaser's World, Inc.,*
　　379 F.3d 654 (9th Cir. 2004) .....................................................18

*Robinson v. Metro-North Committee RailRoad Co.,*
　　267 F.3d 147 (2d Cir. 2001).......................................................11

*Spagnola v. Chubb Corp.,*
　　264 F.R.D. 36 (S.D.N.Y. 1988) ...........................................13 n.21, 21 n.25

*The Presbyterian Church of Sudan v. Talisman Energy, Inc.,*
　　226 F.R.D. 456 (S.D.N.Y. 2005) .................................................12

*United States v. Hays,*
　　515 U.S. 737 (1995)..........................................................22 n.27

**State Cases:**

*Baron v. Pfizer,*
　　No. 6429-04, 2006 WL 1623052 (Sup. Ct. N.Y. Co. May 2, 2006)........................21 n.24

*Gale v. IBM Corp.,*
　　9 A.D.3d 446 (2d Dep't 2004) ....................................................17

*Hooper v. HM Mane Solutions, LLC,*
　　No. 03034/05, 2006 WL 1214818 (Sup. Ct. N.Y. Co. Mar. 15, 2006) ....................21 n.24

*Small v. Lorillard Tobacco Co.,*
　　252 A.D.2d 1 (1st Dep't 1998) ....................................................20

*Sokoloff v. Town Sports International, Inc.,*
　　6 A.D.3d 185 (1st Dep't 2004) ..............................................21 n.25

*Solomon v. Bell Atlantic Corp.,*
   9 A.D.3d 49 (1st Dep't 2004) ........................................................16, 19, 20 n.23

*Spitzer v. Applied Card Systems, Inc.*
   41 A.D.3d 4 (3d Dep't 2007) .................................................................21 n.24

## RULES

Northern District of New York Local Rule 7.1(c) ...........................................................1

Fed. R. Civ. P. 23 ...................................................................................... *passim*

Fed. R. Civ. P. 56(a) .................................................................................1, 19

N.Y. Gen. Bus. Law § 349................................................................... *passim*
1,385,253v1

# PRELIMINARY STATEMENT

The Fuccillo defendants in this action (collectively referred to as "FLM"), respectfully submit the following brief in opposition to plaintiff Heidi R. Seekamp's ("Seekamp") motion for class certification, and in support of FLM's cross-motion for an Order, pursuant to Rule 56(a) of the *Federal Rules of Civil Procedure* ("FRCP") and L.R. 7.1(c), granting summary judgment on all of Seekamp's claims and dismissing her First Amended Complaint ("FAC").

Plaintiff's motion for class certification rests on the legally insupportable theory that by promoting the ATSD discount program exactly for what it was -- a performance guarantee warranting the effectiveness of a $295.00 window-etch security system as a theft deterrent -- FLM engaged in deceptive business practices and other wrongful conduct in alleged violation of New York *General Business Law* ("GBL") § 349, even though plaintiff cannot identify a single person (including herself) who was ever actually deceived, or the manner in which the alleged deception occurred, and even though neither plaintiff, nor any other consumer, has ever asserted a claim under the now defunct discount program, much less been denied any benefit due thereunder.  Plaintiff's attempt to prop up this fatally flawed theory by claiming that the ATSD qualifies as the deceptive and/or unlicensed sale of insurance finds no support in the discovery record, and flies in the face of specific guidance from the State Insurance Department (followed here) setting forth the parameters under which the ATSD could legally be sold in New York.

For the reasons that follow, including plaintiff's failure to establish the required elements of commonality, typicality and predominance, this case cannot be certified as a class under Rule 23.  And because each and every one of plaintiff's claims is fundamentally meritless, including because she received the benefit of her disclosed bargain, cannot prove reliance or causation, and has suffered no damages whatsoever, summary judgment is fully warranted.

<h1 style="text-align:center">STATEMENT OF THE CASE</h1>

**A.      FLM's Agreement With Co-Defendant Universal Automotive Services Concerning the ATSD Program.**

Nicholas Souris is the principal of defaulting co-defendant Universal Automotive Services ("Universal"), an administrative company in the business of administering a variety of service contracts and after-market programs offered by automobile dealers to their customers in several states, including the ATSD program at issue here.[1]   (SMF ¶ 1)  According to Souris: "[Universal] gather[s] the information from the customer and make[s] sure that it follows the guidelines of the dealer's program and then we inform the dealer that either yes they have the -- they followed the guidelines and if they did, then the dealer gives them a discount off the vehicle." (Souris Dep., pp. 8-9)  Souris testified as to his understanding of the tangible benefits which may flow to consumers choosing to enroll in the ATSD, including the possibility of obtaining discounted comprehensive automobile insurance coverage from their insurer, and the theft deterrent effect of an obvious security system:[2]  "it is like if a bank robber saw two banks. One had marked bills in it and the other one didn't have marked bills in it which one would he take?  Of course, the ones without [the markings]." (Souris Dep., pp. 108-09)

Pursuant to the Dealer Agreement, Universal furnished to FLM a number of pre-printed ATSD enrollment forms (including the form signed by plaintiff here), as well as a series of

---

[1] On or about May 14, 1998, defendant "Fuccillo Chevy, Olds, Pontiac, Buick, Geo, Inc." (defined therein as "Dealer") entered into a Dealer Agreement on behalf of numerous Fuccillo-branded dealerships with Richard Crosley, then with a company named "IAS, Inc./Theft Avert," but working on behalf of Universal (defined therein as "Company") concerning the sale and administration of the ATSD after-market program. (SMF ¶ 2) In pertinent part, the Dealer Agreement states:  "[Universal] agrees to investigate, process and pay all valid claims presented under the [ATSD] Program, and arrange for the reimbursement to the customer for valid claims under the [ATSD] Program," and "The parties are acting solely as independent contractors in all matters relative to this Agreement." (Lewis Aff., Ex. A) For reasons that are unclear, plaintiff incorrectly refers to this agreement as a "master agreement" between "Its Huge, Inc. and Universal," when there is no evidence that was the case.

[2] Souris testified, in pertinent part, "This one in here . . .you put it on all your windows.  And by putting it on all the windows -- a joy rider it doesn't matter, but if it is a chop shop as they call them or person selling things for parts, the cost of replacing all the windows is not worth taking the car." (Souris Dep., pp. 108-09)

identifying numbers, and the materials and equipment to engrave those numbers onto the windows of participating vehicles, using a permanent, acid-based process.[3] (SMF ¶ 4, 21) The terms and conditions of the ATSD are clearly stated on the document and its attachments, which plaintiff acknowledged that she read before she chose to enroll in the program.[4] (SMF ¶ 5, 17, 20) The ATSD enrollment form, including the one signed by plaintiff here, states, in bold letters across the center of the page: "**All claims must be reported to the Administrator within 30 days @ 800-410-5981.**"[5] (SMF ¶ 7) The document also accurately describes the ATSD:

---

[3] *See* Souris Dep, pp. 72 ("So, they take a bottle that has like acid in it. They rub it against the blue paper, and of course the blue paper is geared up not to disintegrate with the acid, but the perforation actually goes into the glass and they actually make the numbers."); *see also id.*, pp. 112-13, 131-133.

[4] The substantive terms of the ATSD are as follows:

> If your Vehicle as described on the reverse side of this page is declared a Total Loss due to unrecovered theft or recovered and is declared a Total Loss which occurred as a direct result of the original theft by Your primary insurance company within three (3) years of the date of purchase, finance or lease, then, subject to the conditions and limitations set forth below, the Authorized Dealer will discount the following: if the original motor Vehicle was a NEW motor Vehicle as of the date of purchase, finance or lease, the Authorized dealer will provide You with 10% discount towards the purchase of a Replacement Vehicle in the amount of up to $2,000. Replacement Vehicle shall be amount equal to or greater than the value of the original Vehicle.

> If your Vehicle as described on the reverse side of this page is declared a Total Loss due to unrecovered theft or recovered and is declared a Total Loss which occurred as a direct result of the original theft by Your primary insurance company within three (3) years of the date of purchase, finance or lease, then, subject to the conditions and limitations set forth below, the Authorized Dealer will discount the following: If the original motor Vehicle was a USED motor vehicle as of the date of purchase, finance or lease, the Authorized Dealer will provide You with 10% discount towards the purchase of a Replacement Vehicle in the amount of up to $2,000, but not to exceed 50% of the original N.A.D.A. value as of the date of purchase, finance or lease.

(Seekamp Aff. [D.E. 61-3, Ex. B [D.E. 61-5])

[5] Again for reasons that are unclear, plaintiff has now fastened upon a *completely different* telephone number -- 800-411-8470 -- nowhere mentioned on the ATSD enrollment form or in its terms and conditions, to prop up her newly minted claim that the ATSD claims process was a sham. (Pl. Br. p. 8). However, Souris clearly testified, and the enrollment form establishes, that the telephone number appearing on the sticker affixed to the vehicle which plaintiff has fastened upon, "wouldn't be for the customers . . . you know what I'm saying . . . Definitely wouldn't be for the customers." (Souris Dep., pp. 131-33) That makes perfect sense: the entire ATSD program pre-supposes that the vehicle is stolen and not recovered, or so damaged during the theft that it qualifies as a total loss. If the vehicle has been stolen and not recovered or stolen and totaled, the enrollee would obviously not have access to the windows to read and dial the telephone number shown there in order to report a claim. In any event, Souris testified that if an enrollee lost the form or the telephone number, the dealer would likely still honor the discount, for obvious business reasons. (Souris Dep., pp. 76-86) Plaintiff's newly-minted claim which relies on an inapposite telephone number is a complete and utter red herring.

The AUTO THEFT SECURITY DISCOUNT, permanently installed on the Vehicle windows, includes two (2) warning decals affixed to the driver and passenger windows. It guarantees to the above named purchaser/lessee of the described Vehicle that the system installed will be effective [sic] deterrent against Vehicle theft. AUTO THEFT SECURITY DISCOUNT is not insurance and does not provide general liability coverage or fulfill the requirements of financial responsibility laws. Such coverages are usually provided by the customer's personal automobile insurance carrier.

On June 22, 1999, Souris sought out and obtained a letter-opinion from the New York State Insurance Department concerning the legality of the ATSD program under the New York *Insurance Law*. (SMF ¶ 12) The State Insurance Department's June 22, 1999, letter stated, in pertinent part, "that if a seller provides a discount on a replacement purchase dependent upon the destruction or loss of a prior purchase, that seller would not be doing an insurance business so long as the discount price of the new purchase (including any other discounts that the seller may provide) covers the cost of the purchase to the seller, plus any labor or material cost borne by the seller and reasonable overhead expenses." (Lemberg Decl. [D.E. 61-6, Ex. 2 [D.E. 61-8]) Specifically with respect to the ATSD form used here, the State Insurance Department concluded, "[T]he discount in your proposal does not appear to violate the Insurance Law, based upon the assumption that the discount would not eliminate the dealer's profit margin on each vehicle."[6]

### B.     Plaintiff's New Vehicle Purchase.

On or about June 10, 2007, plaintiff made an initial inquiry of defendant Fuccillo Lincoln Mercury, Inc. (d/b/a Fuccillo Hyundai) concerning a new vehicle purchase through the

---

[6] Significantly, there is not even an allegation here, in the FAC or otherwise, much less credible proof, that granting the maximum $2,000 discount under the ATSD would have deprived FLM of all profit on any given sale. FLM's policy was that it would not. (Lewis Aff., ¶ 6) Passing on a completely different legal question, one that might in appropriate circumstances vitiate any indemnity agreement between a dealer and Universal (assuming such a "back-end" indemnity agreement existed, and Souris denies it did here (Souris Dep., p. 82-83), but which would have no impact whatsoever on the relationship between FLM and its customers, the State Insurance Department further opined that "there is no kind of insurance that may be sold in New York that would indemnify the dealer for the amount of the discount." Whether there was, or was not, such indemnity has absolutely no bearing on this case.

company's internet website http://www.5liner.com. (SMF ¶ 14)  A former Fuccillo salesman, Steve Lasher, contacted plaintiff by telephone in response and invited her to the dealership. Seekamp, who "just wanted something new," selected a vehicle that day (a 2007 Hyundai Elantra, which she still owns), completed an initial application for financing and placed a $500 deposit.  (SMF ¶ 15)  Plaintiff did not ask to see FLM's "invoice price," nor did she make any attempt at all to negotiate any aspect of the vehicle's purchase price.[7]  (SMF ¶ 16)

On June 12, 2007, plaintiff returned to the dealership to complete the paperwork required to pick up her new car.  The ATSD's $295.00 cost was prominently disclosed and separately identified as "Etch" on all of the pertinent purchase and sale documents, and plaintiff has since testified that she knew exactly what "Etch" referred to and how much ATSD enrollment would cost (SMF ¶ 17), before she signed her name under the following statement:  "I do choose to register my VEHICLE under the AUTO THEFT SECURITY DISCOUNT. By my signature below, I request to purchase the AUTO THEFT SECURITY DISCOUNT and acknowledge that I have read and fully understand both sides of this agreement."[8]  (SMF ¶ 18) Plaintiff was furnished with copies of every pertinent document and disclosure on June 12, 2007, including the detailed ATSD terms and conditions, all of which she read.  (SMF ¶ 20(i))

---

[7] Plaintiff admitted at her recent deposition that she lied on her financing application by exaggerating the amount of time she has been employed by her current employer (her application states 2 years when it actually less than one year), and lied as to the amount of time she was employed by her prior employer (again exaggerating her time of employment by approximately 18 months).  This was obviously unknown to FLM until discovery in this case. (SMF ¶ 20(l))

[8] Immediately below that line is another which states, "I do not choose to register my VEHICLE under the AUTO THEFT SECURITY DISCOUNT.  I understand that by not accepting this registration, and, in the event my VEHICLE is stolen and recovered, I am not entitled to any of the AUTO THEFT SECURITY DISCOUNT benefits provided."  In fact, plaintiff was presented with a "menu" of aftermarket products, including environmental protection coverage, life and disability insurance, a service agreement, and the ATSD.  (SMF ¶ 20(c)) She declined some, and selected others, all of her own volition and with the advice and consent of her son, who was present throughout.  Indeed, plaintiff's deposition testimony establishes that no one told her she must purchase the ATSD, no one told her that her purchase of the ATSD was required before should would qualify for, or as a condition of, her financing the purchase and no one forced her to accept the ATSD.  (SMF ¶ 20(d), (k))

Plaintiff has since testified that Lasher made no representations whatsoever concerning the ATSD during their initial meeting. (SMF ¶ 20(a), (f)) Indeed, plaintiff testified -- in direct contradiction of the FAC's central allegation -- that another FLM staff person (presumably its business manager), informed her that the ATSD *was* insurance. (*Id.*) Plaintiff further testified that when she brought that alleged disclosure to Lasher's attention, he concurred that the ATSD was insurance. (*Id.*) Thus, in a case where the FAC claims that FLM engaged in deceptive conduct by not disclosing that the ATSD was allegedly insurance, plaintiff was apparently told that it was. In the final analysis, plaintiff merely deferred the decision whether or not to purchase the ATSD discount for the disclosed sum of $295.00 to her son, who had accompanied her to the dealership, and whose advice she relied on (as opposed to any representation about insurance) in deciding to enroll in the ATSD program. (SMF ¶ 20(k))

An inspection of Seekamp's vehicle during discovery in this case plainly revealed that the etch index number had in fact been permanently etched, using the acid-based product FLM received from Universal, on the front and rear driver's and passenger's side windows, and on the rear windscreen, exactly as advertised. (SMF ¶ 21)

### C. Neither Plaintiff, Nor Any Putative Class Member, Has Ever Asserted, or Attempted to Assert, Any Claim Under the ATSD.

Plaintiff's vehicle was never stolen, and she therefore never had any basis upon which to seek (and so never sought) the discount offered by the ATSD. (SMF ¶ 23) Indeed, months of discovery and FLM's production of business records concerning more than 600 ATSD transactions, and analysis of more than 3,000 such records,[9] has revealed not a single claim, or

---

[9] This discovery reveals yet another fatal flaw in plaintiff's case: more than 97% of the putative class members here are New York residents, as is every FLM defendant from whom relief is sought. (Lewis Aff., ¶¶ 8-30) Consequently, this Court "shall decline to exercise [diversity] jurisdiction" over this case under 28 U.S.C. 1332(d)(4). Since plaintiff has now abandoned both of her original federal claims, for alleged violation of the

attempted claim, under the ATSD - a fact confirmed by Souris's testimony.[10]  (SMF ¶¶ 11, 25)
No claims ever having been asserted, FLM has obviously never withheld any benefit due
plaintiff (or any putative class plaintiff) under the ATSD.

   **D.    Plaintiff Has Misrepresented the Deposition Testimony of Nicholas
           Souris.**[11]

   First, Souris furnished a precise explanation of the *bona fides* of the ATSD program and
its genesis, including alterations made to the program to comply with New York law, *i.e.*,
shifting the program to "a discount versus giving out money to a customer."[12]  Second, Souris
testified that calls made to the 800-410-5981 telephone number listed in the face of the ATSD
enrollment form (which is ***not*** the 800-411-8470 telephone number plaintiff's have erroneously
fastened upon) "went to a claims line" where the enrollee would hear a pre-recorded message:

> [The claims line] was only there to record who was calling the number they were
> calling.  So in other words, let's say it was me.  I would say hi, my name is Nick
> Souris.  My car got stolen and this is my number.  Call me back.  So then we
> would proceed to call them back and tell them read the back of your form, this is
> what we need.  They send it to us.  That is how the process worked.  We never,
> ever answered that line.  It wasn't there for any reason but to record the customer
> calling in and keeping the number they called from.[13]

---

Magnusson-Moss Warranty Act and Truth-in-Lending Act, respectively, this case is predicated solely on the Court's
diversity jurisdiction.

[10] Plaintiff now seeks to dodge this fatal fact by speculating that because the "800" number listed on the vehicle
windows was allegedly inoperable, claimants may have unsuccessfully attempted to assert claims.  First, this claim
fails because plaintiff is, for the reasons stated above, dialing the "wrong number."  Second, Souris's testimony is
consistent with common sense -- a consumer who is either unable or unwilling to use the (correct) "800" number,
would merely return to the dealer from which they purchased the vehicle to obtain the benefit.  (Souris Dep., 77-86)

[11] The conditions under which Souris's deposition in this case was taken are nothing short of remarkable,  if not
unethical.  First, Souris's deposition in Connecticut was not confirmed until the very morning of its occurrence, thus
rendering it impossible for FLM's counsel (in Albany, New York), to attend.  (Hurst Decl., Exs. 6-9)  Souris
appeared without counsel, was apparently interrogated by two individuals off-the-record, and then was examined on
the record by a third attorney.  He arrived before 9:30, as directed, but the deposition "didn't get started until real
late because somebody had to go swimming and then the court reporter wasn't here on time."  (Souris Dep., pp. 9,
40-48)  And even though the unrepresented witnesses' agitation reached a point where counsel apparently threatened
to call 911, they nonetheless proceeded with the examination.

[12] Souris Dep, p., 78, *see also*, *id.*, pp. 82, 117, 139

[13] *Id.*, pp. 78-79

Contrary to plaintiff's unsupported speculation to the contrary, Souris testified that his secretary would review the messages left on the claims line, and, if any message was there which required a response, "she was supposed to call up the customer and say look at the back of your form, it says exactly what you need to send in under conditions." (Souris Dep., pp. 79-81) If the enrollee complied with the conditions, "then what you do is notify the dealer, you tell them you have So-and-So John Smith, follow the guideline and he is going to come up and get a $2,000 discount or whatever discount." (Souris Dep., pp. 82-83) From that point forward, Universal had no further role in the process. (Souris Dep., p. 83) Because Universal merely "administered" the program in this fashion (*i.e.*, receiving telephone messages and confirming ATSD enrollment), and netted $4.00 for each ATSD enrollment by the dealer,[14] Souris was able to work with minimal staff and overhead and testified that "it is very, very simple."[15] Plaintiff's attempt to torture this testimony into something nefarious is, in a word, absurd.

## ARGUMENT

### I. PLAINTIFF'S MOTION FOR CLASS CERTIFICATION SHOULD BE DENIED.

#### A. Rule 23 Requires a "Rigorous Analysis" to Determine Whether Class Adjudication is Proper.

In deciding whether to certify a class, this Court must engage in a "rigorous analysis." *In re Initial Pub. Offer. Sec. Litig.* ("*In re IPO*"), 471 F.3d 24, 38 (2d Cir. 2006) (quoting *Gen. Tel Co. v. Falcon*, 457 U.S. 147, 161 (1982)). Plaintiff cannot rest on speculation and conclusory allegations (all that is present here), but must ***prove*** her entitlement to certification, presenting

---

[14] As Souris testified, FLM would pay to Universal $25.00 for each ATSD enrollment. For reasons that are completely irrelevant to this case, Universal would retain its fee of $4.00 per enrollment, then return the balance to FLM in a separate check. (Souris Dep., pp. 83, 123)

[15] His entire discussion of how the ATSD claims process was purely theoretical: "[FLM] never had a claim through us. We never told Fuccillo here, this customer qualified for a claim." (Souris Dep., pp. 86-87)

"enough evidence, by affidavits, documents, or testimony," to satisfy the Court "that each Rule 23 requirement is met."  *In re IPO*, 471 F.3d at 41.[16]

Rule 23(a) sets out four prerequisites for all classes: numerosity, adequacy of representation, and, of key importance in this case, typicality and commonality.  *Fed. R. Civ. P.* 23(a); *Caridad v. Metro-North Comm. R.R.*, 191 F.3d 283, 291 (2d Cir. 1999).  "Commonality" requires establishing that common questions of fact and law are at the core of plaintiff's claims.  *See Dunnigan v. Metro Life Ins. Co.*, 214 F.R.D. 125, 136 (S.D.N.Y. 2003).  Class certification is inappropriate if the issues at the heart of plaintiff's claims require individualized proof of any element.

Once the requirements of Rule 23(a) are satisfied, plaintiff bears the additional burden of showing that her claims fall within at least one subsection of Rule 23(b).  As pertinent here, plaintiff must satisfy two requirements under Rule 23(b)(3),[17] superiority and predominance.  *Fed. R. Civ. P.* 23(b)(3).  The predominance requirement overlaps with the commonality and typicality requirements in Rule 23(a); however, it is "far more demanding" than those threshold

---

[16] The United States Court of Appeals for the Second Circuit has identified the following guidelines for class cortication:

> (1) a district judge may certify a class only after making determinations that each of the Rule 23 requirements has been met; (2) such determinations can be made only if the judge resolves factual disputes relevant to each Rule 23 requirement and finds that whatever underlying facts are relevant to a particular Rule 23 requirement have been established and is persuaded to rule, based on the relevant facts and the applicable legal standard, that the requirement is met; (3) the obligation to make such determinations is not lessened by overlap between a Rule 23 requirement and a merits issue, even a merits issue that is identical with a Rule 23 requirement; (4) in making such determinations, a district judge should not assess any aspect of the merits unrelated to a Rule 23 requirement; and (5) a district judge has ample discretion to circumscribe both the extent of discovery concerning Rule 23 requirements and the extent of a hearing to determine whether such requirements are met in order to assure that a class certification motion does not become a pretext for a partial trial on the merits.

*In re IPO.*, 471 F.3d at 41-42.  Plaintiff bears the burden of proving by a preponderance of the evidence that each of the elements of Rule 23 are met.  *Id*.

[17] Plaintiff's belated attempt to frame this case as one predominately seeking declaratory relief is easily rejected for the reasons stated, *infra*.

requirements. *Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 623 (1997). If proof of **any** essential element of a cause of action requires individualized treatment, class certification is unsuitable. *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 316 (3d Cir. 2008).[18]

As pertinent here, plaintiff cannot carry her burden of proving, by a preponderance of the evidence, that her claims are typical of the putative class, or that the elements of justifiable reliance and causation -- applicable to the majority of her state law claims -- are capable of proof at trial through evidence common to the class rather than individual to its members. Indeed, plaintiff merely checks off each of the Rule 23 factors in perfunctory fashion because she assumes (without providing any legal basis for her assumption) that mere proof of the alleged misrepresentation satisfies all the elements of her fraud-based claims. Yet that is not the case -- besides the allegedly misleading advertisements identified in the FAC (*i.e.*, stating that the ATSD was not insurance), there are myriad possible reasons for a plaintiff to purchase an anti-theft deterrent for their new automobile -- including concern that the automobile might be stolen or the potential for insurance premium reductions.[19] Or, as is the case with plaintiff here, a purchaser could be *completely indifferent* to the alleged misrepresentation, and could choose to purchase the ATSD for no other reason than a companion recommended she do so. (SMF ¶ 20 (k), (l)) As detailed more fully below, these are uniquely individual inquiries which are wholly unsuitable for class-wide determination.

---

[18] "Because the nature of the evidence that will suffice to resolve a question determines whether the question is common or individual . . . a district court must formulate some prediction as to how specific issues will play out in order to determine whether common or individual issues predominate in a given case." *In re Hydrogen Peroxide*, 552 F.3d at 311.

[19] Almost comically, plaintiff's so-called expert excoriates FLM for preying on "fear." Put simply, that is exactly the case with respect to *any* security system, be it at home, in a car, or elsewhere. If there were no security concerns, there would be no need for a security system or theft deterrent.

## B.     The FAC Does Not Satisfy the Requirements of Rule 23(b)(2).

A court may certify a class under Rule 23(b)(2) only when "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." *Fed. R. Civ. P.* 23(b)(2).  Rule 23(b)(2) "is intended for cases where broad, class-wide injunctive or declaratory relief is necessary to redress a group-wide injury." *Robinson v. Metro-North Comm. R.R. Co.*, 267 F.3d 147, 162 (2d Cir. 2001).  "Prototypical (b)(2) actions seek[] institutional reform, not individualized relief." *In re Methyl Tertiary Ether Prods. Liab. Litig.* ("*In re MTBE*"), 209 F.R.D. 323, 344 n. 34 (S.D.N.Y. 2002).  This case, which centers on a routine automobile aftermarket program that has been defunct for 3 years, and where no putative plaintiff has been injured or deceived, "is markedly different from the paradigm Rule 23(b)(2) class action." *McManus v. Fleetwood Enters., Inc.*, 320 F.3d 545, 553 (5th Cir. 2003).

In *Robinson*, *supra*, the Second Circuit ruled that a class may not be certified under Rule 23(b)(2) unless the Court is satisfied that "even in the absence of a possible monetary recovery, reasonable plaintiffs would bring the suit to obtain the injunctive or declaratory relief sought." *Robinson*, *supra*, 267 F.3d at 164.  "Insignificant or sham requests for injunctive relief should not provide cover for (b)(2) certification of claims that are brought essentially for monetary recovery." *Id.*

As evidenced by the allegations in the FAC, the predominant remedy requested here is money.  (*See*, *e.g.*, FAC ¶¶ 63, 70, 76, 81, 84 and 88)  Indeed, plaintiff's claim for money damages predominates even the single paragraph of the FAC which mentions injunctive relief:

> Plaintiff, in her own behalf and on behalf of those similarly situated, seeks to enjoin the practices complained of herein, asks that the Court order the Defendant **to refund** to all Class members, including plaintiff, all premiums and charges paid in connection with the sale of ETCH ATSDS

> and asks that the Court further ***order disgorgement by the Defendants of all profits and benefits*** unlawfully obtained from the unauthorized sale of insurance, together with treble damages, and all attorneys' fees and costs.

(FAC ¶ 15)  Moreover, plaintiff's belated attempt to re-cast her Complaint into one ***predominately*** seeking declaratory relief flies in the face of the plain text of the FAC, which only seeks declaratory relief with respect to ***two*** of her ***eight*** putative claims -- the proposed cause of action for alleged violation of GBL § 349, and her proposed fifth cause of action for unjust enrichment -- and even then only as an afterthought in the FAC's "Wherefore" clause.[20]  Finally, the unrefuted discovery in this case (both from FLM and Souris) establishes that the allegedly deceptive conduct was discontinued in its entirety as to all dealerships in late-2007, thus rendering moot any request for injunctive relief.  (SMF ¶ 25)  In short, plaintiff's claim for declaratory relief is "an ill-disguised claim for damages," that cannot be sustained under Rule 23(b)(2).  *The Presbyterian Church of Sudan v. Talisman Energy, Inc*., 226 F.R.D. 456, 468 (S.D.N.Y. 2005).

      **C.**      **Plaintiff's Claims Fail Under the Commonality, Typicality and Predominance Tests**.

          **(1)**      **The Alleged Representations Made to Plaintiff Materially Differ From Those Allegedly Made to the Class**.

To satisfy Rule 23(a)'s typicality requirement, plaintiff must establish that "each member's claims arise from the same course of events, and each class member makes similar legal arguments to prove defendant's liability."  *Marisol v. Giuliani*, 126 F.3d 372, 376 (2d Cir.

---

[20] As noted previously, when plaintiff applied for her new car loan, she was well-aware that her recent bankruptcy filing might color her ability to qualify.  (Seekamp Dep., pp. 39-41, 57-58, 100-04)  She has since admitted to lying on the financing application she submitted to FLM by exaggerating the duration of her employment at two (2) separate employers, likely in an attempt to influence the decision in her financing application.  (*Id*.) Under these circumstances, she should be precluded by the doctrines of estoppel and unclean hands from representing any class seeking equitable relief.

1997).[21]  The FAC's central allegation is that "[t]o conceal that ETCH ATSD is insurance, Defendants marketed and sold an ETCH ATSD as a "warranty."'  (FAC, ¶ 3, 5, 7, 33, 38, 45 (a)-(d), 55, 75)

However, plaintiff's testimony clearly establishes, that at least with respect to *her*, the ATSD *was represented to be insurance* by the two individuals she interacted with at the point of sale; first, when she made inquiry while signing the documents with FLM's business manager, then again when she followed up on that inquiry with her salesman, and was allegedly again told (and clearly understood) that she was purchasing "[I]nsurance for the car."  (SMF ¶ 20(e), (f))  Plaintiff's remarkable deposition testimony leaves just two possibilities:  (i) the competing oral and written representations she received were *atypical* of any other class plaintiff (because, unlike plaintiff, they only saw the written "not insurance" alleged misrepresentation), which means that litigation concerning plaintiff's unique situation and whether it precludes her from claiming justifiable reliance on the "not insurance" representation in the written document threatens to overcome the case; or (ii) the competing oral and written representations she received were somehow *typical*, which means that every one of the more than 3,000 putative class plaintiffs would be subjected to an individualized mini-trial to determine exactly what **oral** communications were made in connection with the sale of the ATSD to determine whether they justifiably relied on the conflicting representations, *i.e.*, the written "not insurance" representation on the pre-printed ATSD enrollment form and the alleged oral representation to the contrary.  Either possibility is fatal to class certification because plaintiff is unable to

---

[21] The typicality requirement also "ensure[s] that the class representative is not subject to unique defense which could potentially become the focus of the litigation," a test plaintiff also fails for the reasons discussed, *infra*. *Spagnola v. Chubb Corp.*, 264 F.R.D. 36, 93 (S.D.N.Y. 1988).  To preclude class certification, the defendant need not establish that the class representative ultimately would be defeated by the unique defense.  Rather, class treatment should be denied if a unique defense is even arguably present, and not completely meritless.  *Kline v. Wolf*, 702 F.2d 400, 403 (2d Cir. 1983) (holding that district court need only make a preliminary finding that named plaintiff's credibility would be subject to attack); *accord J.H. Cohn & Co., v. Am. Appraisal Assoc., Inc.*, 628 F.2d 994, 998-99 (7th Cir. 1980).

demonstrate that her claims (and the defenses thereto) are "typical" of any other claim and/or cannot demonstrate that common questions of law or fact "predominate."

> **(2)    Plaintiff Has Admitted That She Did Not Rely on FLM's Characterization of the ATSD as the Reason for Her Enrollment**.

"[A] putative class representatives claims are not typical if that representative is subject to unique defenses." *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig*., 209 F.R.D. 323, 338 (S.D.N.Y. 2002).  Here, plaintiff's deposition testimony establishes, beyond all doubt, that she did not rely on the "insurance/not insurance" distinction in choosing to purchase her vehicle, or the ATSD.  In fact, Seekamp's decision to purchase the ATSD had nothing at all to do with how it was characterized -- she ultimately deferred the purchase decision to her son, who said "well, mom, you already paid 16 or $18,000 for a car, what's another $295."  (Seekamp Dep., p. 137) In response to her son's advice, "[Seekamp] said okay.  ***That's why I finished off with the P and I signed*** [the ATSD enrollment form]."  (*Id*.)  While this was happening, FLM staff "didn't say a word to [plaintiff]."  (*Id*., p. 138)  Consequently, plaintiff has admitted that she purchased the ATSD as an afterthought, without any reliance whatsoever on how it was characterized.

> **D.    The FAC Does Not Satisfy the Requirements of Rule 23(b)(3) Because Individualized Issues of Reliance and Causation Predominate.**

Under Rule 23(b)(3), "[a] class action may be maintained if . . .the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members," and that a class action is superior to other methods of adjudication for fairness and efficiency.  *Moore v. PaineWebber, Inc*., 306 F.3d 1247, 1252 (2d Cir. 2002); *Andrews v. AT&T Co*., 95 F.3d 1014, 1025 (11th Cir. 1996) (no predominance where "plaintiffs would . . . have to show, on an individual basis, that they relied on the misrepresentations, suffered injury as a result, and incurred a demonstrable amount of damages.").  Class-wide issues

predominate only if resolution of some of the legal or factual questions that qualify each class members' case as a genuine controversy can be achieved through generalized proof, *and* if these particular issues are more substantial than the issues subject only to individualized proof." *Moore*, 306 F.3d at 1252 (emphasis supplied). Thus, cases in which "individual issues are high and disparities among class members are great" are "ordinarily not appropriate for class treatment." *Amchem*, 521 U.S. at 625.

The need to prove individual reliance and causation often dooms class treatment in fraud and misrepresentation cases such as the present one. For example, in *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215 (2d Cir. 2008), "[t]he gravamen of plaintiffs' complaint [was] that defendants' implicit representation that Lights were healthier led them to buy Lights in greater quantity than they otherwise would have and at an artificially high price, resulting in plaintiffs' overpayment for cigarettes." *Id.* Similarly, the "gravamen" of plaintiff's complaint here is that FLM's representation that the ATSD was a warranty (or failure to disclose that it was insurance) caused members of the putative class to buy the ATSD, presumably at a higher price than would have been available from a licensed insurer.[22]

In *McLaughlin*, the Second Circuit held that reliance on a misrepresentation made as part of a nationwide marketing strategy "cannot be the subject of general proof." *Id.* at 223. In so doing, the Court rejected the claim -- identical to that raised by plaintiff here -- that common issues predominated because defendant's alleged fraud resulted from a common course of conduct, reasoning:

> proof of misrepresentation -- *even widespread and uniform misrepresentation* -- only satisfies half of the equation; the other half, reliance on the misrepresentation, cannot be the subject of general proof. Individualized proof is needed to overcome the possibility that a member

---

[22] Plaintiff testified that she never sought out an estimate from her insurer as to the cost of any similar product. (SMF ¶ 16)

> of the purported class purchased Lights for some reason other than the
> belief that Lights were a healthier alternative -- for example, if a Lights
> smoker was unaware of that representation, preferred the taste of Lights,
> or chose Lights as an expression of personal style.

*Id.* (Emphasis supplied); *see also, Moore*, 306 F.3d at 1253 ("[o]n the other hand, although

having some common core, a fraud case may be unsuited for treatment as a class action if there

was material variation . . . in the kinds or degrees of reliance by the persons to whom they were

addressed"); *Solomon v. Bell Atlantic Corp.*, 9 A.D.3d 49, 54 (refusing to certify class under

GBL § 349, observing that, *"[e]ven assuming that all the members of the class saw the same

advertisements*, questions as to whether each individual was reasonably misled by them

predominate . . .") (Emphasis supplied).

Exactly as in *Moore* and *McLaughlin*, proof that FLM used a standardized document to

enroll purchasers in the ATSD program might suffice to show an alleged misrepresentation, but

that showing "only satisfies half the equation." *McLaughlin,* 522 F.3d at 223. Plaintiff must still

prove the other half, *i.e.*, must "overcome the possibility that a member of the purported class

purchased" the ATSD for some reason other than their allegedly erroneous belief that it was not

insurance, as, for example, for safety reasons, or, as with plaintiff here, because they were utterly

indifferent to the insurance/not insurance dichotomy and so deferred the ultimate decision to

purchase to a companion - a circumstance which breaks the chain of causation between the

alleged misrepresentation and the purchase.

This Court recently applied *McLaughlin*'s holding in *Dungan v. The Academy at Ivy

Ridge*, 249 F.R.D. 13 (N.D.N.Y.) (McAvoy, D.J.), *aff'd.*, 344 Fed. App'x 645 (2009), where the

putative class plaintiffs "alleged that defendants misrepresented Ivy Ridge's accreditation status

and authorization to issue diplomas and credits in order to induce parents to send their children to

Ivy Ridge." *Dungan*, 344 Fed. App'x at 647.     In denying class certification, Justice McAvoy held:

> This case is predominately a fraud case.  Plaintiff asserts causes of action under 18 U.S.C. § 1962(c) and 18 U.S.C. § 1962(d) (fraud-base RICO claims), and claims for rescission of contract based on fraud, fraud in the inducement, and common law fraud.  Plaintiffs also assert claims of unjust enrichment, breach of contract, negligent misrepresentation, negligence and violations of N.Y. General Business Law §§ 349 and 350, and for a fraudulent conveyance.  Seven of these causes of action (the RICO claims, the fraud claims, the rescission claims, the negligent misrepresentation claims, and the General Business Law § 350 claims) require proof of reliance, causation and damages . . . ***These issues of reliance and causation are the main focus of Plaintiffs claims and . . . the Court finds that the issues of reliance and causation will predominate over this case and that certification, or issue certification, will not reduce the range of issues in dispute and promote judicial economy***.  *See, e.g.*, In re Initial Public Offering Sec. Litig., 471 F.3d 24, 42 (2d Cir. 2006) ("The predominance requirement fails initially with respect to the issue of reliance.").

*Id.*, at 415-16 (internal citations omitted).

As in *Ivy Ridge*, justifiable reliance and causation are elements of plaintiff's "Consumer Fraud" claim (Count II of the FAC); reliance and causation are elements of plaintiff's "Breach of Fiduciary Duty" claim (Count III of the FAC), which specifically alleges that "[defendants] rendered a promise in reliance upon which the consumer transferred money and the Defendants were unjustly enriched" (FAC ¶ 74).  And as to plaintiff's GBL § 349 claim (assuming it is not a GBL § 350 false advertising claim that has been re-cast specifically to avoid the reliance requirement attended thereto), while reliance may not be an element of the claim, plaintiff must nonetheless demonstrate that she, and every member of the putative class, was deceived in a "material" way by the alleged mischaracterization, and that such deception *caused* them to enroll in the ATSD.  *See Gale v. IBM Corp.*, 9 A.D.3d 446 (2d Dep't 2004).  In other words, plaintiff will have to prove that, had the ATSD been "properly" characterized as "insurance" (which, according to plaintiff's remarkable testimony, it was) she -- and every other class member --

would not have paid the $295.00 enrollment fee (an impossible showing here, where plaintiff enrolled allegedly knowing it was insurance). There is just no possible way that can be established through "generalized" proof. *Poulous v. Ceaser's World, Inc.*, 379 F.3d 654, 664 (9th Cir. 2004) ("[I]ndividualized reliance issues ***related to proof of causation*** would predominate over common questions") (Emphasis supplied). In other words, whether or not the "insurance" vs. "warranty" distinction had any significance to the putative class (*i.e.*, whether they would have declined to enroll in the ATSD had it been "properly" characterized as insurance), could never reasonably be determined without a plaintiff-by-plaintiff examination (a/k/a a "mini-trial") as to each plaintiff's motivation for purchasing the product, *i.e.*, without individual proof of reliance and causation.

> **(1)** **Class Treatment is Not Warranted Further for the Reason That the Fundamental Question of Whether the ATSD Qualifies as Insurance Requires an Individualized Inquiry.**

The fundamental theory at the center of plaintiff's claims -- *i.e.*, that the ATSD qualifies as insurance under New York law -- cannot, according to the State Insurance Department, be known without conducting a transaction-by-transaction analysis of vehicle sales records. As aptly explained by Souris, the direct recipient of the State Insurance Department guidance on this matter, "if you have a $20,000 car [that] the dealer owns for $15,000, that means if he gives a $2,000 discount off the list price, then he still makes a profit." (Souris Dep., p. 71) Obviously, members of any putative class have purchased different automobiles at different prices from different dealers with different overhead and profit and loss structures. Plaintiff is completely unable to show that that such a vehicle-by-vehicle analysis, necessarily required to determine whether any given sale qualified as the sale of insurance, could ever be conducted through "generalized proof."

## II. FLM HAS DEMONSTRATED THAT THERE ARE NO GENUINE ISSUES OF MATERIAL FACT AND THAT SUMMARY JUDGMENT DISMISSING ALL OF PLAINTIFF'S CLAIMS IS THUS BOTH NECESSARY AND APPROPRIATE.

The FAC pleads six claims for relief: (i) violation of GBL § 349; (ii) consumer fraud; (iii) breach of fiduciary duty; (iv) breach of contract; (v) unjust enrichment; and (vi) illegal contracts. As detailed more fully below, there are no genuine issues of material fact which would preclude entry of summary judgment in FLM's favor and dismissal of the FAC. *See Fed. R. Civ. P.* 56(a).

### A. Summary Judgment Should be Granted on Plaintiff's GBL § 349 (Count I) and Consumer Fraud Claims (Count II).

In this case, the alleged deception is two-fold: (i) that the ATSD was deceptively marketed and sold as a "warranty," when it was allegedly insurance; and, (ii) that the claims process affiliated therewith -- entirely the responsibility of Universal as independent contractor -- and of which neither this plaintiff, nor any other putative plaintiff, ever attempted to avail themselves, was somehow a sham because a telephone number listed on the etchings themselves, which, as discussed, *infra, is not even the telephone number enrollees were directed to call to assert a claim,* is or was inoperable.

To prevail on her cause of action under GBL § 349, plaintiff must prove that FLM "[1] made misrepresentations or omissions that were likely to mislead a reasonable consumer in the plaintiff's circumstances, [2] that the plaintiff was deceived by those misrepresentations or omissions, [3] that as a result the plaintiff suffered injury." *Solomon v. Bell Atl. Corp.*, 9 A.D.3d 49 (1st Dep't 2004) (cited in *Pelman v. McDonald's Corp.*, No. 02-Civ-07821 (DCP), 2010 WL 4261390 (S.D.N.Y. Oct. 27, 2010) (refusing to certify class under GBL § 349 because "individualized inquiries are necessary to determine whether each plaintiff suffered injury as a

result of being deceived by Defendant's allegedly misleading representations.")). As recognized in *Pelman*, *supra*, "allegations of false beliefs and understandings" as to the nature or characteristics of the ATSD -- which plaintiff here claims as part of her damages -- "do not state a claim for 'actual injury' under GBL § 349, and neither do allegations of pecuniary loss for the purchase of Defendant's products."[23] *Pelman*, 2010 WL 4261390, at * 7 (citing *Small v. Lorillard Tobacco Co.*, 252 A.D.2d 1 (1st Dep't 1998) ("Neither the case law nor the statutory language [of GBL § 349] supports [the] argument that the deception *is* the injury." (emphasis in original)), *aff'd*, 94 N.Y.2d 43 (1999)) (additional citation omitted).

    **(1)**    **Plaintiff Cannot Prove Damages Under GBL § 349 By Seeking Recoupment of the ATSD Enrollment Fee**.

As an initial matter, the New York Court of Appeals has held that recoupment claims such as the one raised by plaintiff here are not actionable under GBL § 349. For example, in *Small, supra,* a group of smokers alleged under GBL § 349 that cigarette companies deceived them about the addictive nature of cigarettes and fraudulently induced them to purchase cigarettes and continue to smoke. 94 N.Y.2d 43 (1999). Plaintiffs also argued that they never would have purchased cigarettes had they known of their addictive quality and therefore were entitled to reimbursement for the cost of their cigarettes. *Id*. Like plaintiff here, the smokers in *Small* sought monetary recoupment of the purchase price of their cigarettes based on the assertion that defendants' deception prevented them from making free and informed choices as consumers. *Id*. at 56.

The Court of Appeals flatly rejected these assertions, concluding that plaintiff's definition of injury was "legally flawed" because it contained no manifestation of pecuniary or actual harm.

---

[23] A copy of the *Pelman* case is annexed hereto as an appendix. Stated another way, "A deceptive act or practice is not 'the mere invention of a scheme or marketing strategy, but the actual misrepresentation or omission to a consumer,' by which the consumer is "caused actual, although not necessarily pecuniary, harm." *Solomon*, 9 A.D.3d at 53 (internal citations omitted).

*Id.* The court first noted that mere deception itself is not actionable injury under the statute. *Id.* It also repudiated the notion that merely spending money on a product in reliance on an alleged misrepresentation qualifies as "pecuniary harm" under GBL § 349. *Id.* Thus, since *Small*, state and federal courts have routinely dismissed actions seeking recoupment based on claims of deception under GBL § 349.[24]

Like the smokers in *Small*, plaintiff here alleges deception as injury and seeks recoupment of the ATSD enrollment fees.[25] (FAC, ¶¶ 15 (seeking a "refund" of "all premiums and charges"), 63 (seeking "recovery of all sums paid for the ETCH ATSD")). Such claims are simply not cognizable under New York law.[26]

---

[24] *See, e.g.*, *Hooper v. HM Mane Solutions, LLC*, No. 03034/05, 2006 WL 1214818, at *1 (Sup. Ct. N.Y. Co. Mar. 15, 2006) (denying certification of a class of purchasers of a product who had alleged misrepresentations by the manufacturer, in part because the mere purchase or use of the product without injury is not actionable); *Bildstein v. MasterCard Int'l, Inc.*, 329 F. Supp. 2d 410, 415-16 (S.D.N.Y. 2004) (credit card holder complaining of deception via undisclosed foreign currency transaction fees failed to state a claim under Section 349); *Spitzer v. Applied Card Sys., Inc.* 41 A.D.3d 4, 9-10 (3d Dep't 2007) (consumers who enrolled in credit card protection program not entitled to restitution for the fees they paid); *Baron v. Pfizer*, No. 6429-04, 2006 WL 1623052, at *4 (Sup. Ct. N.Y. Co. May 2, 2006) (medication consumer not entitled to recover money paid for drug). (Copies of *Hooper* and *Baron* are annexed hereto as appendices).

[25] In *Sokoloff v. Town Sports Inter., Inc.*, the appellate division upheld the dismissal of the Section 349 claim "since plaintiff suffered no actual injury and therefore lacks standing to pursue her claims." 6 A.D.3d 185 (1st Dep't 2004). Using language equally befitting this case, the court observed:

> Plaintiff does not claim any kind of monetary loss other than payment of her membership fees, does not claim that defendant failed to deliver the services called for in the contract, never sought to cancel the contract, remains a member of defendant's health club and continues to pay defendant's monthly membership fees without objection.

*Id.* at 186. The *Sokoloff* court also dismissed plaintiff's unjust enrichment claim, "since plaintiff bargained for and received the use of the health club." That is the case here, where regardless of characterization, plaintiff "bargained for and received the use of" the window etch, and her automobile was never stolen. *See also Spagnola v. Chubb Corporation*, 574 F.3d 64, 74 ("Although a monetary loss is a sufficient injury to satisfy the requirement under § 349, that loss must be independent of the loss caused by the alleged breach of contract.").

[26] Moreover, even if plaintiff's recoupment claims were valid, they could not be tried on a class-wide basis. Under plaintiff's theory of the case, each plaintiff would not have purchased the ATSD had FLM not made the allegedly deceptive "not insurance" representation. Put another way, each plaintiff would have to show how he would have behaved with full information, which requires a series of individual inquires as to whether they would have purchased the ATSD if they knew that (according to plaintiff) it was insurance. Once again, such individualized inquiries preclude class certification.

## (2)     Plaintiff Has Suffered No Actual Damages.

Without question, FLM "etched" plaintiff's vehicle with a unique identifying number, exactly as FLM had agreed to do under the enrollment agreement. (SMF ¶ 21)  Plaintiff has owned her vehicle bearing the etched numbers for 3.5 years, and it has never been stolen.  (SMF ¶ 23) The term of the ATSD (3-years) has now expired, not only as to plaintiff's vehicle, but, because the program was discontinued across-the-board in 2007, also as to any vehicle purchased by any member of the putative class(es).  Consequently, neither this plaintiff, nor any putative plaintiff, has ever had (and will never have) any occasion to seek any of the discounts available under the ATSD, and thus has never (and will never) be improperly deprived of any those benefits.  Nor has she identified any other putative class plaintiff who has been denied any benefit due under the ATSD.  Indeed, since no claims for the discount were ever asserted during the life of the program, either to FLM or to Universal, there are no injured plaintiffs within the putative class(es).  In short, plaintiff cannot establish the damages element of her GBL § 349 or fraud claims (or, for that matter, any of her claims), thus rendering both subject to dismissal on summary judgment.[27]

### B. Summary Judgment is Appropriate Dismissing Plaintiff's Breach of Contract (Count IV) and Unjust Enrichment (Count V) Claims.

To prevail on her breach of contract claim, plaintiff must prove, (1) the existence of an agreement (not in dispute); (2) adequate performance of the contract by the plaintiff (impossible for this plaintiff to satisfy, since she never asserted a claim, much less one that qualified for the

---

[27] To meet "the irreducible constitutional minimum of standing," *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992), plaintiff must show three things:  "First, [plaintiff] must have suffered an 'injury-in-fact' - an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical.  Second, there must be a causal connection between the injury and the conduct complained of.  Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.  *United States v. Hays*, 515 U.S. 737 (1995) (quoting *Lujan*, 504 U.S. at 560-61).  For the reasons set forth above, plaintiff's claims fail under the first and third prongs and she therefore cannot establish Article III standing.

ATSD); (3) breach of the agreement by the defendant and, (4) damages. *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996). In terms of the contractual relationship here, the only promises made by FLM in the ATSD were to etch the identifying numbers on the windows and, to guarantee that, for three years following the sale: (i) "the system installed will be effective deterrent against Vehicle theft," and (ii) in the event the vehicle is stolen and not recovered (or recovered after theft and deemed a total loss), "the Authorized Dealer will provide You with 10% discount towards the purchase of a Replacement Vehicle in the amount of up to $2,000."

Stated simply, even assuming the other elements of a contract claim are established (a doubtful proposition) there has been no breach here. Plaintiff's vehicle was inscribed with the promised etch numbers and was never stolen. At her deposition, plaintiff could not foreclose the possibility that her vehicle was never stolen *because* the etch had proven to be an effective deterrent with respect to her vehicle. (Seekamp Dep., p. 129) Obviously, plaintiff has never been improperly denied the benefit of her bargain, the *sine qua non* of any breach of contract claim, but instead now relies on pure speculation that, had a claim ever been asserted by some mythical class plaintiff using an erroneous telephone number, it would not have been paid.[28] That does not establish a breach of contract.

Similarly, plaintiff cannot state a claim for unjust enrichment because no benefit or obligation due to her from FLM has ever been withheld. Plaintiff has now attempted to re-cast this claim as well, appearing to argue that the etch itself cost only $4.00, but was sold to plaintiff

---

[28]As previously stated, plaintiff's protestations about an allegedly inoperable telephone number fail to raise any genuine issue of fact because that was not the telephone number set forth in the ATSD contract for the purpose of reporting claims. Consequently, its alleged inoperability is completely beside the point. Further, the ATSD contract clearly identifies Universal as the program Administrator. The relationship between FLM and Universal is, according to their contract, that of independent contractor. Accordingly, even if the inoperable telephone number were pertinent, that would be an issue between plaintiff and Universal, which is presumably why Universal is in this case as a defendant in the first place. As a matter of black-letter law, FLM cannot be held liable for the conduct of its independent contractor, Universal.

for $295.00.  However, plaintiff once again ignores the discovery record -- FLM has produced the invoice for the etch process showing a $47.50 charge for parts and labor, yet plaintiff's so-called expert apparently never saw the invoice before rendering his opinion.[29]  And that is only part of the equation as it fails to take into account FLM's overhead, including the cost of ownership, upkeep and maintenance of the facility where the etch was installed.

### C.  Plaintiff's "Illegal Contracts" Claim Should be Dismissed.

To prove that the ATSD is insurance, plaintiff would have to plead, and prove, that had the maximum $2,000 discount been granted to Seekamp, it would have deprived FLM of its profit on the sale.  Plaintiff has not even pleaded that part of the equation.  Thus, the claim should be dismissed.

---

[29] Plaintiff's so-called expert witness, Donald Stiver, opines that the promise of a discount "is illusory" because "[C]sutomer filing a claim would probably get that discount by simply negotiating."  (Stiver Rep., p. 15)  However, this plaintiff admitted that she made no attempt at all to negotiate anything, because she "just wanted something new."   Thus once again, plaintiff's so-called expert has failed to take material information into account before rendering his opinion.

## CONCLUSION

For the foregoing reasons, defendants It's Huge, Inc. and Fuccillo Lincoln Mercury, Inc., d/b/a Fuccillo Hyundai, respectfully request an Order denying plaintiff's motion for class certification, and granting summary judgment dismissing the Complaint, and each and very cause of action found therein, in its entirety.

Dated: March 1, 2011
      Albany, New York

                      Respectfully submitted,

                      **GREENBERG TRAURIG, LLP**

By:      /s/ William A. Hurst
                      William A. Hurst
                      (Bar Roll No.: 510271)
                      54 State Street, 6th Floor
                      Albany, New York 12207
                      Tel: (518) 689-1400
                      Fax: (518) 935-9513
                      hurstw@gtlaw.com

                      **ROEMER WALLENS GOLD**
                        **& MINEAUX, LLP**

                      Matthew J. Kelly
                      Amanda Twinam
                      13 Columbia Circle
                      Albany, New York 12203
                      Tel:  (518) 464-1300
                      Fax:  (518) 464-1010
                      jkelly@rgwmlaw.com
                      awtwinam@rgwmlaw.com

                      *Attorneys for Fuccillo Defendants*

1433960v1

25

# Attachment 1

--- F.R.D. ----, 2010 WL 4261390 (S.D.N.Y.)
**(Cite as: 2010 WL 4261390 (S.D.N.Y.))**

**H**

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
PELMAN, et al., Plaintiffs,
v.
McDONALD'S CORP., Defendant.

No. 02 Civ. 07821(DCP) [FN1].
Oct. 27, 2010.

**Background:** Parents, on behalf of minor children, brought state-court action against fast-food restaurant chain, claiming that consumption of chain's food caused obesity and related serious health problems, and alleging violations of New York's consumer protection statutes. After action was removed, the United States District Court for the Southern District of New York, Robert W. Sweet, J., 237 F.Supp.2d 512, dismissed complaint with leave to amend and, following amendment, 2003 WL 22052778, dismissed complaint in its entirety without leave to amend. Plaintiffs appealed. The Court of Appeals, Jed S. Rakoff, District Judge, sitting by designation, 396 F.3d 508, vacated and remanded. The District Court, Sweet, J., 396 F.Supp.2d 439, granted in part and denied in part defendant's motion for more definite statement. Following filing of amended complaint, defendant moved to strike and dismiss. The District Court, Sweet, J., 452 F.Supp.2d 320, granted motion in part and denied it in part. Consumers moved for class certification.

**Holdings:** The District Court, Pogue, J., held that:
(1) cause of action failed to meet predominance requirement for maintainability as class action with regard to element of injury;
(2) discrete issues of consumer orientation and material deceptiveness of defendant's acts and omissions satisfied criteria for issue class certification other than numerosity; but
(3) numerosity was not satisfied.

Motion denied.

West Headnotes

**[1] Federal Civil Procedure 170A ☞161.1**

170A Federal Civil Procedure
   170AII Parties
      170AII(D) Class Actions
         170AII(D)1 In General
            170Ak161.1 k. Factors, Grounds, Objections, and Considerations in General. Most Cited Cases

Class action rule requires that class action possess four familiar features of numerosity, commonality, typicality, and adequacy of representation; if those criteria are met, district court must next determine whether class can be maintained under any one of three grounds. Fed.Rules Civ.Proc.Rule 23(a, b), 28 U.S.C.A.

**[2] Federal Civil Procedure 170A ☞163**

170A Federal Civil Procedure
   170AII Parties
      170AII(D) Class Actions
         170AII(D)1 In General
            170Ak163 k. Impracticability of Joining All Members of Class; Numerosity. Most Cited Cases

Proposed class satisfies "numerosity" requirement of class action rule if class is so numerous that joinder of all members is impracticable, which is presumed to be the case at level of at least 40 members; plaintiffs need not precisely limit class size at outset, but exact membership of class must be ascertainable at some point in case, and there must be something within record from which it can be inferred that class does exist. Fed.Rules Civ.Proc.Rule 23(a)(1), 28 U.S.C.A.

**[3] Federal Civil Procedure 170A ☞172**

170A Federal Civil Procedure

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

170AII Parties
170AII(D) Class Actions
170AII(D)2 Proceedings
170Ak172 k. Evidence; Pleadings and Supplementary Material. Most Cited Cases

For purposes of motion for class certification, court considers allegations in complaint as true. Fed.Rules Civ.Proc.Rule 23, 28 U.S.C.A.

**[4] Federal Civil Procedure 170A �köm174**

170A Federal Civil Procedure
170AII Parties
170AII(D) Class Actions
170AII(D)2 Proceedings
170Ak174 k. Consideration of Merits. Most Cited Cases

In determining propriety of class action, question is not whether plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether requirements of class action rule are met. Fed.Rules Civ.Proc.Rule 23, 28 U.S.C.A.

**[5] Federal Civil Procedure 170A ⊫⊐165**

170A Federal Civil Procedure
170AII Parties
170AII(D) Class Actions
170AII(D)1 In General
170Ak165 k. Common Interest in Subject Matter, Questions and Relief; Damages Issues. Most Cited Cases

"Predominance" inquiry for class certification tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation; to satisfy this requirement, plaintiffs must establish that issues in the class action that are subject to generalized proof, and thus applicable to class as whole, predominate over those issues that are subject only to individualized proof. Fed.Rules Civ.Proc.Rule 23(b)(3), 28 U.S.C.A.

**[6] Federal Civil Procedure 170A ⊫⊐165**

170A Federal Civil Procedure
170AII Parties

170AII(D) Class Actions
170AII(D)1 In General
170Ak165 k. Common Interest in Subject Matter, Questions and Relief; Damages Issues. Most Cited Cases

Plaintiff's failure to establish that common proof regarding elements of asserted claims would predominate is sufficient to warrant denial of motion for class certification. Fed.Rules Civ.Proc.Rule 23(b)(3), 28 U.S.C.A.

**[7] Antitrust and Trade Regulation 29T ⊫⊐161**

29T Antitrust and Trade Regulation
29TIII Statutory Unfair Trade Practices and Consumer Protection
29TIII(B) Particular Practices
29Tk161 k. Representations, Assertions, and Descriptions in General. Most Cited Cases

**Antitrust and Trade Regulation 29T ⊫⊐162**

29T Antitrust and Trade Regulation
29TIII Statutory Unfair Trade Practices and Consumer Protection
29TIII(B) Particular Practices
29Tk162 k. Omissions and Other Failures to Act in General; Disclosure. Most Cited Cases

To prevail on elements of cause of action under New York consumer protection statute proscribing deceptive acts and practices, plaintiffs must prove that [1] defendant made misrepresentations or omissions that were likely to mislead reasonable consumer in plaintiff's circumstances, [2] plaintiff was deceived by those misrepresentations or omissions and [3] as a result, plaintiff suffered injury. N.Y.McKinney's General Business Law § 349.

**[8] Federal Civil Procedure 170A ⊫⊐182.5**

170A Federal Civil Procedure
170AII Parties
170AII(D) Class Actions
170AII(D)3 Particular Classes Represented
170Ak182.5 k. Consumers, Purchasers,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Borrowers, and Debtors. Most Cited Cases

Cause of action under New York consumer protection statute proscribing deceptive acts and practices against fast food chain which allegedly engaged in deceptive nutritional marketing scheme failed to satisfy predominance requirement of class action rule; individualized inquiries were necessary to determine whether each plaintiff suffered actual injury in form of development of obesity and related serious medical conditions as result of being deceived. Fed.Rules Civ.Proc.Rule 23(b)(3), 28 U.S.C.A.

**[9] Antitrust and Trade Regulation 29T ⬅138**

29T Antitrust and Trade Regulation
    29TIII Statutory Unfair Trade Practices and Consumer Protection
        29TIII(A) In General
            29Tk133 Nature and Elements
                29Tk138 k. Reliance; Causation; Injury, Loss, or Damage. Most Cited Cases

Allegations of false beliefs and understandings do not state claim for actual injury under New York consumer protection statute proscribing deceptive acts and practices, and neither do allegations of pecuniary loss for purchase of defendant's products. N.Y.McKinney's General Business Law § 349.

**[10] Federal Civil Procedure 170A ⬅182.5**

170A Federal Civil Procedure
    170AII Parties
        170AII(D) Class Actions
            170AII(D)3 Particular Classes Represented
                170Ak182.5 k. Consumers, Purchasers, Borrowers, and Debtors. Most Cited Cases

To satisfy commonality requirement in class action alleging deceptive acts and practices under New York consumer protection statute proscribing deceptive acts and practices, proof must show that each plaintiff was reasonably deceived by defendant's misrepresentations and was injured by reason thereof. Fed.Rules Civ.Proc.Rule 23(a)(2), (b)(3), 28 U.S.C.A.; N.Y.McKinney's General Business

Law § 349.

**[11] Federal Civil Procedure 170A ⬅165**

170A Federal Civil Procedure
    170AII Parties
        170AII(D) Class Actions
            170AII(D)1 In General
                170Ak165 k. Common Interest in Subject Matter, Questions and Relief; Damages Issues. Most Cited Cases

Court may certify class on particular issue even if action as whole does not satisfy predominance requirement. Fed.Rules Civ.Proc.Rule 23(b)(3), (c)(4), 28 U.S.C.A.

**[12] Federal Civil Procedure 170A ⬅165**

170A Federal Civil Procedure
    170AII Parties
        170AII(D) Class Actions
            170AII(D)1 In General
                170Ak165 k. Common Interest in Subject Matter, Questions and Relief; Damages Issues. Most Cited Cases

Issue certification is especially appropriate where defendants' liability can be determined once, on classwide basis, through common evidence; moreover, where initial elements of liability may be established on basis of common evidence, issue certification may be an appropriate method for advancing litigation even where prevalence of individual inquiries regarding element of causation precludes class certification for action as whole. Fed.Rules Civ.Proc.Rule 23(c)(4), 28 U.S.C.A.

**[13] Federal Civil Procedure 170A ⬅161.1**

170A Federal Civil Procedure
    170AII Parties
        170AII(D) Class Actions
            170AII(D)1 In General
                170Ak161.1 k. Factors, Grounds, Objections, and Considerations in General. Most Cited Cases

For particular issues to be certified, prerequis-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

ites for certification and maintainability must be satisfied only with respect to those issues. Fed.Rules Civ.Proc.Rule 23(a, b), (c)(4), 28 U.S.C.A.

**[14] Federal Civil Procedure 170A ⟨⟩182.5**

170A Federal Civil Procedure
    170AII Parties
        170AII(D) Class Actions
            170AII(D)3 Particular Classes Represented
                170Ak182.5 k. Consumers, Purchasers, Borrowers, and Debtors. Most Cited Cases
    Cause of action against fast food chain under New York consumer protection statute proscribing deceptive acts and practices presented discrete issues which satisfied criteria for issue class certification other than numerosity; questions of consumer-orientation and material deceptiveness of defendant's acts and omissions were evaluated on basis of objective standards and were therefore subject to proof based on evidence common to class of individual plaintiffs who claimed or might claim exposure to and injury from those acts and omissions. Fed.Rules Civ.Proc.Rule 23(c)(4), 28 U.S.C.A.; N.Y.McKinney's General Business Law § 349.

**[15] Federal Civil Procedure 170A ⟨⟩182.5**

170A Federal Civil Procedure
    170AII Parties
        170AII(D) Class Actions
            170AII(D)3 Particular Classes Represented
                170Ak182.5 k. Consumers, Purchasers, Borrowers, and Debtors. Most Cited Cases
    Numerosity requirement for issue class certification was not met in cause of action against fast food chain under New York consumer protection statute proscribing deceptive acts and practices; plaintiffs had not established that there were any other persons within relevant age group who were exposed to nutritional marketing at issue, then regularly ate at defendant's restaurants and subsequently developed the same medical injuries as those allegedly suffered by plaintiffs. Fed.Rules Civ.Proc.Rule 23(a)(1), (c)(4), 28 U.S.C.A.; N.Y.McKinney's General Business Law § 349.

Samuel Hirsch & Associates, P.C. (Samuel Hirsch), for Plaintiffs.

Winston & Strawn LLP (Thomas J. Quigley, Bradley E. Lerman, Bruce R. Braun, Scott P. Glauberman, Melissa A. Gabriel and Thomas P. O'Connor), for Defendant.

*OPINION AND ORDER*

POGUE, Judge:

**\*1** Plaintiffs in this action are New York State consumers claiming, pursuant to Section 349 of New York's General Business Law ("GBL § 349"), exposure to and injury from Defendant McDonald's Corporation's allegedly deceptive marketing scheme. Plaintiffs claim that the effect of Defendant's affirmative representations and material omissions throughout this marketing scheme-from 1985 until the filing of this case in 2002-was to mislead consumers into falsely believing that Defendant's food products may be consumed on a daily basis without incurring any adverse health effects, and that, as a result of this marketing scheme, Plaintiffs and putative class members suffered injury in the form of, *inter alia,* the development of certain adverse medical conditions. The court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 (2000).

Before the court is Plaintiffs' motion for class certification pursuant to Federal Rule of Civil Procedure 23(b)(3) or, in the alternative, for class certification solely with respect to the litigation of issues common to all putative class members, pursuant to Rule 23(c)(4). As explained below, because establishment of the causation and injury elements of Plaintiffs' claims will necessitate extensive individualized inquiries, the court finds that the questions of law and fact which would be common to putative class members would not predominate over questions affecting only individual members. Ac-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

cordingly, certification of this action for class litigation under Rule 23(b)(3) is not appropriate. *See* Fed.R.Civ.P. 23(b)(3).

Moreover, class certification under Rule 23(c)(4) is not appropriate at this time. Although Plaintiffs' claim contains issues which may be common to potential class members, the resolution of which is susceptible to proof by common evidence on the basis of objective standards, there is insufficient evidence to establish the existence of a class of persons who hold identical claims, on the basis of identical injuries, to those allegedly suffered by Plaintiffs-i.e., the evidence presented is not sufficient to satisfy the numerosity requirement of Rule 23(a)(1). *See, e.g., Charron v. Pinnacle Gr. N.Y.,* 269 F.R.D. 221, 239 (S.D.N.Y.2010) (issue classes certified under Rule 23(c)(4) must satisfy the criteria of Rules 23(a) and (b) with respect to the issues certified).

The court therefore denies Plaintiffs' motion for class certification in its entirety.

## BACKGROUND

*A. Procedural History*

Plaintiffs originally commenced this suit in the State Supreme Court of New York, Bronx County, on August 22, 2002. Plaintiffs claimed that Defendants McDonald's Corporation, McDonald's Restaurants of New York, Inc., McDonald's 1865 Bruckner Boulevard Bronx, New York, and McDonald's 2630 Jerome Avenue, Bronx, New York (collectively "McDonald's") engaged in deceptive business practices in making and selling their products, and that "this deception has caused the minors who have consumed McDonald[']s' products to injure their health by becoming obese." *Pelman v. McDonald's Corp.,* 237 F.Supp.2d 512, 516 (S.D.N.Y.2003) ( "*Pelman I* ").

**\*2** McDonald's removed the action to this Court on September 30, 2002, alleging that Plaintiffs had fraudulently joined non-diverse parties to defeat diversity jurisdiction under 28 U.S.C. § 1332. By opinion of January 22, 2003, the court denied Plaintiff's motion to remand back to the Supreme Court of New York, *Pelman I,* 237 F.Supp.2d at 521-23, concluding that "there is no reasonable basis, based on the pleadings, for liability against the non-diverse defendants in light of the claims alleged." *See id.* at 521 (citation omitted); 523 ("Clearly what is at issue in this lawsuit is the national menu and national policy of McDonald's Corp., and the plaintiffs' real beef is with McDonald's Corp.").[FN2]

Having satisfied itself of jurisdiction, the court, by the same opinion of January 22, 2003, granted Defendant's Rule 12(b)(6) motion to dismiss all counts of Plaintiffs' complaint for failure to state a claim upon which relief may be granted, *id.* at 524-43, but granted Plaintiffs leave to amend their complaint. *Id.* at 543.

Plaintiffs filed their first amended complaint ("FAC") on February 19, 2003. On September 3, 2003, the court again granted Defendant's renewed Rule 12(b)(6) motion, dismissing Plaintiffs' complaint in its entirety, without leave to amend. *Pelman v. McDonald's Corp.,* No. 02 Civ. 7821(RWS), 2003 WL 22052778, at \*14 (S.D.N.Y. Sept.3, 2003) ("*Pelman II*").[FN3]

Plaintiffs appealed solely the district court's dismissal of counts I, II and III-each brought under GBL § 349[FN4]-of their FAC. *Pelman v. McDonald's Corp.,* 396 F.3d 508, 509-11 (2d Cir.2005) ( "*Pelman III* ").[FN5] The United States Court of Appeals for the Second Circuit ("Second Circuit") vacated the district court's dismissal of these claims, holding that, "because a private action under [GBL] § 349 does not require proof of the same essential elements (such as reliance) as common-law fraud, an action under [GBL] § 349 is not subject to the pleading-with-particularity requirements of Rule 9(b), Fed.R.Civ.P., but need only meet the bare-bones notice-pleading requirements of Rule 8(a), Fed. R. Civ. P," *id.* at 511 (citations omitted), and that "[s]o far as the [GBL] § 349 claims are concerned, the [FAC] more than meets the requirements of Rule 8(a)." *Id.* at 512 (footnote omitted).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Following a remand to this Court for further proceedings consistent with the Second Circuit's opinion in *Pelman III, see Pelman III,* 396 F.3d at 512, the court granted in part Defendant's Rule 12(e) motion for a more definite statement, requiring Plaintiffs to "identify the advertisements that collectively amount to the alleged deceptive nutritional scheme." *Pelman v. McDonald's Corp.,* 396 F.Supp.2d 439, 445 (S.D.N.Y.2005) ( *"Pelman IV"* ). In addition, the court required Plaintiffs to provide "a brief explanation of why the advertisements are materially deceptive to an objective consumer." *Id.* [FN6] In addition, "in accordance with GBL § 349's requirement that [P]laintiffs' injuries be 'by reason of' [D]efendant's conduct, the court directed Plaintiffs [to] provide a brief explanation of how [P]laintiffs were aware of the nutritional scheme[ ] they allege to have been deceptive." *Id.* at 446 (citing *Stutman v. Chem. Bank,* 95 N.Y.2d 24, 709 N.Y.S.2d 892, 731 N.E.2d 608, 612 (2000) ).[FN7] The court also required Plaintiffs to "outline the injuries that were suffered by each plaintiff 'by reason of' defendant's alleged deceptive nutritional scheme." *Id.* (quoting N.Y. Gen. Bus. L. § 349). [FN8]

*3 Plaintiffs filed their second amended complaint ("SAC") on December 12, 2005. By opinion of September 16, 2006, the court denied Defendant's motion to strike and dismiss the SAC for failure to comport with the court's orders in *Pelman IV. Pelman v. McDonald's Corp.,* 452 F.Supp.2d 320, 328 (S.D.N.Y.2006) ( *"Pelman V"* ).[FN9] The court noted that:

the SAC identifies a number of advertisements being claimed as part of the Defendant's deceptive practices[;] ... outlines why the advertisements are objectively deceptive[;] ... alleges that Plaintiffs were aware of McDonald's deceptive practices through their exposure to the advertisements and statements annexed to their pleading and that such statements were disseminated in the specified fora of[ ] television, radio, internet, magazine, periodical, in-store poster advertise-

ments, and press releases issued in New York State from 1985 and continuing through filing in 2002[;] ... [and] alleges that each named Plaintiff was injured as a result of Defendant's practices, in the following respects: obesity, elevated levels of Low-Density Lipoprotein, or LDL, more commonly known as 'bad' cholesterol ["LDL"], significant or substantial increased factors in the development of coronary heart disease, pediatric diabetes, high blood pressure, and/or other detrimental and adverse health effects and/or diseases as medically determined to have been causally connected to the prolonged use of Defendant's products[ ].

*Id.* at 323 (citing SAC ¶¶ 558, 564, 570, 576, 582, 588, 594, 600, 617, 623, 629, 635, 641, 647, 653, & 659). The court then held that, because "Plaintiffs need not have seen or heard each advertisement, but rather only to have been exposed to them in some manner," *id.* at 324 (citing *Pelman IV,* 396 F.Supp.2d at 445-46), the SAC sufficiently described how Plaintiffs were aware of the marketing scheme alleged to be deceptive, *id.* at 325, and that, "[c]ontrary to McDonald's contentions, ... the SAC outlines the injuries sustained by each Plaintiff in a manner sufficient for McDonald's to answer." *Id.* at 326.

Now pending before the court is Plaintiffs' motion to certify the class requested in the SAC.[FN10]

*B. The Claims of the Second Amended Complaint ("SAC")*

Count I of Plaintiffs' SAC alleges that Defendant, "its respective agents, servants, and[/]or employees, engaged in unfair and deceptive acts and practices, in violation of [GBL § 349], by allegedly representing, subjecting, exposing, and/or attempting to mislead the Plaintiffs, putative class members, New York State users and consumers, from 1985 and continuing thereafter to 2002,[FN11] that its certain foods, including but not limited to[ ] Chicken McNuggets, Filet-O-Fish, Chicken Sandwich, French Fries and/or Hamburgers were substantially healthier-than-in-fact, in contradiction to

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

medically and nutritionally established acceptable guidelines." (SAC ¶ 548.)

*4 Specifically, Plaintiffs allege that Defendant subjected, exposed and/or attempted to mislead Plaintiffs and putative class members, from 1985 until 2002, "with misleading nutritional claims, in widespread advertising campaigns, promotions, brochures, press releases, 'consumer-oriented' statements, in various media and print outlets, that its certain foods were healthy, nutritious, of a beneficial nutritional nature, and/or were easily part of anyone's healthy daily diet, each and/or all claims being in contradiction to medically and nutritionally established acceptable guidelines." (*Id.* at ¶ 549.[FN12]) Plaintiffs claim that, "as a direct, foreseeable and proximate result of the Defendant's deceptive practice to misrepresent the nutritional attributes of its foods," Plaintiffs and putative Class Members suffered injury in the form of the financial costs of Defendant's products; "false beliefs and understandings as to the nutritional contents and effects of Defendant's food products"; and " obesity, elevated levels of [LDL], significant or substantial increased factors in the development of coronary heart disease, pediatric diabetes, high blood pressure and/or other detrimental and adverse health effects and/or diseases as medically determined to have been causally connected to the prolonged use of Defendant's products ...."[FN13]

Count II of Plaintiffs' SAC alleges that Defendant, "its respective agents, servants, and[/] or employees, engaged in unfair and deceptive acts and practices, in violation of [GBL § 349], by engaging in an ingredient disclosure scheme, from 1985 and continuing thereafter to 2002, whereby the Defendant is alleged to have failed to adequately disclose its use of certain additives and that the manner of its food processing rendered certain of its foods, specifically French Fries, hash browns, chicken McNuggets, fish and/or chicken products, substantially less healthy than were represented to Plaintiffs, putative Class Members, New York State residents and consumers, in widespread advertising

campaigns, 'consumer-oriented' statements, promotions, brochures, press releases, corporate nutritionist statements, and Internet disseminations, store-posters, and other means of media communications." (SAC ¶ 605.[FN14]) Plaintiffs allege that, "as a direct, foreseeable and proximate result of the Defendant's deceptive ingredient disclosure scheme," Plaintiffs and putative Class Members suffered injuries identical to those claimed in Count I.[FN15]

Count III of Plaintiffs' SAC alleges that Defendant, "its respective agents, servants, and[/]or employees, engaged in unfair and deceptive acts and practices, in violation of [GBL § 349], by representing, warranting and issuing promissory statements, that it provide[d], and w[ould] continue to provide, nutritional brochures including disclosures regarding the ingredients, and amount of calories, protein, carbohydrates, fat, cholesterol and sodium, on all of its products, at all its store/franchise and drive-through locations in conspicuous locations for study by consumers prior to purchase" (SAC ¶ 665), when in fact "the nutritional information which the Defendant represent[ed] and warrant[ed] was not adequately available to the Plaintiff consumers and putative Class members at a significant number of the Defendant's New York stores for inspection upon request." (*Id.* at ¶ 667).[FN16] Plaintiffs allege that, "by reason of the Defendant's deceptive practices, the Infant-Plaintiffs [and putative Infant Class Members] have been caused to believe said nutritional materials were present, when in fact said data was not available [,] resulting [in] preventing the Infant-Plaintiff[s] and purchaser[s] from making informed decisions about the consumption of Defendant's certain foods." (*Id.* at ¶¶ 674, 676.)

*5 Because Counts I, II, and III of Plaintiffs' SAC each claim identical injuries[FN17] as a result of the same allegedly deceptive marketing scheme[FN18]—alleged in each count to be materially deceptive as a result of affirmative misrepresentations (Count I) and/or material omissions or non-disclosures (Counts II and III)—the court concludes

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

that Plaintiffs' SAC presents a single cause of action under GBL § 349.

*C. Plaintiffs' Request for Class Certification*

Plaintiffs' putative Class Members "consist of New York State residents, infants, and consumers, who were exposed to Defendant's deceptive business practices, and as a result thereof, purchased and consumed the Defendant['s] products in New York State stores/franchises, directly causing economic losses in the form of the financial costs of the Defendant's goods, causing significant or substantial factors in the development of diabetes, coronary heart disease, high blood pressure, obesity , elevated levels of [LDL], and/or other detrimental and adverse health effects and/or diseases as medically determined to have been causally connected to the prolonged use of Defendant's certain products." (SAC ¶ 41; *see also id.* at ¶ ¶ 530-34.)[FN19] Plaintiffs concede that "[t]he exact number of putative class members ... [is] not known" (*id.* at ¶ 538), arguing that "[t]he number and identities of the class members can only be ascertained through appropriate investigation and discovery" (*id.*), but estimating a class size numbering in the thousands. (*Id.*[FN20])[FN21]

"In the event the Court finds individualized issues may predomina[te] as to causality of Class illness, including obesity and pediatric diabetes" (Pls.' Mem. Supp. Class Cert. 1), Plaintiffs ask that the court certify an issue class "for a determination of Defendant's liability for its deceptive conduct [ ] under [GBL § 349]." (*See id.*)

**STANDARD OF ANALYSIS**

[1][2] Federal Rule of Civil Procedure 23 governs the certification of federal class actions.[FN22] " Rule 23(a) requires that a class action possess four familiar features: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. If those criteria are met, the district court must next determine whether the class can be maintained under any one of the three subdivisions of Rule 23(b) ." *McLaughlin v. Am. Tobacco Co.,* 522 F.3d 215, 222 (2d Cir.2008).[FN23] With respect to the re-

quirements of Rule 23(b), Plaintiffs argue that their proposed class or issue class can be maintained under 23(b)(3) (Pls.' Mem. Supp. Class Cert. 7), which requires the court to find that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed.R.Civ.P. 23(b)(3).[FN24]

[3][4] For purposes of this motion for class certification, the court considers the allegations in Plaintiffs' SAC as true. *See Shelter Realty Corp. v. Allied Maint. Corp.,* 574 F.2d 656, 661 n. 15 (2d Cir.1978). However, "[i]n determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met." *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 178, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974) (internal quotation marks and citation omitted).

**DISCUSSION**

*6 The court begins and ends its analysis of class certification with consideration of the predominance requirement of Rule 23(b)(3). Because, as explained below, Plaintiffs have failed to satisfy this element for certification, the court need not examine each remaining element individually.[FN25]

[5] "The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 623, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997) (citation and footnote omitted). To satisfy this requirement, Plaintiffs must establish that "the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, predominate over those issues that are subject only to individualized proof." *In re Visa Check/ MasterMoney Antitrust Litig.,* 280 F.3d 124, 136 (2d Cir.2001) (internal quotation and alteration marks and citation omitted), *abrogated in part on other grounds, In re Initial Pub. Offerings Sec. Lit-*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

*ig.,* 471 F.3d 24, 42 (2d Cir.2006).

[6] The court must therefore consider the elements of Plaintiffs' cause of action under GBL § 349, and determine whether they may be established by common, class-wide proof. *See In re Currency Conversion Fee Antitrust Litig.,* 230 F.R.D. 303, 310 (S.D.N.Y.2004) (quoting *In re Linerboard Antitrust Litig.,* 305 F.3d 145, 156 (3d Cir.2002) ("Clearly, if proof of the essential elements of the cause of action require[s] individual treatment, then there cannot be a predominance of questions of law and fact common to the members of the class." (internal quotation marks omitted))) (additional citations omitted). A plaintiff's failure to establish that "common proof regarding the elements of the asserted claims would predominate," *id.,* is sufficient to warrant a denial of the motion for class certification. *See id.*

[7] To prevail on the elements of their cause of action under GBL § 349, Plaintiffs must prove that Defendant "[1] made misrepresentations or omissions that were likely to mislead a reasonable consumer in the plaintiff's circumstances, [2] that the plaintiff was deceived by those misrepresentations or omissions and [3] that as a result the plaintiff suffered injury." *Solomon v. Bell Atl. Corp.,* 9 A.D.3d 49, 777 N.Y.S.2d 50, 55 (2004) (citation omitted). As explained below, the court concludes that individualized inquiries are necessary to determine whether each plaintiff suffered injury as a result of being deceived by Defendant's allegedly misleading representations. Accordingly, the court decides that the cause of action fails to satisfy the predominance requirement of Rule 23(b)(3). Further, although the cause of action does present discrete issues which otherwise satisfy the criteria for Issue Class certification pursuant to Rule 23(c)(4), the court concludes that, because Plaintiffs have failed to present specific evidence of a sufficiently numerous class of individuals who were both exposed to Defendant's allegedly deceptive marketing scheme *and* have subsequently suffered from the same adverse medical conditions as those alleged

by Plaintiffs to have been the result of their exposure, Plaintiffs have also not met their burden for Issue Class certifiability at this time. The court will explain, in turn, each of these conclusions.

*A. The Cause of Action Fails to Meet Rule 23(b)(3) 's Predominance Requirement.*

**\*7** [8] To succeed on their GBL § 349 claim, Plaintiffs' and putative Class members' alleged injuries must have been suffered "by reason of" Defendant's alleged deceptive business practices. N.Y. Gen. Bus. L. § 349. "[W]hile the statute does not require proof of justifiable reliance, a plaintiff seeking compensatory damages must show that the defendant engaged in a material deceptive act or practice that *caused* actual, although not necessarily pecuniary, harm." *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.,* 85 N.Y.2d 20, 623 N.Y.S.2d 529, 647 N.E.2d 741 (1995) (emphasis added).

[9] Plaintiffs claim to have suffered three types of harm or injuries "by reason of" Defendant's allegedly deceptive nutritional marketing scheme-the financial costs of Defendant's products; "false beliefs and understandings as to the nutritional contents and effects of Defendant's food products"; and "obesity, elevated levels of [LDL], significant or substantial increased factors in the development of coronary heart disease, pediatric diabetes, high blood pressure and/or other detrimental and adverse health effects and/or diseases as medically determined to have been causally connected to the prolonged use of Defendant's products."[FN26] However, allegations of "false beliefs and understandings" do not state a claim for "actual injury" under GBL § 349, *Small v. Lorillard Tobacco Co.,* 252 A.D.2d 1, 679 N.Y.S.2d 593, 599 (1998) ("Neither the case law nor the statutory language [of GBL § 349] supports [the] argument that the deception *is* the injury." (emphasis in original)), *aff'd,* 94 N.Y.2d 43, 698 N.Y.S.2d 615, 720 N.E.2d 892 (1999); and neither do allegations of pecuniary loss for the purchase of Defendant's products. *Small,* 698 N.Y.S.2d 615, 720 N.E.2d at 898 ("[Plaintiffs]

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

posit that consumers who buy a product that they would not have purchased, absent a manufacturer's deceptive commercial practices, have suffered an injury under [GBL] § 349. We disagree."). Accordingly, the only alleged injuries for which Plaintiffs and putative Class members may claim damages under GBL § 349 are those related to the development of certain medical conditions, as alleged in the SAC.

All proposed experts who have given their opinion in this case regarding the possibility of a causal link between the consumption of Defendant's products and the development of these medical conditions essentially agree that the presence of such causal connection, if any, depends heavily on a range of factors unique to each individual. As Dr. Raman, Defendant's proposed nutritional expert, concludes, "[b]ecause there are so many factors that contribute to obesity and to obesity related illnesses, it is improper to generalize and make assumptions as to causation in any individual." (Def.'s Mot. to Strike Class Allegations & Deny Class Cert. ("Def.'s Mot. to Strike"), Aff. of Rita P. Raman ("Raman Aff.") ¶ 6.) *See, e.g., In re Rezulin,* 210 F.R.D. at 66 ("[T]he issue of whether [ingestion of Defendant's product due to Defendant's failure to warn of risks] caused physical injury to a specific class member will depend on his or her unique characteristics[,] such as [,] [*inter alia,*] family and medical background, preexisting medical conditions, age, gender, life style, drug or alcohol use, quantity of [product] ingested, [etc.].") As explained below, none of the testimony Plaintiffs present in support of their motion for class certification can reasonably be construed to present any evidence to the contrary.

*8 Plaintiffs' own proposed nutritional expert, Dr. Barnard, attests to the lack of certainty with regard to a generalized causal connection between consumption of Defendant's products and the medical injuries Plaintiffs identify,[FN27] leaving aside for the moment the question of a generalized causal connection between such injuries and exposure to Defendant's nutritional marketing scheme. Dr. Barnard asserts that a general causal link between consumption of Defendant's products and the development of certain medical conditions can be determined because Defendant's products are high in fat, salt, and cholesterol, low in fiber and certain vitamins, and contain beef and cheese. (Barnard Aff. 2-3.) However, because many foods are high in fat, salt, and cholesterol, low in fiber and certain vitamins, and contain beef and cheese, and because there is no evidence to suggest that all who consume such foods develop the kinds of medical conditions which are at issue in this case, the central proposition upon which Dr. Barnard's argument is based necessarily admits the conclusion that, in the absence of individualized inquiries regarding various other factors, no necessary generalizable causal connection is manifest between the consumption of Defendant's products and the development of certain medical conditions.[FN28]

Dr. Frieden, whose declaration in a prior action[FN29] is also submitted in support of Plaintiffs' motion for class certification (Pls.' Mot. for Class Cert. Ex. C ("Frieden Decl.")), similarly presents no evidence establishing a direct and necessary causal connection, obviating the need for individualized inquiries, between the consumption of Defendant's products and the development of the sort of medical conditions allegedly suffered by Plaintiffs. (*See, e.g., id.* at ¶ 9 ("People who are overweight are at *increased risk* for diabetes, heart disease, stroke, high blood pressure, arthritis, and cancer." (emphasis added)).[FN30]) Because, as Dr. Frieden points out, "increasing weight results from an imbalance between calories consumed (nutrition) and energy expended (physical activity)" (Frieden Aff. ¶ 14), individualized inquiries predominate in this case regarding the extent of each plaintiff's consumption and energy expenditure.

The court therefore concludes that, because factual questions with regard to, at the very least, the nutritional composition of food products consumed by each plaintiff from sources other than

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Defendant's facilities, as well as the level of regular physical activity engaged in by each plaintiff, predominate in the inquiry with respect to an essential element of Plaintiffs' cause of action, this case is not appropriate for adjudication on a class-wide basis.[FN31] *See, e.g., Yeger v. E\*Trade Sec. LLC,* 65 A.D.3d 410, 884 N.Y.S.2d 21, 24 (2009) (decertifying class, despite a common question as to the wrongfulness of the defendant's conduct, because "this is only half the question," and whether the defendant's conduct "caused an individual class member to suffer actual damages depends upon facts so individualized that it is impossible to prove them on a class-wide basis").

*9 [10] Moreover, Defendant is correct that whether or not Plaintiffs' claims-that they ate McDonald's food because they believed it to be healthier than it was in fact-are true for any particular person is an inquiry which also requires individualized proof. (McDonald's Mem. of Law in Supp. Mot. to Strike Class Allegations & Deny Class Cert. ("Def.'s Mem. in Opp'n Class Cert.") 13.) *See, e.g., Newman v. RCN Telecom Servs., Inc.,* 238 F.R.D. 57, 63 (S.D.N.Y.2006) ("To sustain a claim under GBL § 349, [ ] the alleged deceptive act must be the cause of the harm asserted."); *Whalen v. Pfizer, Inc.,* 9 Misc.3d 1124(A), 862 N.Y.S.2d 812 (N.Y.Sup.Ct.2005) (Table) ("[T]o satisfy the commonality requirement in a class action alleging deceptive acts and practices [under GBL § 349] ..., the proof must show that *each* plaintiff was reasonably deceived by the defendant's misrepresentations and was injured by reason thereof." (emphasis in original)).

As Defendant points out, "[a] person's choice to eat at McDonald's and what foods (and how much) he eats may depend on taste, past experience, habit, convenience, location, peer choices, other non-nutritional advertising, and cost" (Def.'s Mem. in Opp'n Class Cert. 13 (citing Def.'s Mot. to Strike, Aff. Timothy P. Meyer ("Meyer Aff.") ¶¶ 2, 4-9, 18), and although "[b]eliefs about nutrition may influence a person's decision in some cases, [it

will] not always [be the case]." (*Id.* (citing Meyer Aff. ¶ 26)).)

Thus, in addition to individualized inquiries regarding the causal connection between the consumption of products of a certain nutritional make-up and the development of certain physical or medical conditions in particular plaintiffs, and in addition to individualized inquiries regarding the extent to which Defendant's establishments were the primary source of these types of products for each particular plaintiff, individualized inquiries will also predominate regarding the causal connection between each plaintiff's exposure to the allegedly misleading aspects of Defendant's advertising scheme and each Plaintiff's subsequent consumption of Defendant's allegedly injurious products. *See, e.g., Naftulin v. Sprint Corp.,* 16 Misc.3d 1131(A), 847 N.Y.S.2d 903 (N.Y.Sup.Ct.2007) (Table) ("[T]he inducement to purchase defendants' services [or products] cannot be inferred and is unique to each class member." (citing *Hazelhurst v. Brita Prods. Co.,* 295 A.D.2d 240, 744 N.Y.S.2d 31, 33 (2002))); *Solomon,* 777 N.Y.S.2d at 54 ("Even assuming that all the members of the class saw the same advertisements, questions as to whether each individual was reasonably misled by them predominate, given the alternative sources of information about [Defendant's product] that each may have had.").[FN32]

Accordingly, the court concludes that, "[w]hile some common questions concerning [Defendant's nutritional marketing scheme] exist, individual questions about causation would overwhelm them[,] [and therefore] Plaintiff [s'] Section 349 claim is not appropriate for class certification." *In re Currency Conversion,* 230 F.R.D. at 311.

*B. Class Certification for the Litigation of Certain Issues Pursuant to Rule 23(c)(4) Is Also Not Appropriate.*

*10 Having concluded that Plaintiffs' proposed Class fails to meet the predominance requirement for certification under Rule 23(b)(3), the court will now consider Plaintiffs' request to certify an Issue

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Class "for a determination of Defendant's liability for its deceptive conduct on consumers under [GBL] § 349." (Pls.' Mem. Supp. Class Cert. 1.)

[11] "When appropriate, an action may be brought or maintained as a class action with respect to particular issues." Fed.R.Civ.P. 23(c)(4). Further, "a court may employ Rule 23(c)(4) [ ] to certify a class on a particular issue even if the action as a whole does not satisfy Rule 23(b)(3)'s predominance requirement." *In re Nassau Cnty. Strip Search Cases,* 461 F.3d 219, 225 (2d Cir.2006).[FN33] "District courts should take full advantage of this provision to certify separate issues in order to reduce the range of disputed issues in complex litigation and achieve judicial efficiencies." *Robinson v. Metro-North Commuter R.R.,* 267 F.3d 147, 167-68 (2d Cir.2001) (internal alteration and quotation marks and citations omitted) (holding issue-class certification to be appropriate where "litigating the pattern-or-practice liability phase for the class as a whole would both reduce the range of issues in dispute and promote judicial economy").

[12] "Issue certification is especially appropriate ... where Defendants' liability can be determined once, on a class-wide basis, through common evidence." *Charron,* 269 F.R.D. at 242 (citation omitted). Moreover, where the initial elements of liability may be established on the basis of common evidence, issue certification may be an appropriate method for advancing the litigation even where the prevalence of individual inquiries regarding the element of causation precludes class certification for the action as a whole. *Collins v. Olin Corp.,* 248 F.R.D. 95, 104 (D.Conn.2008) ("[I]ndividual issues of causation do not preclude class certification.... [A]lthough the element of causation may require more individualized proof, the proof as to the other elements of [the cause of action] will be class-wide." (citing *Bates v. Tenco Servs., Inc.,* 132 F.R.D. 160, 163-64 (D.S.C.1990) ("Individual offers of proof of proximate cause and damages for each plaintiff will become an inevitable necessity; however, these individual questions of proof will

arise whether the suit proceeds individually or as a class action.")) (footnote and additional citations omitted)).

[13] "For particular issues to be certified pursuant to Rule 23(c)(4), the requirements of Rules 23(a) and (b) must be satisfied only with respect to those issues." *Charron,* 269 F.R.D. at 239 (citing 5 Moore's Fed. Prac. § 23.86[2] ).

As mentioned, there are three elements to Plaintiffs' cause of action under GBL § 349: "first, that the challenged act or practice was consumer-oriented; second, that it was misleading in a material way; and third, that the plaintiff suffered injury as a result of the deceptive act." *Stutman,* 709 N.Y.S.2d 892, 731 N.E.2d at 611 (citations omitted). As explained above, Plaintiffs essentially challenge two aspects of Defendant's advertising scheme during the years between 1985 and 2002-the affirmative representation of Defendant's products as allegedly healthier than in fact, and the omission of material information regarding the actual nutritional composition of Defendant's products[FN34]-claiming that the medium of both the representation and the omission was consumer-oriented and misleading in a material way, and that Plaintiffs and putative class members were injured as a result of these deceptive acts. (SAC ¶¶ 548-681.)

**\*11** [14] While the court has concluded that proof of the element of injury as a result of the allegedly deceptive acts would require a level of individualized inquiry that precludes the class-wide litigation of the action as a whole, questions of the consumer-orientation and material deceptiveness of Defendant's acts and omissions are evaluated on the basis of objective standards, and are therefore subject to proof based on evidence common to the class of individual plaintiffs who claim or may claim exposure to and injury from these acts and omissions. *See Teller v. Bill Hayes, Ltd.,* 213 A.D.2d 141, 630 N.Y.S.2d 769, 772-73 (1995) (noting that the element of consumer-orientation in GBL § 349 "require[s] a showing of potential impact on consumers at large"); *Stutman,* 709

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

N.Y.S.2d 892, 731 N.E.2d at 611-12 ("Whether a representation or an omission, the deceptive practice [under GBL § 349] must be likely to mislead a reasonable consumer acting reasonably under the circumstances." (citation omitted)).

In their SAC, Plaintiffs list a number of specific advertisements which they allege to comprise the nutritional scheme that is the subject of this litigation.[FN35] Plaintiffs contend that "the cumulative effect" of these representations was to constitute a marketing scheme that misleadingly "convey [ed], to the reasonable consumer, including Plaintiffs and putative Class members, that Defendant's foods are nutritious, healthy, and can be consumed easily every day without incurring any detrimental health effects[ ]...." (SAC ¶ 508.) As the court held in *Pelman IV,* an extensive marketing scheme is actionable under GBL § 349, such that "[P]laintiffs need not confirm that each plaintiff saw or heard each advertisement." 396 F.Supp.2d at 446.[FN36]

The 1) existence; 2) consumer-orientation; and 3) materially misleading nature of the marketing scheme alleged by Plaintiffs as the basis of their cause of action against Defendant are each questions which can be settled upon a showing of objective evidence and legal argument. Such evidence and argumentation are commonly applicable to the entire class of existing and potential plaintiffs who claim to have been exposed to and injured by this marketing scheme.

Because these issues "are precisely the common questions of law and fact," *Charron,* 269 F.R.D. at 241, and because "when a Court chooses to limit class certification only to certain common issues ..., those issues necessarily predominate [in the resulting class action]," [FN37] the commonality and typicality requirements of Rule 23(a), as well as the predominance requirement of Rule 23(b)(3), are met, with respect to these issues, for the set of individuals in Plaintiffs' position. Persons who are in Plaintiffs' position are those persons who had not yet reached the age of twenty-one as of August 2002,[FN38] who were exposed to McDonald's nutri-

tional marketing scheme in New York during the years from 1985 until 2002, who ate regularly at McDonald's, and who subsequently developed the same medical conditions as Plaintiffs. *See id.*[FN39] Further, because the representative Plaintiffs would not possess any substantial interests that are antagonistic to such putative Issue Class members, and because resolving the issues common to this putative class of plaintiffs, on the basis of common evidence in one set of class-wide determinations, is clearly a more efficient use of judicial resources than litigating exactly the same issues, on precisely the same set of facts, with respect to each individual plaintiff,[FN40] the adequacy of representation requirement of Rule 23(a) and the superiority requirement of Rule 23(b)(3) may also arguably be met.[FN41]

**\*12** [15] With respect to the numerosity requirement of Rule 23(a), however, although Plaintiffs argue that "[New York State] product sales records, frequency and customer-product-use surveys can reveal hundreds of thousands [of] consumers within the ambit of the class" (Pls.' Mem. Supp. Class Cert. 16 n. 10 (citation omitted)), Plaintiffs have not presented the court with any specific evidence that there are any other persons who had not yet reached the age of twenty-one as of August 2002, were exposed to McDonald's nutritional marketing scheme in New York during the years from 1985 until 2002, ate regularly at McDonald's, *and subsequently developed the same medical conditions as Plaintiffs. (See generally* Pls.' Mot. for Class Cert.; Pls.' Mem. Supp. Class Cert.[FN42]) *See, e.g., Amchem Prods.,* 521 U.S. at 594-95, 117 S.Ct. 2231 ("Representatives must be part of the class and possess the same interest *and suffer the same injury as the class members."* (emphasis added, citation omitted)).

While Plaintiffs are correct that "reasonable inferences can [ ] be drawn from available facts to find numerosity" (Pls.' Mem. Supp. Class Cert. 16 n. 1 (citing *McNeill,* 719 F.Supp. 233)), there must nevertheless be "something within the record from

which it can be inferred that a class does exist."
*Clarkson,* 783 F.Supp. at 798. Lack of knowledge
as to exact class size has been held excusable in
cases where "defendants alone have access to such
data," *id.* (noting that "classes [have been] certified
where the exact number of class members could not
be determined by the plaintiffs because the pertin-
ent information was within the defendants' con-
trol"), but that is not the case here. *Compare, e.g.,
Folsom v. Blum,* 87 F.R.D. 443, 445
(S.D.N.Y.1980) ("The exact number of affected
persons is known to the defendants who have the
means to identify them at will.").

Because Plaintiffs have not yet established that
there are any other persons within the relevant age
group who were exposed to the nutritional market-
ing at issue, then regularly ate at McDonald's, and
subsequently developed the same medical injuries
as those allegedly suffered by Plaintiffs, and be-
cause Plaintiffs have not submitted sufficient evid-
ence from which these facts may be reasonably in-
ferred, the court cannot conclude that the putative
class of persons with claims identical to those of
Plaintiffs' in this case "is so numerous that joinder
of all members is impracticable." Fed.R.Civ.P.
23(a). *See, e.g., Clarkson,* 783 F.Supp. at 798. Ac-
cordingly, Plaintiffs have failed to meet their bur-
den of proving that the putative Issue Class satisfies
all requirements of Rule 23, and the motion for cer-
tification of an Issue Class in this case must there-
fore also be denied.[FN43]

### CONCLUSION

For all of the foregoing reasons, Plaintiffs' mo-
tion for class certification and, in the alternative,
for issue class certification, is DENIED in its en-
tirety. The parties shall consult and submit a re-
vised scheduling order by November 29, 2010.

**\*13** It is SO ORDERED.

FN1. Judge Donald C. Pogue of the United
States Court of International Trade, sitting
by designation.

FN2. Because "Defendant McDonald's
Corp. is a Delaware corporation with its
principal place of business ... [in] Illinois,"
*id.* at 519, the court held that diversity jur-
isdiction exists pursuant to 28 U.S.C. §
1332. *Id.* at 521-23. In light of this ruling,
the court will refer to the Defendant in the
singular.

FN3. The court noted that, in *Pelman I,*
"[t]he plaintiffs ha[d] been warned that
they must make specific allegations about
particular advertisements that could have
caused plaintiffs' injuries, and to provide
detail on the alleged connection between
those injuries and the consumption of Mc-
Donald's foods." *Pelman II,* 2003 WL
22052778, at *14. The court went on to
conclude that, because plaintiffs "ha[d]
failed to remedy the defects of the initial
complaint in the face of th[ese] warnings
[,] [g]ranting leave to amend would there-
fore [have been] futile." *Id.*

FN4. GBL § 349 makes unlawful
"[d]eceptive acts or practices in the con-
duct of any business, trade or commerce or
in the furnishing of any service" in the
State of New York, N.Y. Gen. Bus. L. §
349(a), and provides a private right of ac-
tion to any person "injured by reason of"
such acts or practices to seek an injunction,
actual damages, or both. *Id.* at § 349(h).
Count I of Plaintiffs' FAC alleged that the
combined effect of Defendant's advertising
scheme during the years from 1987 until
2002 "was to create the false impression
that [Defendant's] food products were nu-
tritionally beneficial and part of a healthy
lifestyle if consumed daily." *Pelman III,*
396 F.3d at 510. Count II alleged that De-
fendant's food products were substantially
less healthy than represented by Defend-
ant, in light of Defendant's manner of food
processing and use of certain additives. *Id.*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

And Count III alleged that Defendant "deceptively represented that it would provide nutritional information to its New York customers when in reality such information was not readily available at a significant number of McDonald's outlets in New York visited by the plaintiffs and others." *Id.* (footnote omitted).

FN5. The FAC additionally included a fourth count, which Plaintiffs voluntarily dismissed. *Pelman III,* 396 F.3d at 510 n. 1. Plaintiffs did not challenge the district court's conclusion that all individual claims of the parent co-plaintiffs were time-barred, *id.,* nor the dismissal of all claims asserted under Section 350 of New York's General Business Law. *Id.* at 511.

FN6. The court reasoned that, "[j]ust as defendant cannot reasonably admit nor deny that its practices were misleading if [Defendant] [does not] know which ads comprised the alleged deceptive nutritional scheme, [it] cannot do so if not given notice of why plaintiffs[ ] allege [the] nutritional scheme[ ] [was] objectively deceptive to consumers." *Pelman IV,* 396 F.Supp.2d at 445. *See also id.* at 443 (discussing standard for granting Rule 12(e) motions and quoting *Humpherys v. Nager,* 962 F.Supp. 347, 352-53 (E.D.N.Y.1997) ("[A] 12(e) motion is proper when a complaint pleads a viable legal theory, but is so unclear that the opposing party cannot respond to the complaint.")); *id.* at 444 (noting that "[t]he standard for whether an act or practice is misleading [under GBL § 349] is objective, requiring a showing that a reasonable consumer would have been misled by the defendant's conduct" (citing *Marcus v. AT&T,* 138 F.3d 46, 64 (2d Cir.1998); *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.,* 85 N.Y.2d 20,

623 N.Y.S.2d 529, 647 N.E.2d 741, 745 (1995))).

FN7. The court denied Defendant's Rule 12(e) motion in so far as it requested the Plaintiffs to "confirm that they saw or heard each advertisement in New York before the lawsuit began," *Pelman IV,* 396 F.Supp.2d at 445, holding that "[P]laintiffs need not confirm that each plaintiff saw or heard each advertisement." *Id.* at 446.

FN8. The court also denied Defendant's Rule 12(e) motion in so far as it requested the Plaintiffs to provide a description of how each advertisement injured each plaintiff, *id.* at 446, holding that "Plaintiffs' claims in this case are based upon [ ] a deceptive scheme, which the Second Circuit held sufficient for Rule 8(a) notice pleading." *Id.* at 446 & n. 1 (noting that "[t]he scheme alleged [in the FAC] is comprised of advertisements and statements made and/or published by [D]efendant, but [P]laintiffs have not alleged that each and every advertisement that comprises a part of this scheme in and of itself amounts to a deceptive practice under GBL § 349").

FN9. In accordance with unchallenged portions of *Pelman II, see supra* note 5, the court held that "[t]hose portions of the SAC that refer to parents as individual co-plaintiffs shall be stricken, as shall the Plaintiffs' allegations concerning McDonald's 'cholesterol-free' french fry representation and McDonald's Mighty Kids Meals." *Pelman V,* 452 F.Supp.2d at 328; *see also id.* at 327.

In addition, in response to Defendant's objection to Plaintiffs' "intention to add 'other' advertisements to their case at some later date," *Pelman V,* 452 F.Supp.2d at 326 (quoting SAC ¶ 506), the court "concluded that Plaintiffs shall

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

be limited to the advertisements identified in the SAC, with leave granted to permit Plaintiffs to amend the SAC with additional advertisements for good cause shown." *Id.*

FN10. On July 26, 2007, Defendant filed a motion to strike all class allegations from the SAC. Plaintiffs filed their cross-motion for class certification and an order denying Defendant's motion to strike class allegations from the SAC on October 16, 2007. (Plaintiffs' class certification motion is dated October 9, 2007, but was filed with the court on October 16, 2007.) A pretrial conference was held on April 9, 2008. Following Judge Sweet's recusal, and reassignment of the case to Judge Stein, another pretrial conference was held on February 24, 2009, at the close of which conference the court ordered that all pending motions to compel discovery, previously filed by both Plaintiffs and Defendant, were dismissed with leave to renew after the Court rules on the motions for class certification. By order of March 27, 2009, the court directed the Clerk to close Defendant's motion to strike class allegations, "assur[ing] the parties that in resolving the remaining motion, Plaintiffs' motion to certify the class, the Court will consider, as appropriate, all papers, arguments, and evidence submitted on this issue, whether originally submitted as part of Defendant's motion to strike the class allegations, or as part of Plaintiffs' cross motion to certify the class." [Dkt. No. 136] (The case was thereafter reassigned to the present Judge.)

FN11. While the FAC alleged a scheme dating from 1987 until 2002, *see Pelman III,* 396 F.3d at 510, the SAC alleges a scheme dating from 1985 until 2002 (SAC ¶¶ 548-49; 605; 607), although certain aspects of the scheme are alleged in the SAC

to have taken place during shorter periods within this overall period of time (*see, e.g.,* SAC ¶¶ 519 (alleging press releases disseminated in New York State "[i]n 1987 and continuing to 2002"); 520 (same); 526 (alleging certain failures to disclose "from 1986 through 2002"); 607 (alleging certain failures to disclose "from July 23, 1990 through May 21, 2001")).

FN12. (*See also id.* at ¶ 550 (alleging that the nutritional scheme alleged to be deceptive created "the false nutritional beliefs that [Defendant's] foods could be easily consumed as part of a healthy daily diet without any significant ill effects or adverse health or nutritional ramifications"); *id.* at ¶ 551 ("[A]ctually, if consumed on a continual basis several times per week over several years, [Defendant's represented products] could be shown to be significant and/or substantial factors in the development of pediatric diabetes and type II diabetes, coronary heart disease, high blood pressure, obesity, elevated levels of [LDL], increased risks for cancer, and other detrimental and adverse health effects.").)

FN13. (SAC ¶¶ 556-58, 562-64, 568-70, 574-76, 580-82, 586-88, 592-94 (alleging injuries sustained by named Infant Plaintiffs); 598-600 (alleging identical injuries sustained by putative class members).)

FN14. With respect to Defendant's French Fries product, Plaintiffs' allegation that Defendant, "from July 23, 1990 through May 21, 2001, ... fail[ed] to disclose its use of certain beef flavoring, food processes and hydrogenated vegetable oils ..., after affirmatively representing that its product would be made with only '100% vegetable oil' with no beef and other cholesterol causing ingredients ..., would thereafter be included in the processing and formulation

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

of its French Fries product" (SAC ¶ 606), has been stricken as objectively non-deceptive. *See Pelman V,* 452 F.Supp.2d at 327; *Pelman II,* 2003 WL 22052778, at *13.

FN15. *(See* SAC ¶¶ 615-17, 621-23, 627-29, 633-35, 639-41, 645-47, 651-53, 657-59; *compare with id.* at ¶¶ 556-58, 562-64, 568-70, 574-76, 580-82, 586-88, 592-94, 598-600. With respect to all products at issue, Plaintiffs allege that they and the putative Class Members "would not have purchased and/or consumed [these products] in their entire[t]y, or on such frequency, had they [ ] been aware of the ingredients which were failed to have been adequately disclosed [ ] by the Defendant." *Id.* at ¶ 609.)

FN16. In addition to claiming that Defendant falsely represented the availability of certain nutritional information in its New York outlets (SAC ¶¶ 665-67), Plaintiffs also claim, as part of Count III of their SAC, that the non-disclosure of this information, regardless of Defendant's representations as to its availability, is itself violative of GBL § 349. *(See* SAC ¶ 681 (alleging, the context of Count III of the SAC, that Defendant "failed to adequately label packages and containers, failed to properly account to the users and consumers [ ] the ingredients, processes and/or added nutritional values of such processing and attributes [of] products, including but not limited to, the ingredients, quantities and qualities of fat, salt, sugar, and cholesterol content[ ] contained within [Defendant's] food products"; that the Defendant "failed to provide and/or display the nutritional processes or contents of [Defendant's] food products at points of purchase, including drive-through locations"; and that Defendant "failed to ad-

equately disseminate the nutritional values and contents of the aforesaid respective food products").)

FN17. (SAC ¶¶ 556-58, 562-64, 568-70, 574-76, 580-82, 586-88, 592-94, 598-600, 615-17, 621-23, 627-29, 633-35, 639-41, 645-47, 651-53, 657-59; *see id.* at ¶¶ 674, 676.)

FN18. *(See* SAC ¶¶ 121; 133; 147; 157; 171; 182; 195; 209; 223; 239; 253; 271; 283; 295; 312; 335; 347; 358; 386; 418; 433; 443; 457; 473; 498 (each affirmative representation and material omission alleged "as being collectively part of the Defendant's long-term deceptive scheme and campaign to misrepresent the nutritional attributes of its certain foods"). *See also id.* at ¶ 526 (alleging Defendant's "failures[,] from 1986 through 2002, to provide nutritional information at its store point-of-sale and drive through locations" to be "part of a deceptive practice to mislead New York State consumers and Plaintiffs").)

FN19. Within the putative Class, Plaintiffs would define as "Heavy-Users" of Defendant's products those Class Members who consumed these products at least once a week "during a portion of the time period(s) that the schemes were alleged to have been perpetrated[ ]." (SAC ¶ 39.) "Super Heavy-Users" within the Class are defined as those Class Members who consumed the products at least four times per week "during a portion of the time period(s) that the schemes were alleged to have been perpetrated [ ]." (SAC ¶ 40.)

FN20. *(See also* Pls.' Mem. Law Supp. Cross-Mot. for Class Cert. & Opp'n to Def.'s Mot. to Strike Class Allegations & Deny Class Cert. ("Pls.' Mem. Supp. Class Cert.") 8-9 & n. 4 (estimating "number of Class consumers denied access to nutri-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

tional production information at its New York State locations" without citation to individual declarations or other specific evidence, while noting that "Defendant's accounting for brochures provided to New York stores or consumers has still not been disclosed, to date"); 16 (estimating Class size in hundreds of thousands, without specific evidence of correlation between consumption of Defendant's products and development of medical or health conditions identical to those alleged by Plaintiffs); *id.* at n. 11 (relying on study that generally concludes that "[c]onsumption of fast food among children in the United States seems to have an adverse effect on dietary quality in ways that plausibly could increase risk for obesity" (citing Pls.' Cross-Mot. for Order Granting Class Cert. and Denying Def.'s Mot. to Strike Class Allegations ("Pls.' Mot. for Class Cert.") Ex. [F] (Bowman et al., 113 Pediatrics 112 (2004)))); *id.* at 20-23 (same); *id.* at 24 (requesting additional discovery on issue of class certification).)

FN21. By their motion for class certification, Plaintiffs "seek certification for three subsets of Classes on both liability and damages related to Defendant's (a) illusory offers to obtain nutritional brochure [s] at its stores[;] (b) false Chicken McNugget ingredient claims[;] and (c) engagement in a 'healthier-than-in-fact' nutritional scheme." (Pls.' Mem. Supp. Class Cert. 1.) However, as explained above, the court considers the SAC to assert a single cause of action, based on Defendant's alleged practice of conveying to the consumer that its products may be consumed daily without incurring adverse health consequences, and failing to disclose information to the contrary. Similarly, Plaintiffs' proposed Subclass (c)-based on Defendant's "engagement in a

'healthier-than-in-fact' nutritional scheme" (*id.*)-encompasses the allegations that Defendant failed to disclose material nutritional information in store brochures, and that Defendant made false ingredient claims with respect to its Chicken McNugget product.

FN22. *See, e.g., Gasperini v. Ctr. for Humanities, Inc.,* 518 U.S. 415, 427, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996) ("Under the *Erie* doctrine, federal courts sitting in diversity apply state substantive law and federal procedural law." (citing *Erie R.R. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938))).

FN23. A proposed class satisfies the numerosity requirement of Rule 23(a) if the class "is so numerous that joinder of all members is impracticable," Fed.R.Civ.P. 23(a)(1), which is presumed to be the case at a level of at least 40 members. *Consol. Rail Corp. v. Town of Hyde Park,* 47 F.3d 473, 483 (2d Cir.1995) (citation omitted). Plaintiffs need not precisely limit the class size at the outset, *see Robidoux v. Celani,* 987 F.2d 931, 935 (2d Cir.1993), "but the exact membership of the class must be ascertainable at some point in the case," *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.,* 209 F.R.D. 323, 337 (S.D.N.Y.2002) (internal quotation marks and citation omitted), and "there must be something within the record from which it can be inferred that a class does exist." *Clarkson v. Coughlin,* 783 F.Supp. 789, 798 (S.D.N.Y.1992); *see also Robidoux,* 987 F.2d at 935 ("[P]laintiffs must show some evidence of or reasonably estimate the number of class members ...." (internal quotation marks and citation omitted)).

FN24. Rule 23(b)(3) also provides that "[t]he matters pertinent to these findings include: (A) the class members' interests in

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." *Id.*

FN25. *See, e.g., In re Canon Cameras Litig.*, 237 F.R.D. 357, 359 (S.D.N.Y.2006) ("Here, while the Court harbors doubts that plaintiffs have satisfied all the requirements of Rule 23(a), it need not reach that question because it is plain that they do not begin to satisfy the requirements of Rule 23(b)." (footnote omitted)); *In re Rezulin Prods. Liab. Litig.*, 210 F.R.D. 61, 66, 71 (S.D.N.Y.2002) ("In this case, the Court assumes without deciding that the requirements of Rule 23(a) are satisfied. It nevertheless is clear that the case is inappropriate for certification [because the predominance requirement of Rule 23(b)(3) is not satisfied].").

FN26. (SAC ¶¶ 556-58, 562-64, 568-70, 574-76, 580-82, 586-88, 592-94, 598-600, 615-17, 621-23, 627-29, 633-35, 639-41, 645-47, 651-53, 657-59; *see id.* at ¶¶ 674, 676.)

FN27. *See* Pls.' Mot. for Class Cert. Ex. B ("Barnard Aff.") 3 ("[C]onsumption by individuals beyond two to three times per week of typical McDonald's products ... *can be* medically, scientifically isolated and identified to be a significant and *contributing* cause to an individual's development of obesity, diabetes, and their related illnesses." (emphasis added)); *see also id.* at 2-3 (relying exclusively on the presumption that Defendant's products are "high in fat, salt, and cholesterol, and low in fiber and certain vitamins"; a study concluding

the fat content of a typical McDonald's meal to be approximately 43 percent, compared with the 37 percent average fat intake of U.S. consumers; and a study concluding that regular consumption of products *"such as* those sold at McDonald's" may lead to "a greater [ ] increase in insulin resistance, the *primary* abnormality leading to type 2 diabetes" (emphasis added).)

FN28. In addition, even were there sufficient evidence to conclude that consumption of products high in fat, cholesterol, and salt, and/or containing beef and cheese, entails a generalizable causal link to the development of the medical illnesses allegedly suffered by Plaintiffs, given the widespread availability of such products from many different sources, individualized questions would predominate regarding the extent to which, in each particular Plaintiff's case, it was consumption of *Defendant's* products, and not the myriad other food products on the market high in fat, cholesterol, and salt, and containing beef and cheese, which initiated the causal reaction.

FN29. *N.Y. State Restaurant Ass'n v. N.Y. City Bd. of Health,* 509 F.Supp.2d 351 (S.D.N.Y.2007).

FN30. (*See also id.* at ¶¶ 6 ("Heart disease, stroke, cancer and diabetes ... are all conditions which are significantly *more prevalent* among persons who are obese." (emphasis added, citation omitted)), 9 ("According to the Surgeon General of the United States: 'For the *vast majority* of individuals, overweight and obesity result from excess calorie consumption *and/or* inadequate physical activity.' " (emphasis added) (quoting U.S. Dep't of Health and Human Servs., Office of Surgeon General, *Call to Action to Prevent and Decrease*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Overweight and Obesity* (2001))), 10 ("People who are overweight or obese are at *increased risk* for [certain medical conditions]." (emphasis added)), 14 ("[I]ncreasing weight results from an imbalance between calories consumed (nutrition) and energy expended (physical activity) ....").)

FN31. *Compare, e.g., Morrissey v. Nextel Partners, Inc.,* 72 A.D.3d 209, 895 N.Y.S.2d 580, 587 (2010) (reversing lower court's denial of motion for class certification of GBL § 349 claim where claim was based on identical communication from the defendant to all putative class members regarding a fee increase, whose small typeface and inconspicuous location within a billing statement was allegedly materially misleading, because "the particular damages suffered by each class member can be easily computed" as the increase in fee which was allegedly assessed without adequate notice) (generalizable causal link-if the notice of fee increase was misleading, then the damage of incurring the additional fee, which can be easily shown, follows as a matter of course); *In re Coordinated Title Ins. Cases,* 2 Misc.3d 1007(A), 784 N.Y.S.2d 919 (N.Y.Sup.Ct.2004) (Table) (holding that common questions predominate where "[t]he question raised in the complaint involves the conduct of the defendants in allegedly overcharging or failing to notify the members of the putative class of the availability of the mandated discounts") (generalizable causal link-if it can be shown that this failure was materially misleading, and that the class members did not receive their discount, it is easily inferred that the reason the class members lost the benefit of the discount is because they were not informed of it).

FN32. *See also Carnegie v. H & R Block, Inc.,* 269 A.D.2d 145, 703 N.Y.S.2d 27, 29 (2000) (decertifying class in GBL § 349 action because "questions of whether each individual was exposed to, and influenced by, the advertising would predominate"); *Tegnazian v. Consol. Edison, Inc.,* 189 Misc.2d 152, 730 N.Y.S.2d 183, 187 (N.Y.Sup.Ct.2000) (declining to certify class in GBL § 349 action because the case "would require individualized inquiry to ascertain which, if any, of the putative class members were misled by [the defendant]'s advertising, and whether it resulted in any damage[,] [which] inquiry would predominate over any common questions") (citing *Carnegie,* 269 A.D.2d 145, 703 N.Y.S.2d 27).

FN33. *See also Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.,* 502 F.3d 91, 109 (2d Cir.2007) ("[The Second Circuit] adopted [ ] the Ninth Circuit's view that Rule 23(c)(4) [ ] is available to certify particular issues 'regardless of whether the claim as a whole satisfies Rule 23(b)(3)'s predominance requirement.' " (quoting *Nassau Cnty.,* 461 F.3d at 227) (citing *Valentino v. Carter-Wallace, Inc.,* 97 F.3d 1227, 1234 (9th Cir.1996) ("Even if the common questions do not predominate over the individual questions so that class certification of the entire action is warranted, Rule 23 authorizes the district court in appropriate cases to isolate the common issues under Rule 23(c)(4) [ ] and proceed with class treatment of these particular issues."))).

FN34. As explained above, the court considers Counts II and III of the SAC to be part of the same claim-the claim that Defendant unlawfully omitted to reveal certain material aspects of the nutritional composition of its products, whether

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

through omissions in its advertising (Count II) or the refusal to provide nutritional pamphlets to consumers (Count III).

FN35. Specifically, Plaintiffs list the following distinct representations allegedly made by Defendant: 1) that "only delicious chunks of juicy breast and thigh meat go into Chicken McNuggets" (SAC ¶¶ 118-30); 2) that Defendant's Chicken McNuggets were made with "100 percent chicken" (*id.* at ¶¶ 131-43); 3) that Defendant's Chicken McNuggets were made from only whole cuts of breast and minced thigh meat (*id.* at ¶¶ 144-53); 4) "that an average of 109 mg of sodium, less than half a cookbook pinch of salt[,] was placed in [Defendant's] French Fries product" (*id.* at ¶¶ 154-79); 5) that "sodium [was] down across [Defendant's] menu [of products]" (*id.* at ¶¶ 180-92); 6) that Defendant's food products consisted of "[m]eat and potatoes[,] [m]ilk and bread[,] 100% pure American beef at least 77.5% lean[,] [r]eal milk in every dairy product[,] wholesome bread from local bakeries[,] [g]ood, basic, nutritious food" (*id.* at ¶¶ 193-206; *see also id.* at ¶ 427 (discussing representation that "[m]ost of [Defendant's] menu is made from a few basic natural ingredients-meat, fish, eggs, grain and potatoes")); 7) that Defendant's products consist of "[f]ood that's been the foundation of well balanced diets for generations [ ] [a]nd will be for generations to come" (*id.* at ¶¶ 207-20); 8) that Defendant shops where consumers shop, buys brands trusted by consumers, and prepares its products "with the same care as [consumers] do at home" (*id.* at ¶¶ 221-36; *see also id.* at ¶¶ 250-63 (discussing additional advertisements representing that Defendant "cook[s] the way [consumers] do" and shares consumers' goals of serving tasty and nutritious meals)); 9) that Defendant's products can

"fit comfortably into [the consumer's] well-balanced diet" (*id.* at ¶¶ 237-49; *see also* at ¶¶ 268 (additional representation that Defendant "enrich[ed] [its] hamburger buns with niacin, iron, thiamine, and riboflavin"); 310 (additional representation that Defendant's products "measure[ ] up to" guidelines for a healthful diet established by the U.S. Department of Agriculture and Health and Human Services, by "serv[ing] many variations within the basic food groups [,] ... avoid[ing] too much fat, saturated fat and cholesterol [,] ... [providing] foods with adequate starch and fiber[,] [and] avoid [ing] too much sugar and soda"); 467-80 (additional representations that Defendant's products can be "consumed three times per day, for breakfast, lunch and dinner, and be considered part of a healthy diet for all consumers"); 496-505 (additional representations that Defendant's Happy Meal product provides "an 'excellent' or 'good' source of nine or more nutrients, [according to Food and Drug Administration labeling guidelines]")); 10) that, "at McDonald's[,] it's easy to get calcium in almost every meal" (*id.* at ¶¶ 264-67 (*see also id.* at ¶¶ 280-90 (additional representation of calcium content in Defendant's hamburger buns and English Muffins)); 11) that Defendant cooks its Chicken McNuggets, Filet-O-Fish, and pies with only "100% cholesterol-free vegetable shortening" (*id.* at ¶¶ 269, 274; *see also id.* at ¶¶ 331; 356 (same)); 12) that Defendant's milk shakes contain no artificial preservatives and include 22 percent of a person's recommended daily allowance for protein, 32 percent of the allowance for calcium, and 26 percent of the allowance for riboflavin (*id.* at ¶¶ 292-305); 13) that Defendant's products are made with "beef that's leaner than the kind of beef most people buy in the supermarket" (*id.* at ¶¶ 306-25; *see also id.* at ¶¶

328-29; 345 (same)); 14) that Defendant does not add additives, fillers, or extenders to its beef products, and that its beef products are comprised of "[s]elected cuts including sirloin, chuck and round steak" (*id.* at ¶ 330; *see also id.* at ¶¶ 345, 428 (additional representations regarding lack of additives in Defendant's beef products)); 15) that Defendant's French Fries are cooked in 100 percent vegetable oil (*id.* at ¶¶ 368, 373, 376-81); 16) that Defendant's McLean Deluxe was 91 percent fat-free ( *id.* at ¶¶ 415-24); 17) that daily consumption of meat products "can make it easier to do things like climb higher and ride [a] bike farther" (*id.* at ¶¶ 440-49); 18) that Defendant's Fish Filet was made with " '100% cod' [and] with only a pinch of salt added to taste after cooking" (*id.* at ¶¶ 450-66).

As noted above, Plaintiffs' allegations regarding Defendant's Mighty Kids Meal product (SAC ¶¶ 481-95), as well as the allegations regarding Defendant's representations that its French Fries are "cholesterol-free" (SAC ¶ 369), have been stricken. *See supra* note 9. In addition, Plaintiffs' allegations regarding "other consumer-oriented statements, advertisements, and press releases" have similarly been stricken, with leave to seek amendment of the SAC to add allegations regarding any additional representations for good cause shown. *Id.*

FN36. *See also id.* at 445 ("[A] general allegation of deception states a claim under GBL § 349." (citing *Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris Inc.,* 178 F.Supp.2d 198 (E.D.N.Y.2001), *rev'd on other grounds sub nom., Empire Healthchoice, Inc. v. Philip Morris USA, Inc.,* 393 F.3d 312 (2d Cir.2004); *Gaidon v. Guardian Life Ins. Co. of Am.,* 94

N.Y.2d 330, 704 N.Y.S.2d 177, 725 N.E.2d 598 (1999))). *See Blue Cross,* 178 F.Supp.2d at 210 ("[P]laintiff adduced sufficient evidence for a jury to find that defendants engaged in a successful scheme to distort the body of public knowledge ...."); *id.* at 271 ("Proof that each individual subscriber was personally addressed by the defendant was not necessary. The evidence was sufficient to support the conclusion that this fraud caused damage to plaintiff recoverable under section 349."); *Gaidon,* 704 N.Y.S.2d 177, 725 N.E.2d at 603 (holding "extensive marketing scheme" actionable under GBL § 349).

FN37. *Id.* (citing 2 Newberg on Class Actions § 4:23 ("When a court decides to limit a class action with respect to particular common issues only, such limitation will necessarily afford predominance as to those issues." (citations omitted)) (internal quotation marks and additional citation omitted)). *See also supra* note 33.

The court notes that there is a circuit split with respect to this issue between the Ninth and Second Circuits, on the one hand, and the Fifth Circuit, on the other. *Compare In re Nassau,* 461 F.3d at 227; *Valentino,* 97 F.3d at 1234, *with Castano v. Am. Tobacco Co.,* 84 F.3d 734, 745 n. 21 (5th Cir.1996) ("A district court cannot manufacture predominance through the nimble use of subdivision (c)(4). The proper interpretation of the interaction between subdivisions (b)(3) and (c)(4) is that a cause of action, as a whole, must satisfy the predominance requirement of (b)(3) and that (c)(4) is a housekeeping rule that allows courts to sever the common issues for a class trial. Reading rule 23(c)(4) as allowing a court to sever issues until the remaining common issue predominates over the remain-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

ing individual issues would eviscerate the predominance requirement of rule 23(b)(3); the result would be automatic certification in every case where there is a common issue, a result that could not have been intended.").

FN38. As discussed above, *see supra* notes 5 and 9, the applicable three-year statute of limitation bars the claims of all Plaintiffs except those who had not yet reached the age of majority prior to the three years before filing of this law suit, for whom the statute is tolled until majority is reached. Majority is reached at eighteen years. Therefore, potential plaintiffs have until they are twenty-one years old to bring this claim. Because this action was brought in August 2002, the statute of limitations had run for anyone over the age of twenty-one at that time, but not yet for those individuals who had not yet reached that age, who have three years after the statute started running for them at age eighteen. Accordingly, limiting the putative Issue Class in this regard would ensure that the typicality requirement of Rule 23(a) is met.

FN39. *Cf. Simon v. Philip Morris, Inc.,* 200 F.R.D. 21, 29 (E.D.N.Y.2001) ("Rule 23(c)(4) [ ] accords district judges the discretion to certify a class action as to particular issues in a manner that treat[s] common things in common and distinguishes the distinguishable, thereby satisfying Rule 23(a)'s requirements of commonality and typicality." (internal quotation and alteration marks and citation omitted)).

FN40. *See, e.g., Robinson,* 267 F.3d at 168 ("[L]itigating the pattern-or-practice liability phase for the class as a whole would both reduce the range of issues in dispute and promote judicial economy."); *Charron,* 269 F.R.D. at 241 ("Forcing individual Class members to separately and re-

peatedly litigate the liability questions common to their [ ] claims would be highly inefficient").

FN41. Rule 23(a)'s adequacy of representation requirement also necessitates a finding that " '[Plaintiffs'] attorneys are qualified, experienced and able to conduct the litigation.' " *In re Flag Telecom Holdings, Ltd. Sec. Litig.,* 574 F.3d 29, 35 (2d Cir.2009) (quoting *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.,* 222 F.3d 52, 60 (2d Cir.2000)). "On a motion for class certification, the moving party bears the burden of proving that all the requirements of Rule 23 are met." *McNeill v. N.Y. City Housing Auth.,* 719 F.Supp. 233, 252 (S.D.N.Y.1989) (citing *In re Gulf Oil/ Cities Serv. Tender Offer Litig.,* 112 F.R.D. 383 (S.D.N.Y.1986)). Plaintiffs have submitted no information to allow the court to make this requisite finding at this time. *Compare, e.g., Poddar v. State Bank of India,* 235 F.R.D. 592, 596 (S.D.N.Y.2006) ("The class attorneys' qualifications and experience are [ ] evidenced by the affidavit they submitted in support of plaintiffs' motion."); *Andre H. by Lula H. v. Ambach,* 104 F.R.D. 606, 612 (S.D.N.Y.1985) ("The named plaintiff is represented by the Legal Aid Society. Plaintiff sets forth a number of class actions in which Legal Aid has been involved. The list of cases speaks for itself and certainly supports a finding that the plaintiff can adequately represent the class.").

Further, Rule 23(b)(3) provides that one of the considerations pertinent to the superiority inquiry is that of "the likely difficulties in managing a class action." Fed.R.Civ.P. 23(b)(3)(D). One management difficulty of a class action is "the burden of complying with rule 23's no-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

tice requirements." *In re Vivendi Universal, S.A.,* 242 F.R.D. 76, 107 (S.D.N.Y.2007) (citing 7AA Wright, Miller, & Kane, Fed. Prac. & Proc. § 1780, at 187-90). Plaintiffs have also failed to submit any information on the basis of which the court could conclude that all members of the putative issue class will be adequately and manageably notified of this action and their right to seek exclusion. *Compare id.* at 108 ("[P]laintiffs have filed a comprehensive affidavit outlining the effectiveness of [their] proposed method of providing notice [to all putative class members].").

FN42. (*See, e.g.,* Pls.' Mem. Supp. Class Cert. 21 (citing studies tending to show that consumption of products from fast food restaurants increases the risk of obesity, but providing no evidence of the existence of young persons who specifically developed "obesity, elevated levels of [LDL], significant or substantial increased factors in the development of coronary heart disease, pediatric diabetes, [and/or] high blood pressure" (SAC ¶¶ 558, 564, 570, 576, 582, 588, 594, 600, 617, 623, 629, 635, 641, 647, 653, 659), after regular consumption of *Defendant's* food products during the relevant time period).)

FN43. The court notes Plaintiffs' request for additional class discovery (Pls.' Mem. Supp. Class Cert. 24), as well as Defendant's argument that Plaintiffs are precluded by Judge Stein's ruling at the February 24, 2009 Pretrial Conference, *see supra* note 10, from seeking further class discovery. (Letter from Def. to Court (Mar. 31, 2010).) The court concludes that Judge Stein's order-that, because Plaintiffs had fully briefed their motion for class certification before bringing a motion to compel discovery, no further discovery with regard to class certification is warranted (Tr. of Ct. Hearing (Feb. 24, 2009) 32-33)-is the law of this case, and accordingly denies Plaintiffs' request for additional class discovery.

S.D.N.Y.,2010.
Pelman v. McDonald's Corp.
--- F.R.D. ----, 2010 WL 4261390 (S.D.N.Y.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

# Attachment 2

12 Misc.3d 1169(A), 820 N.Y.S.2d 841, 2006 WL 1623052 (N.Y.Sup.), 2006 N.Y. Slip Op. 51115(U)
**(Table, Text in WESTLAW), Unreported Disposition**
**(Cite as: 12 Misc.3d 1169(A), 2006 WL 1623052 (N.Y.Sup.))**

**H**
(The decision of the Court is referenced in a table in the New York Supplement.)

Supreme Court, Albany County, New York.
Stephanie BARON, on Behalf of Herself and All Other Similarly Situated New York Residents, Plaintiff,
v.
PFIZER, INC., Defendant.

No. 6429-04.
May 2, 2006.

Dillon & Dillon, LLC, (John M. Dillon, Esq., of counsel), Mamaroneck, and James, Hoyer, Newcomer, & Similjanich, P.A., (John A. Yanchunis, Esq., and Jill Bowman, Esq., of counsel), Tampa, FL, Attorneys for Plaintiff and the Class.

Davis Polk & Wardwell, (James P. Rouhandeh, Esq., of counsel), New York, and Whiteman Osterman & Hanna, LLP, (Neil L. Levine, Esq., of counsel), Albany, Attorneys for Defendant.

WILLIAM E. McCARTHY, J.
*1 After joinder of issue but prior to class certification, defendant Pfizer, Inc. moves to dismiss the proposed class-action complaint in its entirety pursuant to CPLR 3211(a)(7) and 3016(b). Plaintiff Stephanie Baron the sole class representative opposes this motion.

CPLR 3211(a)(7) provides: "A party may move for judgment dismissing one or more causes of action asserted against him on the ground that the pleading fails to state a cause of action." In determining a motion to dismiss premised on CPLR 3211(a)(7), this Court "must afford [plaintiff's] complaint a liberal construction, accept as true the allegations contained therein, accord ... plaintiff the benefit of every favorable inference and determine only whether the facts alleged fit within any cog-

nizable legal theory' " ( *Skibinsky v. State Farm Fire & Cas. Co.,* 6 AD3d 975, 976 [3d Dept 2004] [quoted case omitted]; *see Frank v. Daimier-Chrysler Corp.,* 292 A.D.2d 118, 120-121 [1st Dept 2002] ). "Stated another way, the court's role in a motion to dismiss is limited to determining whether a cause of action is stated within the four corners of the complaint, and not, whether there is evidentiary support for the complaint" ( *Frank,* 292 A.D.2d at 121).

In October 2004, plaintiff commenced this proposed-class action, seeking certification of a statewide class of all New York residents who purchased Neurontin for an "off-label" use a use of a drug that is not approved by the Federal Drug Administration (FDA) (*see Caggiano v. Pfizer, Inc.,* 384 F Supp 2d 698, 690 [SDNY 2005]; *Coram Healthcare Corp. v. Wal-Mart Stores, Inc.,* 238 F Supp 2d 586, 587 [SDNY 2002] ). According to the complaint, the FDA approved Neurontin for the treatment of epilepsy (*see* Complaint, ¶ 3). However, plaintiff alleges that, starting in 1995, defendant and its predecessor Parke-Davis Division of Warner-Lambert Company developed a scheme to market Neurotin for "off-label" use to realize the profits from such marketing (*see id.*).[FN1] Further, plaintiff alleges that the "principal component of the scheme was the hiring and deployment in the field of approximately 60 medical liaisons,' whose real function was to actively solicit physicians to promote off-label' uses of Neurontin, using cash payments as a reward and incentive" (*id.*). The complaint also alleges that these medical liaisons "were trained to use knowingly false information to persuade physicians to use Neurontin for off-label' uses" (*id.* at ¶ 6). According to the complaint, defendant "did this with the combined motives of increasing sales, generating a body of medical practice,' and generating case reports which could later be used for further off-label' promotion with other physicians" (*id.* at ¶ 8). The complaint further alleges that the scheme "focused in particular on the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 2

12 Misc.3d 1169(A), 820 N.Y.S.2d 841, 2006 WL 1623052 (N.Y.Sup.), 2006 N.Y. Slip Op. 51115(U)
(Table, Text in WESTLAW), Unreported Disposition
(Cite as: 12 Misc.3d 1169(A), 2006 WL 1623052 (N.Y.Sup.))

market for bipolar disorders. It did so by a variety of methods, including sponsoring inexpensive studies, later published in scientific journals, which purported to show a favorable results in using Neurontin for non-approved uses" (*id.*). Plaintiff contends that defendant urged physicians to use Neurontin for treatment of bipolar disorder and, based on defendant's deceptive practices, "tens of thousands of bipolar disorder patients are now treated with Neurontin" (*id.* at ¶ 11). However, the complaint states that

> FN1. Although many of the allegations in the complaint concern Parke-Davis, this Court will refer to both Pfizer and Parke-Davis as defendant for purposes of convenience.

**\*2** a scientifically valid study conducted at the Harvard Bipolar Research Program found that patients *did worse on Neurontin than those who were on a sugar pill.* [Defendant] sponsored this 1998 study, was aware of the results, but did not publish the results until two years later. By that time, Neurontin accounted for $1.3 billion in sales, with over 80% of its use coming from non-approved uses, such as treatment for bipolar disorder (*id.* [emphasis in original] ).

Specifically as to plaintiff, the complaint alleges that "[s]he was prescribed and purchased Neurontin for the treatment of severe neck pain, an off-label use for which Neurontin is not approved" (*id.* at ¶ 13). The complaint fails to allege a time period in which plaintiff was prescribed and purchased Neurontin.[FN2] Otherwise, the complaint generally alleges that potentially thousand of New York residents took Nerontin for varying off-label uses during an unspecified time duration which, following discovery, will be further defined. (*see id.* at ¶ 17). The complaint alleges that defendant (1) violated General Business Law § 349, (2) committed common law fraud, and (3) was unjustly enriched by its actions (*see id.* at ¶¶ 27-45).

> FN2. A copy of plaintiff's affidavit from

her class certification motion presented by defendant in support of this motion states that plaintiff was prescribed Neurontin in 2003.

As to the first cause of action, the complaint alleges that defendant "engaged in deceptive acts and practices in violation of General Business Law § 349" and that, "[a]s a result of [d]efendant's deceptive acts and practices, [p]laintiff and Class Members suffered damages in an amount to be determined at trial" (*id.* at ¶¶ 28-29). Further, the complaint alleges that "[a]s a further result of [d]efendant's deceptive acts and practices, defendant is liable to [p]laintiff and Class Members for their costs of suit, including attorneys' fees and experts' fees" (*id.* at 30).

Defendant contends that the cause of action premised on General Business Law § 349 should be dismissed because plaintiff fails to establish that she suffered an actual injury. Similarly, defendant argues that plaintiff fails to allege that defendant's action caused in any cognizable injury. For instance, defendant asserts that the complaint lacks any factual connection between plaintiff's prescription for Neurontin and the deception alleged in the complaint. Thus, defendant contends that "plaintiff is unable to point to any causal relationship between her generalized allegations and the actions of her own doctor" (Memorandum of Law in Support of Defendant's Motion to Dismiss Plaintiff's Class Action Complaint, at 8).

In pertinent part, "General Business Law § 349 is a consumer protection statute designed to protect against deceptive acts or practices in the conduct of any business, trade, or commerce or in the furnishing of any service in this State' " ( *Blue Cross and Blue Shield of New Jersey v Philip Morris USA Inc.,* 3 NY3d 200, 205 [2004] [quoting General Business Law § 349(a) ] ). In 1980, the Legislature amended the statute to provide for a private right of action (*see id.*). That "amendment was intended to afford additional protection for consumers, allowing them to bring suit on their own behalf without

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 3

12 Misc.3d 1169(A), 820 N.Y.S.2d 841, 2006 WL 1623052 (N.Y.Sup.), 2006 N.Y. Slip Op. 51115(U)
**(Table, Text in WESTLAW), Unreported Disposition**
**(Cite as: 12 Misc.3d 1169(A), 2006 WL 1623052 (N.Y.Sup.))**

relying on the attorney general for enforcement" ( *id.*). Specifically, the relevant portion of section 349(h) provides that

**\*3** any person who has been injured by reason of any violation of this section may bring an action in his own name to enjoin such unlawful act or practice, an action to recover his actual damages or fifty dollars, whichever is greater, or both such actions. The court may, in its discretion, increase the award of damages to an amount not to exceed three times the actual damages up to one thousand dollars, if the court finds the defendant willfully or knowingly violated this section. The court may award reasonable attorney's fees to a prevailing plaintiff.

To plead a cause of action pursuant to this provision, a plaintiff must allege that (1) "the challenged act or practice was consumer-oriented," (2) "it was misleading in a material way," and (3) "the plaintiff suffered injury as a result of the deceptive act" ( *Stutman v. Chemical Bank,* 95 N.Y.2d 24, 29 [2000]; *see Blue Cross and Blue Shield of New Jersey,* 3 NY3d at 205-206; *Small v. Lorillard Tobacco Co.,* 94 N.Y.2d 43, 55 [1999] ). With regard to an alleged deceptive practice, that "practice must be likely to mislead a reasonable consumer acting reasonably under the circumstances' " ( *Stutman,* 95 N.Y.2d at 29 [quoting *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank,* 85 N.Y.2d 20, 26 (1995) ] ). Additionally, "a plaintiff must prove actual' injury to recover under the statute, though not necessarily pecuniary harm" ( *id.; see Small,* 94 A.D.2d at 56 [noting that "proof that a material deceptive act or practice *caused actual, although not necessarily pecuniary harm,'* is required to impose compensatory damages" (emphasis in original) ] ).

Plaintiff argues that she has alleged a cognizable injury namely, that she paid money for Neurontin, which, in her brief in opposition to defendant's motion to dismiss, she alleges to be an ineffective treatment for neck pain that was prescribed to her as an off-label use.[FN3] Here, this

Court disagrees. Simply, plaintiff's complaint fails to state a cause of action premised on General Business Law § 349. First, this Court notes that a physician's discretionary use of an approved drug for off-label use is not restricted by the FDA, "is widespread in the medical community[,] and often is essential to giving patient's optimal medical care" (Beck and Azari, " FDA, Off-Label Use, and Informed Consent: Debunking Myths and Misconceptions," 53 Food Drug L.J. 71, 72 [1998]; *see* O'Reilly and Dalal, "Off-Label Or Out of Bounds? Prescriber and Marketer Liability for Unapproved Uses of FDA-Approved Drugs," 12 Ann Health L. 295, 296 [2003] ). Thus, here, for plaintiff to state a cause of action under General Business Law § 349, plaintiff needs to allege more than being prescribed a medication for off-label use and paying for such medication since prescribing FDA-approved medications for off-label uses appears to be a common practice in the medical community.

> FN3. In a footnote in her Memorandum of Law in Opposition to Defendant's Motion to Dismiss, plaintiff suggests that any inadequacy in her pleadings could be remedied by this Court allowing further discovery and by granting leave for the amendment of her pleadings. However, plaintiff neither relies on CPLR 3211(d) in opposing this motion nor cross-moves for leave to amend her pleadings.

In response, plaintiff asserts that her allegations with respect to section 349 are adequate "as she has alleged [d]efendant's deceptive conduct distorted and resulted in unwarranted prescriptions for Neurontin for off-label uses and particularly injured her because she was prescribed and paid for Neurontin as a result of the [d]efendant's conduct" (Plaintiff's Memorandum of Law in Opposition to Defendant's Motion to Dismiss, at 12). However, as defendant notes, in her complaint, plaintiff has failed to connect the allegations regarding defendant's deceptive conduct to any actions taken with regard to plaintiff. For instance, plaintiff alleges

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 4

12 Misc.3d 1169(A), 820 N.Y.S.2d 841, 2006 WL 1623052 (N.Y.Sup.), 2006 N.Y. Slip Op. 51115(U)
**(Table, Text in WESTLAW), Unreported Disposition**
**(Cite as: 12 Misc.3d 1169(A), 2006 WL 1623052 (N.Y.Sup.))**

that defendant knew of negative study results with regard to the effectiveness of Neurontin in treating bipolar disorder but failed to release that study for two years. Even if true, plaintiff fails to relate these allegations to the Neurontin prescription she received for neck pain a prescription that was given to her after defendant released those study results. In other words, there are simply no allegations relating defendant's alleged deceptive practice of encouraging physicians to prescribe Neurontin for off-label use to plaintiff's physician prescribing Neurontin for plaintiff. For that matter, plaintiff fails to even allege in her complaint that the Neurontin prescribed to her for neck pain was ineffective.

**\*4** As the Court in *Solomon v. Bell Atlantic Corp.* held:

A deceptive act or practice is not the mere invention of a scheme or marketing strategy but the actual misrepresentation or omission to a consumer,' by which the consumer is caused actual, although not necessarily pecuniary harm.' Thus to prevail in a cause of action under [General Business Law § 349], the plaintiff must [allege] that the defendant made representations or omissions that were likely to mislead a reasonable consumer in the plaintiff's circumstances, that the plaintiff was deceived by those misrepresentations or omissions and that as result the plaintiff suffered injury ( 9 AD3d 49, 55 [1st Dept 2004] [quoting *Oswego Laborer's Local 214 Pension Fund v. Marine Midland Bank,* 85 Ny2d 20, 25 (1995), *supra]* ).

In this instance, plaintiff has failed to include in her complaint any allegations regarding how the defendant's alleged deceptive acts or practices mislead her or her physician, resulting in actual harm to plaintiff (*see id.; Small,* 94 N.Y.2d at 55-59). Stated another way, nothing within the four corners of the complaint alleges that the deceptive conduct in which defendant supposedly engaged concerned the off-label use of Neurontin for neck pain, such conduct caused plaintiff's physician to prescribe

Neurontin for her, and such conduct resulted in actual injury to plaintiff.

In that regard, the situation here appears similar to that in *Small v. Lorillard Tobacco Company, Inc.,* 94 N.Y.2d 43, 55 [1999], *supra.* There, consumer plaintiffs in a proposed class action alleged that defendant cigarette manufacturers deceived them about the addictive properties of cigarettes. In addressing plaintiffs' General Business Law § 349 cause of action, the Court of Appeals noted that "[p]laintiffs' definition of injury [was] legally flawed" (94 N.Y.2d at 56). The Court explained that, in confining the relief plaintiffs "sought solely to monetary recoupment of the purchase price of cigarettes," they are arguing that the deception is both the act and the injury (*id.*). Thus, the Court concluded that the plaintiffs were unable to demonstrate any connection between the alleged misrepresentation and any harm from it (*see id .*). Similarly here, plaintiff's complaint fails to allege any connection between defendant's alleged deceptive acts and any harm to plaintiff from that alleged deception. Accordingly, this Court dismisses the first cause of action in plaintiff's complaint that is premised on General Business Law § 349 (*see id.; Gale v. International Business Machines, Inc.,* 9 AD3d 446, 447 [2d Dept 2004] ).

In the second cause of action, plaintiff asserts a claim premised on common law fraud. "To make out a prima facie case of fraud, the complaint must contain allegations of a representation of material fact, falsity, scienter, reliance and injury" ( *Small,* 94 N.Y.2d at 57 [citing *Vermeer Owners v. Guterman,* 78 N.Y.2d 1114, 1116]; *see Gaidon v. Guardian Life Ins. Co.,* 94 N.Y.2d 330, 348-349 [1999] ). Further, the "circumstances constituting the fraud must be stated in detail" ( *Small,* 94 N.Y.2d at 57; *see* CPLR 3016[b] [providing: "Where a cause of action or defense is based upon misrepresentation, fraud, mistake, willful default, breach of trust or undue influence, the circumstances constituting the wrong shall be stated in detail."]; *Dowdell v. Greene County,* 14 AD3d 750, 751 [3d Dept 2005]

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 5

12 Misc.3d 1169(A), 820 N.Y.S.2d 841, 2006 WL 1623052 (N.Y.Sup.), 2006 N.Y. Slip Op. 51115(U)
**(Table, Text in WESTLAW), Unreported Disposition**
**(Cite as: 12 Misc.3d 1169(A), 2006 WL 1623052 (N.Y.Sup.))**

).

**\*5** Here, this Court agrees with defendant that the cause of action for common law fraud lacks sufficient detail to withstand its dismissal (*see* CPLR 3016[b]; *Rotterdam Ventures, Inc. v. Ernst & Young, LLP,* 300 A.D.2d 963, 964-965 [3d Dept 2002]; *Mountain Lion Baseball v. Gaiman,* 263 A.D.2d 636, 638 [3d Dept 1999] ). As discussed above, the complaint fails to detail the circumstances surrounding plaintiff's prescription for Neurontin. For instance, the complaint lacks specific allegations regarding whether plaintiff's physician either received or relied upon any information from defendant in prescribing Neutron for plaintiff. Accordingly, this Court dismisses the second cause of action in plaintiff's complaint.

The final cause of action in the complaint is for unjust enrichment. To sustain a cause of action based on unjust enrichment, a plaintiff must allege "(1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit the other party to retain what is sought to be recovered' " ( *Citibank v. Walker,* 12 AD3d 480, 481 [2d Dept 2004 [quoting *Paramount Film Distr. Corp. v. State of New York,* 30 N.Y.2d 415, 421] ). This "remedy is available if one man [or woman] has obtained money from another through the medium of oppression, imposition, extortion, or deceit, or by the commission of a trespass' " ( *Parsa v. State of New York,* 64 N.Y.2d 143, 148 [1984]; *see Mente v. Wenzel,* 178 A.D.2d 705, 706 [3d Dept 1991] [citing *Parsa,* 64 N.Y.2d at 148]; *see also Strong v. Strong,* 277 A.D.2d 533, 534 [3d Dept 2000] ).

Plaintiff's complaint fails to state a cause of action for unjust enrichment. As noted before, the complaint fails to link the alleged deceitful conduct by defendant to the alleged harm suffered by plaintiff. Accordingly, the cause of action for unjust enrichment must fail because no allegations exist in the complaint that defendant obtained money from plaintiff based on defendant's alleged deceit (*see Parsa,* 64 N.Y.2d at 148; *Mente* 178 A.D.2d at

706).

Moreover, based on the Court's decision with regard to defendant's motion to dismiss, this Court dismisses, as academic, plaintiff's pending motion to compel discovery. Similarly, the pending class certification motion must be dismissed as academic since plaintiff must possess a valid cause of action in order to represent the class ( *Rapp v. Dime Sav. Bank of NY,* 64 A.D.2d 964, 965 [2d Dept 1978] ). Here, plaintiff does not have a valid cause of action, and, therefore, cannot represent the class. Accordingly, it is

ORDERED that defendant's motion to dismiss is granted; and it is further

ORDERED that the complaint is dismissed in its entirety; and it is further

ORDERED that the pending motions by plaintiff to compel discovery and for class certification are rendered academic.

This shall constitute both the decision and order of the Court. All papers, including this decision and order, are being returned to defendant. The signing of this decision and order shall not constitute entry or filing under CPLR 2220. Counsel is not relieved from the applicable provisions of that section relating to filing, entry and notice of entry.

**\*6** SO ORDERED!

N.Y.Sup.,2006.
Baron v. Pfizer, Inc.
12 Misc.3d 1169(A), 820 N.Y.S.2d 841, 2006 WL 1623052 (N.Y.Sup.), 2006 N.Y. Slip Op. 51115(U)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

# Attachment 3



11 Misc.3d 1091(A), 819 N.Y.S.2d 848, 2006 WL 1214818 (N.Y.Sup.), Prod.Liab.Rep. (CCH) P 17,466, 2006 N.Y. Slip Op. 50803(U)

**(Table, Text in WESTLAW), Unreported Disposition**
**(Cite as: 11 Misc.3d 1091(A), 2006 WL 1214818 (N.Y.Sup.))**

C

(The decision of the Court is referenced in a table in the New York Supplement.)

Supreme Court, New York County, New York.
Sarah HOOPER et al., Plaintiffs,
v.
HM MANE SOLUTIONS, LLC, Defendant.

No. 103034/05.
March 15, 2006.

MARYLIN G. DIAMOND, J.

*1 Upon the foregoing papers, it is ordered that: This action is brought by eleven plaintiffs who claim that a hair-straightening product, manufactured and sold by the defendant, caused damage to their hair and scalp. The product is called "Easy Straight Hair Straightening System." The plaintiffs allege that the defendant was aware that the Easy Straight product can cause damage to the hair and scalp but failed to warn them or other consumers of this possibility anywhere in its packaging or on its website. The complaint asserts seven causes of action, which include allegations of deceptive business practices, in violation of General Business Law §§ 349, 350, 350-a and 350-e, common law fraud and negligent misrepresentation. It also includes individual claims for the named plaintiffs for breach of warranty, negligence and strict products liability. The plaintiffs seek injunctive relief, attorney's fees and treble damages, pursuant to the GBL and CPLR article 9.

The plaintiffs now move for an order, pursuant to CPLR 902, certifying that this action shall be maintained as a class action. They seek the certification of two separate classes. The first class would consist of all persons who purchased, obtained or used the product after reading the product's packaging or the defendant's website, irrespective of whether their scalp or hair was damaged thereby. The second class would consist of all persons who

suffered personal injury as the result of their use of the product.

CPLR 901(a) authorizes a class action if (1) the class is so numerous that joinder of all members is impracticable, (2) questions of law or fact common to the class predominate over any question affecting only individual members, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, (4) the representative parties will fairly and adequately protect the interests of the class and (5) a class action is superior to other available methods for the fair and efficient adjudication of the controversy. *See Friar v. Vanguard Holding Corp.,* 78 A.D.2d 83, 90-91 (2nd Dept 1980).

As a threshold matter, the court notes that on a motion for class action certification, judicial inquiry into the merits is limited to a determination as to whether on the surface there appears to be a cause of action which is palpably without merit. *See Brandon v. Chefetz,* 106 A.D.2d 162, 168 (1st Dept 1985). Here, the plaintiff has failed to persuade the court that a person who has not been injured by his or her use of the Easy Straight product has any viable cause of action against the defendant merely because the product may have damaged the hair or scalp of other users and the manufacturer or seller failed to disclose this fact or provide a warning. The court therefore declines to certify the first proposed class since its composition is based on the plaintiffs' argument that the mere purchase or use of Easy Straight is actionable even without any injury.

*2 As to the second proposed class, the defendant opposes certification on the ground that this action does not present common questions of fact regarding the claims of the individual class members. The court agrees. In *Rosenfeld v. A.H. Robins Co., Inc.,* 63 A.D.2d 11, 17-18 (2nd Dept 1978), a products liability and breach of warranty case in which the plaintiffs alleged that they were injured as a result of their use of an intrauterine device

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

11 Misc.3d 1091(A), 819 N.Y.S.2d 848, 2006 WL 1214818 (N.Y.Sup.), Prod.Liab.Rep. (CCH) P 17,466, 2006 N.Y. Slip Op. 50803(U)
**(Table, Text in WESTLAW), Unreported Disposition**
**(Cite as: 11 Misc.3d 1091(A), 2006 WL 1214818 (N.Y.Sup.))**

known as the Dalkon Shield, the Second Department denied certification on the ground that the question of causality had to be determined on a case-by-case basis. The court held that even if the Dalkon Shield were found to have been defectively designed, the alleged injuries of some of the proposed class members may nevertheless have resulted from a variety of factors completely unrelated to the use of the shield, reflecting their individual use or physical peculiarities. *Id.* at 17. The court also noted that the proposed class members had suffered different types of injuries.

In reaching its decision, the court in *Rosenfeld* favorably cited a commentator who had concluded that personal injury, as opposed to property damage, product liability cases are not amenable to class action treatment in view of the difficult questions of causation and the extent of injury. *See Rosenfeld v. A.H. Robins Co., Inc.,* 63 A.D.2d at 15-16. Indeed, not one of the many CPLR article 9 class action cases cited by the plaintiff involved the use of a product which allegedly caused physical injury to the members of the class. Nor has the court found any such case.

Here, as with the Dalkon Shield, even if there is some ingredient in Easy Straight which can damage one's hair or scalp, it cannot be inferred that each and every person who suffered any such damage after using the product suffered this damage as a result of the presence of this ingredient. As the defendant points out, scalp or hair damage may reflect, in some instances, predisposing factors, such as an allergic or idiosyncratic response to certain stimuli, as well as the manner in which the product is used. Moreover, as with the Dalkon Shield, it appears that the proposed class members have allegedly suffered different types of injuries, ranging from merely dull hair to broken hair strands, to the loss of hair and to scalp injuries. Under the circumstances, the court is persuaded that the claims raised herein are not amenable to class certification and that plaintiffs' request for the certification of the second proposed class should also be denied.

*See Lieberman v. 293 Mediterranean Market Corp.,* 303 A.D.2d 560 (2nd Dept 2003).

Accordingly, the plaintiffs' motion for class certification is hereby denied in its entirety.

The parties shall appear before the court in Room 412, 60 Centre Street, New York, New York on April 11, 2005 at 10:30 a.m. for a preliminary conference.

N.Y.Sup.,2006.
Hooper v. HM Mane Solutions, LLC
11 Misc.3d 1091(A), 819 N.Y.S.2d 848, 2006 WL 1214818 (N.Y.Sup.), Prod.Liab.Rep. (CCH) P 17,466, 2006 N.Y. Slip Op. 50803(U)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.