EXHIBIT 2

```
 1     UNITED STATES DISTRICT COURT
       NORTHERN DISTRICT OF NEW YORK
 2     ------------------------------------------:
       HEIDI SEEKAMP, On Behalf Of Herself and All
 3     Others Similarly Situated,

 4                          Plaintiff,     CIVIL ACTION NO.
                                           09-CV-00018-LEK-DRH
 5     -against-

 6     IT'S HUGH, INC.,
       FUCCILLO LINCOLN MERCURY, INC., d/b/a FUCCILLO HYUNDAI,
 7     FUCCILLO CHRYSLER JEEP DODGE OF AMSTERDAM, INC.,
       FUCCILLO FORD, INC.,
 8     FUCCILLO DODGE CHRYSLER JEEP, INC.,
       FUCCILLO IMPORTS, INC.,
 9     FUCCILLO AUTO WORLD, INC.,
       FUCCILLO BUICK PONTIAC GMC, INC.,
10     FUCCILLO CHEVROLET OF NELLISTON, INC.,
       FUCCILLO HYUNDAI OF SYRACUSE, INC.,
11     FUCCILLO HYUNDAI OF GREECE, INC.,
       FUCCILLO FORD OF SENECA FALLS, INC.,
12     FUCCILLO CHEVROLET OLDS PONTIAC BUICK, INC.,
       FUCCILLO CHEVROLET, INC.,
13     FUCCILLO CHRYSLER OF NELLISTON, INC.,
       FUCCILLO ENTERPRISES OF EAST GREENBUSH, INC.,
14     FUCCILLO ENTERPRISES, INC.
       FUCCILLO FORD OF EAST GREENBUSH, INC.,
15     FUCCILLO FORD OF NELLISTON, INC.,
       FUCCILLO PONTIAC BUICK, INC. and
16     UNIVERSAL AUTOMOTIVE SERVICES, INC.,

17                          Defendants.
       ------------------------------------------:
18
             DEPOSITION of Defendant, FUCCILLO, et al., by its
19     agent, JOHN TESTONE, held pursuant to Order at the
       Offices of ROEMER, WALLENS GOLD & MINEAUX, LLP,
20     commencing, on Thursday, April 14, 2011, at 10:00
       a.m., before Deborah M. McByrne, Shorthand Reporter
21     and Notary Public in and for the State of New York.

22

23
```

```
 1      APPEARANCES:

 2

 3          LEMBERG & ASSOCIATES

 4          Attorneys for the Plaintiff

 5              1100 Summer Street

 6              Stamford, Connecticut  06905

 7          BY:  SUSAN SCHNEIDERMAN, ESQ.

 8

 9

10          ROEMER, WALLENS GOLD & MINEAUX, LLP

11          Attorneys for Defendants

12              13 Columbia Circle

13              Albany, New York  12203

14          BY:  MATTHEW J. KELLY, ESQ.

15

16

17

18

19

20

21

22

23
```

1                       S T I P U L A T I O N S

2

3

            IT IS HEREBY STIPULATED, by and between the
4       attorneys hereto, that:

5

            All rights provided by the C.P.L.R, and Part
6       221 of the Uniform Rules for the Conduct of
        Depositions, including the right to object to any
7       question, except as to form, or to move to strike any
        testimony at this examination is reserved; and in
8       addition, the failure to object to any question or to
        move to strike any testimony at this examination shall
9       not be a bar or waiver to make such motion at, and is
        reserved to, the trial of this action.

10

11            This deposition may be sworn to by the
        witness being examined before a Notary Public other
12      than the Notary Public before whom this examination
        was begun, but the failure to do so or to return the
13      original of this deposition to counsel, shall not be
        deemed a waiver of the rights provided by Rule 3116 of
14      the C.P.L.R, and shall be controlled thereby.

15

            The filing of the original of this deposition
16      is waived.

17

            IT IS FURTHER STIPULATED, that a copy of this
18      examination shall be furnished to the attorney for the
        witness being examined without charge.

19

20

21

22

23

```
 1              (Documents are marked as Testone Exhibits 1,
 2         2 and 3 for Identification.)
 3                      JOHN TESTONE,
 4         was called as a witness, and having been first
 5         duly sworn, was examined and testified as
 6         follows:
 7    EXAMINATION BY
 8    MS. SCHNEIDERMAN:
 9    Q. Mr. Testone, good morning.  My name is Susan
10       Schneiderman.  I'm one of the attorneys for Heidi
11       Seekamp, in the case of Seekamp versus Fuccillo, et
12       cetera.  Are you here pursuant to a notice to take the
13       deposition of a representative of It's Huge, Inc.?
14    A. I am.
15    Q. Okay.  Now, I would like to show you what was marked
16       as Fuccillo -- strike that.
17              First of all, let me ask you, have you ever
18       had your deposition taken before?
19    A. Yes, I have.
20    Q. In what content?
21    A. Oh, I think it was an income tax audit case, a fraud
22       case and that was many years ago, and then once before
23       that.  I'm not sure in what context.
```

1    Q. Did you have any discussions with Mr. Fuccillo about

2        that?

3    A. No.

4    Q. Did Mr. Fuccillo ask you any questions about it at any

5        time?

6    A. No.  When it comes to compliance, that's usually

7        something that's pretty much self-contained by bean

8        counters and people like myself, so, and at corporate.

9        And Mr. Fuccillo works hard, he visits the stores,

10       he's been -- he is not at corporate very often at all.

11   Q. At the time that you were reviewing the correspondence

12       between Mr. Souris and the Insurance Department in

13       assessing whether or not you felt that you were in

14       compliance with the insurance laws, you, meaning the

15       Fuccillo Group, did you make any notes?

16   A. Did I make any notes?  I don't believe so.

17   Q. Did you prepare any written memoranda?

18   A. Yes.

19   Q. What kind of written memoranda did you prepare?

20   A. Yes, I prepared -- it was sometime pursuant to these

21       August faxes and so on.  I prepared a memorandum,

22       which I believe was distributed to Billy Fuccillo and

23       Scott Fox, and I outlined the difference between the

```
 1        discount program and a group insurance program,

 2        explained in detail the differences, and concluded

 3        that the product we were selling was a discount

 4        program, not an insurance program.  I can't remember

 5        whether that memo contained -- if I repeated what New

 6        York State said about making sure there was a profit,

 7        but I just wanted to communicate to Billy and to Scott

 8        the results of my discussions with Mr. Souris, and

 9        obtaining some documentation and so on.  That was the

10        gist of that memo.

11   Q. Was that memo on paper or on e-mail or both?

12   A. Both.  It was a Word document, yes, and paper.

13   Q. Do you have a copy of that document?

14   A. Not with me.

15   Q. Okay.

16   A. I have one --

17   Q. Do you have one in your office?

18   A. I do.

19   Q. Okay.  In the context of this lawsuit, were you asked

20        to produce documents relating to Etch ATSD?  Were you

21        asked to search your records for documents pertaining

22        to the Etch ATSD program that was sold by the Fuccillo

23        dealerships?
```

1    A. Was I asked?  I know we were.  I am not sure if I was

2       specifically.  And I believe that document still

3       exists, although I did get a new computer about two

4       years ago, but I think we saved everything that was on

5       the hard drive.

6    (REQUEST)        MS. SCHNEIDERMAN:  I would call for

7       production of the memoranda what was prepared by

8       Mr. Testone in connection with his assessment of the

9       Etch ATSD product vis-à-vis the New York Insurance

10      Department.

11              MR. KELLY:  Yeah, we'll make a search for it.

12      I was just looking through the initial disclosure.

13              MS. SCHNEIDERMAN:  I don't recall having seen

14      it anywhere.

15              MR. KELLY:  And I'll see if it's here.

16              MS. SCHNEIDERMAN:  And that's not to say I

17      didn't miss it, although I certainly think it would

18      have caught my attention.

19   Q. I would like to direct your attention now to the

20      document that was marked -- strike that a second.

21              Have there been any claims related to the

22      Etch ATSD product claims, meaning customers seeking to

23      obtain the benefits of their Etch ATSD product; have

```
 1        there been such claims on account of the Etch ATSD
 2        product that Fuccillo was selling?
 3   A. Yes.
 4   Q. How many claims that you know of?
 5   A. One.
 6   Q. Might there have been claims that you don't know of?
 7   A. Yes, ma'am.
 8   Q. And where would one go to find that out?
 9   A. You would have to get that from the individual stores.
10   Q. And have you, at any time, undertaken to request from
11        the individual stores, any records that they have
12        concerning claims made under the Etch ATSD policies
13        that they sold?
14   A. No.
15   Q. Do you know if anybody within the Fuccillo Group
16        undertook that inquiry?
17   A. I do not.
18   Q. And who at the Fuccillo Group would be the appropriate
19        person to go to in connection with such an inquiry?
20   A. I'm not certain there would be any one person at -- we
21        call corporate -- at headquarters, the Fuccillo
22        Automotive Group headquarters.  Most of the stores are
23        autonomous.  That information certainly would be
```

```
 1      available at any one of the stores.  I would be
 2      speculating, but there's nobody at corporate that has
 3      that responsibility, that I am aware of, including
 4      myself.
 5   Q. And could you describe what Scott Fox's position is?
 6   A. Scott is a corporate general manager.  Primarily, he
 7      has not all, but several stores who, basically, the
 8      general managers they report to him.  He is a car
 9      person, he's not --
10   Q. A car, C-A-R?
11   A. He's an automotive person.  He's been in the business
12      for years and the day-to-day operations of an
13      automotive dealership is his experience.  And not all
14      the stores, but somewhat geographic, but many of the
15      stores, basically, the general manager, who was the
16      top ranking person at a store, would report to him.
17   Q. Did you have any discussions with Mr. Fox concerning
18      whether or not there were any customer claims with
19      respect to the ATSD policies?
20   A. Never.
21   Q. I would like to put in front of you what was
22      previously marked as Testone Exhibit 2.
23              MS. SCHNEIDERMAN:  Is it possible to get some
```

```
1          additional copies of this so we could all look at it
2          or do you have one?
3                    MR. KELLY:  Yeah, I got it right here.
4                    MS. SCHNEIDERMAN:  Great.
5                    MR. KELLY:  Did you mark that yet?
6                    MS. SCHNEIDERMAN:  Yes, this was premarked
7          when I started.  This is Testone 2.
8                    MR. KELLY:  And here's a copy for you.
9                    MS. SCHNEIDERMAN:  Thank you.
10    Q. Do you recognize that document?
11    A. Yes, I do.
12    Q. What do you recognize that document to be?
13    A. It was an e-mail, copy of an e-mail from Michelle
14         Kuwik to myself, dated January 29, 2009, where she
15         says, "Hi, John.  We received the Etch check on
16         October 25, 2007.  It was receipted under Universal
17         Automotive for customer Christopher Fields.  Let me
18         know if you need further info."
19    Q. Did you ask her for any further info?
20    A. No, I did not.
21    Q. Okay.  What was the circumstances that precipitated
22         Michelle having sent you this e-mail?
23    A. I received a call sometime before January 29 from, I
```

1       don't recall if it was Michelle, but it was somebody,

2       one of our employee.  It could have been the general

3       manager, but from this store.  This store is, it's the

4       Fuccillo Chevrolet, Inc., is the corporate name.  It's

5       a Chevrolet store in Grand Island, New York, and they

6       called me because they weren't certain of whether they

7       had the right phone number to, basically, contact

8       Universal.  They were having an issue with that and I

9       just -- all I had was, probably from my correspondence

10      from a letterhead on things that were received from

11      Universal, but I did have a phone number, gave that to

12      the person at that store who had called me, the phone

13      number, and I said let me know if you need anything

14      else.  And then sometime later I got this, which was,

15      essentially, telling me that the claim had been paid

16      by Universal.

17   Q. Okay.  Do you know why in January 2009 somebody was

18      looking for the telephone number to contact Universal?

19   A. I don't.  I'm assuming they didn't have it.

20   Q. Do you know why they needed to contact Universal?

21   A. I get a lot of phone calls , sometimes thing that are

22      not within the scope of my knowledge or

23      responsibility.  I make myself accessible, so, but

1     other than that, to say that John Testone is the

2     person to contact with Etch questions, that would have

3     been probably a presumption on someone's part.

4     Q. Okay.  Who was Michelle K.?

5     A. Michelle K., Michelle Kuwik --

6          MR. KELLY:  Could you spell Kuwik for us?

7          THE WITNESS:  K-U-W-I-K.

8     A. She is the office manager for Fuccillo Chevrolet,

9     Inc., doing business as Fuccillo Chevrolet of Grand

10    Island.

11    Q. And does she hold that position today?

12    A. Yes, she does.

13    Q. And she held that position in January 29, 2009?

14    A. Yes.

15    Q. Did she hold that position in October 2007, if you

16    know?

17    A. I believe so.

18    Q. Okay.  Was Michelle responding to an inquiry from you

19    when she wrote this e-mail on January 29, 2009?

20    A. To repeat, I think what I said earlier, is that when

21    they were seeking to get, to communicate with

22    Universal, I think that what she was reporting here,

23    subsequently, was that they obviously got through to

1    Q. You may.

2    A. I had telephone numbers from the fax cover sheet from

3        Universal.  I can't remember exactly if that's the

4        number.  I don't know which number, but whatever I

5        gave them, apparently enabled them to get through to

6        Universal.  I would have to -- because my file

7        consisted, pretty much, of what was attached to

8        Testone Exhibit Number 3.

9    Q. And when did you first learn that Heidi Seekamp had

10       sued Fuccillo?  And when I use the term Fuccillo, I'm

11       referring to the group of Fuccillo companies.

12   A. It was shortly after the complaint, because I did see

13       a copy of the original complaint, and I'm not sure

14       exactly what that date is, but it was shortly

15       thereafter.

16   Q. At any time since having become aware of the existence

17       of this lawsuit, did you undertake any effort to

18       determine whether claims had been asserted by

19       customers pursuant to the ATSD policies?

20   A. No.

21   Q. And do you know -- I may have asked this already.  Do

22       you know if anybody within the Fuccillo Group was

23       charged with that responsibility of finding out?

```
 1     A. You did ask that before, I believe, and to -- no, I
 2        don't know of anyone else that was charged with that
 3        task of, at corporate or anywhere.
 4     Q. Were you ever asked if it was correct that no such
 5        claims were ever made?
 6     A. Was I ever asked that?  No, I was never asked that.
 7     Q. I am going to show you what was previously marked as
 8        Lewis Exhibit 3, and I just want to ask you if this is
 9        a document that you ever saw?  You could take a look
10        at it.
11     A. I believe, yes, I have seen this document at least
12        once before.
13     Q. Okay.  Did you participate, at all, in the framing of
14        any response to the allegations in that document?
15     A. No, other than my deposition, which was, we looked at
16        earlier, I did not.
17     Q. You mean, you are referring to your affidavit?
18     A. I mean my affidavit, yes.
19     Q. Okay.  Do you know if there was any contract between
20        Fuccillo, any Fuccillo entity and Universal concerning
21        the sale of the Etch ATSD products?
22     A. No.
23     Q. No, you don't know or no there was none?
```

1      the dealership go about insuring that there was always

2      a profit on the vehicle, on the new vehicle?

3              MR. KELLY:  You mean how about a different

4      profit or even a dime, even ten cents of a profit?

5              MS. SCHNEIDERMAN:  Any profit on the

6      replacement vehicle after applying the $2,000

7      discount.

8              MR. KELLY:  Do you mean how would an

9      individual dealership make sure they made ten cents?

10             MS. SCHNEIDERMAN:  Yes.

11             MR. KELLY:  Oh, well, they just cut their

12     margin.

13             MS. SCHNEIDERMAN:  Well, why don't we let the

14     witness answer the question.

15             MR. KELLY:  Well, I think your question is

16     confusing.

17  Q. Do you understand the question, Mr. Testone?

18  A. If you could repeat it, please.

19  Q. If a customer was to come into any of the Fuccillo

20     dealerships that sold Etch, stating I've complied with

21     the requirements under the policy, my car was stolen,

22     I would like to purchase a new vehicle with my $2,000

23     discount --

1    A. Right?

2    Q. Okay?  How is it assured that the dealership would

3       make a profit on the replacement transaction?

4            MR. KELLY:  Let me just note my objection to

5       the question, because I think it's a 10 percent

6       discount, up to $2,000.

7            MS. SCHNEIDERMAN:  Ah, I'm sorry.  I think

8       you're correct.

9            MR. KELLY:  Yeah, that's on the Exhibit

10      Testone 4 on paragraph 2 on the next page, Auto Theft

11      Security Discount.

12           MS. SCHNEIDERMAN:  I stand corrected.

13           MR. KELLY:  Yeah.

14   Q. With the amendment that your attorney placed in the

15      question --

16   A. Yes.

17   Q. -- that the discount was 10 percent or $2,000,

18      whichever is less.  Okay?  How would the dealership

19      assure that they were profiting from the transaction?

20   A. I would say there was nothing in place in way of a

21      mandate that said whenever you sell an Etch contract,

22      if a customer comes back and receives either their

23      $2,000 discount towards the purchase of a replacement

```
 1        vehicle or 10 percent, there was probably nothing like
 2        that, except that just I guess my response is based on
 3        common sense.  We are starting out with, let's assume,
 4        just for discussion, that that was $2,000, the maximum
 5        discount.
 6    Q.  Okay.  Which would mean it was a $20,000 or greater
 7        purchase price?
 8    A.  Exactly.
 9    Q.  Okay.
10    A.  So we have a car purchase -- the selling price is
11        $20,000, and the customer is entitled to a $2,000
12        discount.  So we'd have to have -- let me just do the
13        math for a moment.  I mean, there's a margin of profit
14        between our cost for that vehicle and what we're
15        selling it for.  We started out with a $2,000 -- that
16        $2,000 is coming from Universal Automotive Services.
17        So I guess we would have to sell it for $2,000.10 over
18        our -- under our cost, if you will -- over our cost,
19        if you will, but we're not making a profit, and even
20        then we wouldn't.  We are getting $2,000 applied to
21        the deal from Universal Automotive Services.  It's the
22        customer's credit.  So there's a built in discount.  I
23        guess maybe that's why it's an -- the customer is
```

1        getting the discount, but it's being applied to the

2        deal.  From a practical standpoint, it would seem to

3        me that it would be virtually impossible not to make a

4        profit.

5    Q. So in assessing whether or not the transaction was

6        profitable, do you view the $2,000 in the example that

7        you gave me as a wash?

8    A. A wash?

9    Q. A wash, meaning you gave the customer a discount, but

10       it's reimbursed, and in calculating your profit, do

11       you calculate --

12   A. It's not a wash.  I'm sorry to interrupt you, ma'am.

13       It's not a wash.

14   Q. Okay.  That's what I am trying to find out.

15   A. It's like a manufacture's incentive.  I mean in this

16       respect, that the manufacturer -- if the customer

17       assigns the incentive to which they are entitled --

18   Q. Right?

19   A. We are getting $2,000 in this case from the assignment

20       of an incentive.

21   Q. Okay.

22   A. So it's not a wash.  It's part of the selling price

23       that we are getting paid for.

```
1    Q. Okay.  So in computing whether there is a profit or
2       loss on the transaction, how is the $2,000 factored
3       into that computation?  Where would I find that?
4    A. Well, we maintained records on what our cost, our true
5       cost --
6    Q. Right.
7    A. -- of the vehicle is.  And we also maintain records as
8       to the selling price.  And if we are getting a $2,000
9       discount, that is not a wash, but is applied to the
10      transaction, it seems to me that even if we sold it at
11      cost, okay, we're still getting that $2,000 from
12      the -- it's a built-in profit.
13   Q. Okay.  So, let me see if I understand it now, because
14      math and accounting is not my thing.  Okay?  So you
15      have a $20,000 vehicle?
16   A. Okay.
17   Q. Okay?  And is there a typical dealer markup?
18   A. It varies.  It varies.  I think that -- I mean, it
19      varies not only from dealership to dealership,
20      manufacturer or the type of car we're selling, but I
21      think if you used $2,000 as a spread between cost and
22      selling price, that probably would be fair for
23      discussion.
```

```
 1    Q. Okay.  So if you look at, let's say for example if you
 2       were to look at the sticker price, the manufacture's
 3       suggested selling price on the sticker, on the
 4       vehicle, let's say it was $20,000, okay, would it be
 5       reasonable then to assume that the dealership
 6       purchased the vehicle for $18,000 from the
 7       manufacturer or something less than that?
 8    A. No, I think that would be reasonable.  Again, it's
 9       going to vary from manufacturer to manufacturer.
10    Q. Understood.  This is more of a hypothetical, trying to
11       figure out the way that this is computed.
12    A. Okay.
13    Q. Okay?  So you got a $2,000 profit built into that, if
14       you sell the car at the sticker price?
15    A. Okay.
16    Q. Okay?  Is that correct so far?
17    A. Yes.
18    Q. Based on the parameters that we set out here?
19    A. Yes.
20    Q. Now, the customer comes in with their Etch ATSD
21       certificate and says, I've complied with the
22       requirements of the program, I'm entitled to a
23       discount.  I want to buy this $20,000 vehicle.  Right?
```

```
 1          Okay.  So, now the customer is entitled to a $2,000
 2          discount.  Okay?  So now you've sold her the $20,000
 3          vehicle, you've discounted it by $2,000, so she has to
 4          pay $18,000; correct?
 5     A. We're applying a credit, yes.  So the customer --
 6     Q. You're applying a credit.  You're asking the customer
 7          to pay $18,000?
 8     A. Right.  We haven't discounted anything.  We're selling
 9          it for 20, but the customer is going to be responsible
10          for paying the balance of 18.
11     Q. Okay.  So, and you purchased the vehicle from the
12          manufacturer for 18?
13     A. Right.
14     Q. So in that circumstance, have you still made a profit?
15     A. $2,000.
16     Q. You still made a $2,000 profit.  And if the customer
17          negotiated a lower price, saying, look, I want to
18          negotiate a price of $19,000 on the vehicle.  Okay?
19          So she negotiates, or she or he negotiates a $19,000
20          price on the vehicle, the 10 percent now is $1,900,
21          and that's the discount that's applied?
22     A. Yes, yes.
23     Q. Okay.  And --
```

```
1    A. In that case we are making $1,000 profit.

2    Q. In that case you are making $1,000 profit?

3              MR. KELLY:  No, 1,900.

4    A. Oh, 1,900, I'm sorry.

5    Q. 19,000 minus 1,900.

6    A. No, it's $1,000 off, so.

7    Q. So that would be, the customer would now be

8       responsible for $17,100?

9    A. Compare that to the $19,000; right?

10   Q. Correct.  So now you've made a $1,000 profit?

11   A. That's what I said, yes.

12   Q. Okay.

13             MR. KELLY:  Actually, you made a $1,900

14      profit, haven't you?

15             MS. SCHNEIDERMAN:  You made -- yes.  No.

16             MR. KELLY:  $1,900.

17   A. No, because we're --

18   Q. No, you purchased the car -- actually, you've made a

19      $900 profit.  No.

20   A. No, 19 -- the profit would be $1,000.  Regardless, for

21      starters, where it's coming from, if we discounted the

22      price to the customer - because nobody pays sticker -

23      and said, yes, we'll sell you the car for $19,000,
```

```
 1        we're getting $19,000.  But, in that case, 1,900 of it
 2        is coming from the customer, and the 17,100 would be
 3        coming -- should be 17 one is --
 4   Q. 1,900 is coming from?
 5   A. Universal.  And 17,100 is coming from the customer.
 6        So it's still $1,000 profit.
 7   Q. Got it.  I got it.
 8   A. Okay.
 9   Q. Now, you indicated when we began the deposition today,
10        that you're not qualified or completely qualified to
11        talk about instructions, training and procedures with
12        respect to the sale of the Etch ATSD or similar
13        products as part of the sale of vehicles by Fuccillo
14        dealerships.  Do you recall telling me that?
15   A. Yes, I do.
16   Q. Okay.  First of all, who would be the person at
17        Fuccillo who would be most, who would be best able to
18        discuss the instructions, training and procedures for
19        Etch ATSD products?
20   A. Dealership management personnel.
21   Q. And for that, we would have to go to each individual
22        dealership?
23   A. Yes.  Specifically general manager, general sales
```

115

```
 1              (Discussion is held off the record.)

 2              (Memo is marked as Testone Exhibit 7 for

 3         Identification.)

 4      (BY MS. SCHNEIDERMAN)

 5      Q. Back on the record.  Mr. Testone, my understanding is

 6         that during the break you were able to obtain from

 7         your office a copy of the memo that you distributed to

 8         Mr. Fuccillo, Scott Fox and Shawn Rowlands that you

 9         had described earlier in your testimony; is that

10         correct?

11      A. Yes.

12      Q. Do you have before you the document that's been marked

13         as Testone 7 for identification?

14      A. Yes.

15      Q. Is that the memo that you were able to obtain from

16         your office?

17      A. Yes.

18      Q. Is that, in fact, the memo that you described in your

19         earlier testimony that you had prepared?

20      A. Yes.

21      Q. Okay.  And the memo is dated August 16, 2005.  Is that

22         the date on which you prepared it?

23      A. Yes, it is.
```

```
 1    Q. Okay.  And the memo is directed to Mr. -- to Billy

 2       Fuccillo, with copies to Scott Fox and Shawn Rowlands.

 3       Do you see that?

 4    A. Yes.

 5    Q. Had Mr. Fuccillo requested anything in particular that

 6       prompted you to make this, to prepare this memo?

 7    A. No.

 8    Q. Why did you prepare the memo?

 9    A. Basically, to convey to some of our top -- the owner

10       and top people at corporate headquarters, the results

11       of my review of our arrangement with Universal

12       Automotive Services.  They had a need to know.

13    Q. Who had a need to know?

14    A. The recipients of the memoranda.

15    Q. By the recipients, Mr. Fuccillo?

16    A. Right.

17    Q. Mr. Fox?

18    A. Yes.

19    Q. And Ms. Rowlands?

20    A. Yes.

21    Q. What was the basis of their need to know?

22    A. Billy, as the owner, should know everything.  Scott

23       Fox's title is corporate general manager, and I think
```

```
 1    A. No.

 2    Q. Did Mr. Fuccillo ask to see them?

 3    A. No.

 4    Q. Did Shawn Rowlands ask to see them?

 5    A. No.

 6    Q. Did Mr. Fox ask to see them?

 7    A. No.

 8    Q. Did Mr. Lewis ask to see them?

 9    A. No.

10    Q. I would like you to turn to the June 22, 1991

11       correspondence from the State Insurance Department.

12    A. Yes.

13    Q. Okay.  You have that in front of you?

14    A. I do.

15    Q. Okay.  Taking a look, turning to page 2 of the letter.

16    A. Okay.

17    Q. Looking at the second to last paragraph, where it

18       says, "It must also be noted that there is no kind of

19       insurance that may be sold in New York that would

20       indemnify the dealer for the amount of the discounts."

21       Do you see that?

22    A. Yes.

23    Q. Did you see that at the time that you read the letter?
```

```
 1     A. I am sure I did.
 2     Q. Okay.  Did you come to any conclusions concerning
 3        product which were selling based upon that statement?
 4     A. It's a while back, but maybe having read that, that
 5        would only again reconfirm some of my issues that I
 6        raised here, particularly one of the stones that was
 7        thrown by Mr. Crossley at Mr. Souris, was that there
 8        was no insurance backing.  So that if, in fact, there
 9        is no kind of insurance that could be sold in New York
10        that would indemnify the dealer and, in fact, if
11        Universal -- if Crossley was right in his stone that
12        he threw about the financial backing, my concern would
13        be to make sure that we weren't in a position where
14        there would be a claim and it would be nobody to make
15        the claim, to make us whole, that we had given the
16        discount.  And that was really my objective from the
17        beginning, was to look out for the, for my employer.
18     Q. Okay.  And what steps did you do to determine whether
19        or not, in fact, there was sufficient financial
20        backing to protect your employer?
21     A. Nothing, nothing, I did nothing personally.
22     Q. Do you know whether anybody else did?
23     A. No, I don't.  I don't know if anybody else did.
```

125

```
 1    Q. Okay.  So when you read the statement in the letter
 2       from the Insurance Department to Mr. Souris that said
 3       it must also be noted there is no kind of insurance
 4       that may be sold in New York that would indemnify the
 5       dealer for the amount of the discount, what did you
 6       take that to mean?  Did you have an understanding of
 7       what that sentence meant?
 8    A. Yeah, I think I did and I think I do.
 9    Q. Okay.  And what was that understanding?
10    A. I guess the risk involved here is that if the dealer
11       was not reimbursed for a discount given to a qualified
12       customer who had purchased an Etch contract, that we
13       would have exposure that we had given a discount for
14       which we were not reimbursed.
15            MS. SCHNEIDERMAN:  Could you read that answer
16       back, please?
17            (The previous answer is read back.)
18    Q. Okay.  And what is your understanding of how that
19       connects up to the ATSD products that were being sold
20       by Fuccillo?
21            MR. KELLY:  How it connects up?
22            MS. SCHNEIDERMAN:  Yes, how it connects up.
23       That was my technical term.
```

```
 1        little more specificity the substance of the
 2        discussions that you had, please?
 3   A.   I don't recall.  All I know is that the gist of it is
 4        that Mr. Crossley wanted us to do business with him,
 5        and Mr. Souris wanted us -- wanted to retain our
 6        business.  And each of them, their motivation, that
 7        being their motivation, was, as stated in here, were
 8        throwing stones at the other.
 9             MS. SCHNEIDERMAN:  I have nothing further.
10             (Whereupon the above-entitled matter was
11        concluded at 2:51 p.m.)
12
13
14
15
16
17
18
19
20
21
22
23
```

1                          <u>ERRATA</u>

2

3          I_____, have read the

4     transcript of my testimony and would like the following

5     changes, and the reason for such changes, for example,

6     "to correct stenographic error" or "to clarify the

7     record" or "to conform with the facts."

8

9     PAGE/LINE              CORRECTION              REASON

10    _____

11    _____

12    _____

13    _____

14    _____

15    _____

16    _____

17    _____

18    _____

19    _____

20    _____

21    _____

22    _____

23    _____

```
 1     STATE OF NEW YORK    )

 2                   SS.:

 3     COUNTY OF            )

 4

 5

 6            I, JOHN TESTONE, HAVE READ the foregoing

 7      record of my testimony taken at the time and place

 8      noted hereof, and I do hereby acknowledge it to be a

 9      true and correct transcript of the same.

10

11            _____

12

13

14     Sworn to before me this ____ day of _____

15     _____ County.

16

17

18     My commission expires

19     Notary Public, State of New York

20     Resident in _____ County.

21     _____

22                  Notary Public

23
```

```
 1                      I N D E X   P A G E

 2
      WITNESS:
 3                 JOHN TESTONE

 4
      EXAMINATION BY MS. SCHNEIDERMAN                    4
 5

 6
      EXHIBITS
 7    TESTONE          DESCRIPTION                      PAGE

 8    1      List of items Mr. Testone was to have       4
             knowledge to testify about
 9
      2      Copy of an e-mail from Michelle Kuwik to     4
10           Mr. Testone, dated 1/29/09

11    3      Affidavit of John Testone                    4

12    4      ATSD agreement executed between Ms. Seekamp 14
             and Fuccillo Lincoln Mercury
13
      5      Defendant's responses to Plaintiff's first 99
14           set of interrogatories

15    6      Four-page document Bates numbered 1048,    106
             1049, 1050 and 1051.
16
      7      Memo to Billy Fuccillo from John Testone   115
17

18    REQUESTS
      PAGE/LINE          DESCRIPTION
19
      35/6               Production of the memoranda prepared by
20                       Mr. Testone in connection with his
                         assessment of the Etch ATSD product
21                       vis-à-vis the New York Insurance
                         Department
22
      54/17              Production of the entire folder labeled
23                       Etch and all of its contents that is
                         maintained by Mr. Testone.
```

M-F Reporting, Inc.

(518) 478-7220